**C**



At an IAS Part of the Supreme Court
of the State of New York, held for the
County of Ulster at the Courthouse
thereof located at 285 Wall Street, Kingston,
New York 12401, on the 17th day of
October, 2012.

HON. CHRISTOPHER E. CAHILL, JSC

------------------------------------------------------------------------x

TNHYIF, INC.,

                                             Plaintiff,

        -against-                            **ORDER TO SHOW CAUSE**

VINEYARD COMMONS HOLDINGS, LLC, WORKERS'       Index No. 12-3216
COMPENSATION BOARD OF THE STATE OF NEW
YORK, NEW YORK STATE DEPARTMENT OF LABOR,
VINEYARD COMMONS CLUBHOUSE, INC., and "JOHN
DOE NO. 1" through "JANE DOE NO. 12", the last twelve
names being fictitious and unknown to Plaintiff, the persons
or parties intended being tenants, occupants, persons or
corporations, if any, having or claiming an interest in or lien
upon the Premises, described in the Complaint,

                                             Defendants.

------------------------------------------------------------------------x

        **UPON** the annexed October 16, 2012 Affirmation of Joshua E. Kimerling, Esq., a

member of Cuddy & Feder LLP, attorneys for Plaintiff TNHYIF, Inc., and the exhibits annexed

thereto, and upon all prior pleadings and proceedings heretofore had herein, including but not

limited to the Order to Show Cause entered October 5, 2012, and filed by VINEYARD

COMMONS APARTMENTS, INC. and VINEYARD COMMONS CLUBHOUSE, INC. (the

"Moving Defendants"), to which this Order to Show Cause responds and Cross-Moves;

        **LET** Defendants, VINEYARD COMMONS HOLDINGS, LLC (the "Borrower") and the

Moving Defendants (the Moving Defendants and the Borrower are referred to as "Defendants"),

and non-party HIGHLAND ONE, INC. ("Highland"), which non-party alleges certain tenancy

rights to the "Restaurant Area – Building 6" as well as other common areas, of the Vineyard Commons Residential Complex, Highland, New York (the "Mortgaged Premises"), **SHOW CAUSE**, before me, a Justice of the Supreme Court of the State of New York, County of Ulster, at the Ulster County Courthouse, located at 285 Wall Street, Kingston, New York 12401, on ~~October~~ *26*, 2012, **WHY** an Order should not be made and entered herein, as follows:

1. Directing Defendants and Highland to comply with the Order appointing Receiver, entered September 13, 2012, and the Amended Order Appointing Receiver, which Defendants and Highland are refusing to comply with;

2. Directing Defendants to provide a complete accounting to the Receiver of any rental payments received from tenants, occupants and/or subtenants of the Mortgaged Premises since September 1, 2012;

3. Enjoining Defendants, and anyone acting on their behalf, during the duration of the Receivership, from seeking to collect or collecting any rents from any occupant, tenant and/or subtenant of the Mortgaged Premises and from interfering with the Receiver's collection of said rents;

4. Enjoining Defendants and/or Highland, during the duration of the Receivership, from interfering with the Receiver's right to use and control all common areas of the Mortgaged Premises;

5. Enjoining Defendants and/or Highland, during the duration of the Receivership, from interfering with or preventing the Receiver and the residents of the Mortgaged Premises from having full use of and access to the common areas of the Mortgaged Premises,

C&F: 2011996.4

6. Enjoining Highland, during the duration of the Receivership, from using Room/Unit 601 of the Mortgaged Premises and/or the adjacent office thereto and directing Highland to turn over all keys to said spaces to the Receiver; and

7. Granting to Plaintiff such other and further relief as to the Court may seem just, proper and equitable;

**SUFFICIENT CAUSE APPEARING THEREFORE:**

**IT IS HEREBY ORDERED**, that pending a further Order of this Court, Defendants and Highland, or anyone acting on their behalf, are hereby temporarily enjoined and restrained from

1. Interfering with the Receiver's right to collect all rents, profits and income from the Mortgaged Premises, from whatever source, including but not limited to, any and all subtenants, tenants or occupants at the Mortgaged Premises; and

2. Interfering with the Receiver's right to take charge and enter into full and complete possession of the Mortgaged Premises, including but not limited to the Restaurant Area – Building 6, lounge area, outside patio area, gazebo, community bathrooms, lobby, theater, Room/Unit 601 and the adjacent office space thereto, or any other portion of the Mortgaged Premises;

3. (i) Posting any notices at the Mortgaged Premises or delivering any notices to any residents of the Mortgaged Premises without the prior written approval of the Receiver, (ii) excluding any of the residents of Vinyard Commons from the use of the common areas or any portion of the Mortgaged Premises, and (iii) changing any locks at the Mortgaged Premises; and it is further

C&F: 2011996.4

**ORDERED**, that Defendants, and the Borrower's managing agent, Trifont Liberty Management and its principal, Mark Fonte, who is also President of the Moving Defendants, are hereby directed and ordered to immediately turn over to the Receiver:

(i)     all security deposits of any tenant, occupant or subtenant at the Mortgaged Premises, and all documents concerning said security deposits,

(ii)    all documents required by the Order Appointing Receiver dated September 13, 2012 and the Amended Order Appointing Receiver; and

(iii)   all rental payments received from any occupant, tenant or subtenant of the Mortgaged Premises from September 1, 2012 through the duration of the Receivership; and it is further

**ORDERED**, that service of a copy of this Order to Show Cause, together with all papers upon which it is based, by overnight delivery to Vineyard Commons Holdings LLC, at 10 Wintergreen Place, Hopewell Junction, New York 12553; to Vineyard Commons Clubhouse Inc. and Vineyard Commons Apartments, Inc. c/o Robert A. Weis, Esq., the Law Firm of William G. Sayegh, 65 Gleneida Avenue, Carmel, New York 10512; to Highland One, Inc. c/o Vasti & Vasti PC, 1733 Main Street, Route 44, Pleasant Valley, New York; to Trifont Liberty Management, 1955 Central Park Avenue, Yonkers, NY 10710; and to Andrew Zweben, Esq., Receiver, at 12 John Street, Kingston, New York, on or before October 19, 2012, shall be deemed good and sufficient service thereof; and it is further

**ORDERED**, that any and all opposition papers in response to the within Order to Show Cause shall be served upon attorneys for Plaintiff, Cuddy & Feder LLP, Attention: Joshua E. Kimerling, Esq., 445 Hamilton Avenue, 14th Floor, White Plains, NY 10601 so that they are

C&F: 2011996.4

received no later than seven (7) days prior to the return date hereof, and any reply papers shall be served and filed by Plaintiff on or before the return date hereof.

Dated: October 17, 2012

ENTER

Hon. Christopher E. Cahill, J.S.C.

**NO PERSONAL APPEARANCES
ON THE RETURN DATE.
ALL ORIGINAL PAPERS MUST
BE FILED IN THE COURT CLERK'S
OFFICE.**

C&F: 2011996.4

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ULSTER
------------------------------------------------------------X
TNHYIF, INC.,

                                        Plaintiff,

        -against-

VINEYARD COMMONS HOLDINGS, LLC,
WORKERS' COMPENSATION BOARD OF THE
STATE OF NEW YORK, NEW YORK STATE
DEPARTMENT OF LABOR, VINEYARD COMMONS
CLUBHOUSE, INC., VINEYARD COMMONS
APARTMENTS INC., and "JOHN DOE NO. 1" through
"JANE DOE NO. 12", the last twelve names being
fictitious and unknown to Plaintiff, the persons or parties
intended being tenants, occupants, persons or
corporations, if any, having or claiming an interest in or
lien upon the Premises, described in the Complaint,

                                        Defendants.


------------------------------------------------------------X

**AFFIRMATION IN
OPPOSITION TO MOTION TO
MODIFY ORDER APPOINTING
RECEIVER AND IN SUPPORT
OF CROSS-MOTION**

Index No. 12-3216
Hon. Christopher E. Cahill, JSC

        JOSHUA E. KIMERLING, an attorney duly admitted to practice law before the

Courts of the State of New York, affirms, under penalties of perjury, as follows:

        1.        I am a member of Cuddy & Feder LLP, attorneys for Plaintiff TNHYIF, Inc.

("Plaintiff"), the holder of a Mortgage (defined below) duly recorded in the Ulster County

Clerk's Office on August 3, 2009. The Mortgage was given to secure a loan in the principal

sum of Forty-Six Million Five Hundred Forty-Five Thousand ($46,545,000.00) Dollars (the

"Loan") made to Defendant Vineyard Commons Holdings, LLC (" the Borrower"), the

developer of a project known as Vineyard Commons in Highland, New York (the "Project"

or the "Property").

2.      This affirmation is respectfully submitted in opposition to the frivolous motion by Vineyard Commons Apartments, Inc. ("VCA") and Vineyard Commons Clubhouse, Inc. ("VCC") (collectively, the "Moving Defendants") to modify this Court's Order Appointing Receiver, dated September 13, 2012 (the "Receiver Order"), and in support of Plaintiff's Cross-Motion, as discussed below.  This Cross-Motion -- essentially to obtain compliance with the Receiver Order -- has become necessary because of the utter disregard of the Receiver Order by the Moving Defendants, the Borrower and non-party Highland (defined below).

3.      For seventeen (17) consecutive months since June, 2011, the Borrower has failed and refused to pay the required monthly payment of principal and interest due under the Mortgage in the amount of $275,823.51.  During this extended time, in excess of $4.5 Million in required monthly payments of principal and interest have not been paid as required by the Mortgage, and the entire Mortgage debt (in excess of $46 Million) is now due and owing to Plaintiff.  All the while, the Borrower and/or the Moving Defendants have collected millions of dollars in rents that belong to and should have been paid to Plaintiff or its predecessors.

4.      Despite the above, and after the Borrower had long been in default of the Mortgage and other recorded documents (as discussed below), the Moving Defendants conspired to obtain from the Borrower three fraudulent so-called Master Lease Agreements (the "Purported Master Leases;" at Exhibits A, B & C to the Moving Defendants' motion), upon which the Moving Defendants' Motion to modify the Receiver Order is based.  The Moving Defendants are entities controlled by Mark J. Fonte, who, through another company that he controls, Trifont Liberty Management, allegedly managed the Property for the

C&F: 2009914.4

Borrower. See Affidavit of Mark J. Fonte, dated October 1, 2012 (the "Fonte Aff."), at paragraph 4.

5.     The Purported Master Leases, entered into when the foreclosure action was imminent, allegedly leased to the Moving Defendants approximately 70 of the approximate 185 residential units at the Project, for grossly under-market 'rents' of as little as one-third their fair market value. Among the Units allegedly leased pursuant to the Purported Master Leases is the Vineyard Commons clubhouse itself.[1]

6.     The Moving Defendants, in turn, thereafter entered into subleases (the "Subleases") with subtenants (the "Subtenants") for the residential Units, for Sublease rents that were much higher than the paltry rental amounts for each of the residential Units as set forth in the Purported Master Leases.

7.     By this scheme, and certainly with knowledge that this foreclosure action and the appointment of a Receiver was going to occur given the longstanding default under the Mortgage, the Moving Defendants and the Borrower conspired to circumvent and render the Mortgage lien effectively worthless, by purporting to put out of reach of the Receiver and Plaintiff the right to collect all of the rents and profits of the Project, which were expressly pledged to Plaintiff as security for the Mortgage.

---

[1] It appears that other than the Clubhouse (called Unit #1 in Exhibit B to the Moving Defendants' Motion) and a storage facility (called Unit #2 in Exhibit B thereto), the remaining 69 Units rented to the Moving Defendants consist of residential apartments. Exhibit B to the Moving Defendants' Motion provides that the entire Clubhouse and storage facility were leased for just $1,000 a month (with the "Landlord" – i.e., the Borrower – responsible for all utilities). Exhibit "A" to the Moving Defendants' Motion provides that the residential Units were leased to the Moving Defendants for just $540 per month. The 'term' of both of the Purported Master Leases was 49 years. Oddly, Exhibit "C" to the Moving Defendants' Motion appears to provide for the leasing of the Clubhouse back to the Borrower, with the "rent" being calculated at the rate of $250 per unit for each residential unit in the Vineyard Commons Complex" that is occupied. Thus, effectively, the $540 in rent for each occupied residential Unit was reduced by $250, for a net monthly rental amount for those residential Units of just $290. The monthly rental value of the residential Units is between $1,775 and $2,500 each. Thus, hundreds of thousands of dollars have been, and are threatened to continue to be, skimmed from the rents that are due and owing to Plaintiff, and pledged to Plaintiff as security.

C&F: 2009914.4

8.   Incredibly, by their Motion to modify the Receiver Order, the Moving Defendants now claim that they should be able to continue to pocket the Sublease Rents for the Units, prevent Plaintiff from recovering all rents and profits from the Project to which it is entitled, and obtain an Order from this Court vitiating the Receiver's Order to the extent of carving out the Sublease rents from the Receiver's right to collect "all the rents and profits. . . issuing out of the [Property]." (Receiver Order, at 2).[2]

9.   This specious Motion by the Moving Defendants should be summarily rejected, as it is predicated upon the unabashedly illegal and void Purported Master Leases, which were knowingly entered into when the Borrower was in default of the Mortgage, in obvious violation of the Mortgage and other recorded instruments, and reflects a transparent effort to defraud Plaintiff and abscond with the rents and profits of the Project to which Plaintiff is entitled, and which have been specifically pledged to Plaintiff as security for the Mortgage.

10.   In short, the Moving Defendants and the Borrower, by entering into the Purported Master Leases, devised a plan to frustrate and defeat Plaintiff's rights under the pertinent governing documents to recover all rents, profits and income that are explicitly pledged to Plaintiff as security for the Mortgage. The scheme is wrongful and fraudulent on so many levels that it is shocking that the moving Defendants would now actually seek the Court's imprimatur on such a fraud, by asking the Court to prevent the Receiver from exercising his lawful duty to collect all rents and fees arising out of the Property, including the Sublease rents.

---

[2] Page 3 of the Receiver Order further provides that the Receiver is authorized "to demand, collect and receive from the occupants, tenants and licensees in possession of the Mortgaged Premises or others liable therefore, inclusive of the mortgagor, all the rents and license fees thereof to become fixed and now due and unpaid, and hereafter to become due. . . "

C&F: 2009914.4

11.    As explained below, the law clearly entitles the Receiver to obtain the rents that the Moving Defendants claim to be entitled to based upon the Purported Master Leases, thereby warranting the rejection of the Moving Defendants' Motion.  Accordingly, Plaintiff seeks an Order preventing the Moving Defendants from seeking to collect any Sublease rents, and turning over to the Receiver any such rents that it may have received since September 1, 2012.

12.    The Purported Master Leases were not the only fraudulent attempt by the Borrower, on the eve of this foreclosure action, to alienate Plaintiff's right to rents from the Project and, in so doing, now interfere with the Receiver's ability to control and manage the Property and collect all rents and profits therefrom.  Although the Receiver is expressly authorized by the Receiver Order to "forthwith take charge and enter into possession of the Mortgaged Premises, he is now being prevented from doing so based on baseless claims by another alleged lessee under a fourth "Master Lease Agreement."

13.    In that regard, the Borrower purported to enter into a fourth "Master Lease Agreement" also in May, 2012 (Exhibit "A" hereto)(hereinafter, the "Restaurant Master Lease") with an entity known as Highland One, Inc. ("Highland").   The Restaurant Master Lease purported to lease to Highland for just $250 per month, for 49 years,[3] the entire "Restaurant Area" at Vineyard Commons, as well as "the lounge area, outside patio area, gazebo, community bathrooms, lobby, theatre, private entrance and vestibule and 30 parking spaces directly in front of Building 6."  These areas are common areas for the benefit of all residents of Vineyard Commons, and are within the purview of the authority of the Receiver under the Receiver Order.

---

[3] Paragraph 9 of the Restaurant Master Lease provides for the Borrower to actually pay Highland a monthly "subsidy."

14.     Highland, which may very well be affiliated with the Moving Defendants and/or the Borrower, as evidenced by its illegal "sweatheart" deal using the same form "Master Lease," has now taken affirmative steps to interfere with the Receiver's control of the Property, by changing locks and sending various notices to Vineyard Commons residents, all of which undermines the Receiver's authority to manage the Property as provided in the Receiver Order, and prevents the residents from having access to common elements to which they are entitled.

15.     Accordingly, so as to ensure that the Receiver has the authority to properly manage the Property and prevent further interference to the residents' right to use the common areas, Plaintiff seeks, on its Cross-Motion, an Order barring Highland from posting any notices at the Property or sending notices to residents without the prior written approval of the Receiver, interfering with the Receiver's control and operation of the entire Property, excluding the residents from the common areas, and changing any locks at the Property.

16.     While, at this time, the Receiver is not asking this Court for removal of Highland from the Restaurant, Highland should be enjoined from excluding any residents, and of course, the Receiver, from having full access to the theatre, community ballroom, lounges, lobbies or any other common space.

17.     Lastly, Plaintiff's Cross-Motion seeks an Order directing the Moving Defendants and the Borrower, and all entities on their behalf, including but not limited to Trifont Liberty Management, Trifont Management and/or Mark Fonte, individually (collectively, "Fonte"), to comply with the Receiver Order, failing which they should be subject to Contempt of Court.

18.    Despite the Receiver Order having been served upon them, they have refused to abide by its requirements by failing to (i) "turn over to said Receiver all rent lists, orders, unexpired and expired leases, agreements, correspondence, notices and registration statements relating to rental spaces or facilities in the Mortgaged Premises;" and (ii) "deliver and attorn to the Receiver all rent lists, shareholder lists, unexpired and expired leases, proprietary leases, agreements, contracts, recognition agreements, corporate by-laws, correspondence, notices, registration statements, tenants, securities, shareholders, escrows, and lists of current rent or other monies, arrears, relating to space in the mortgaged premises."

19.    As of the date hereof, the Receiver has not received any of the above, including security deposits, leases, and contracts pertaining to the Property.  In fact, I understand that Mr. Fonte admitted in front of the Receiver and the Sheriff Deputy that he had taken the records to his Yonkers office.

20.    As such, Plaintiff respectfully requests an Order compelling the Moving Defendants, Borrower and Fonte, to immediately provide same to the Receiver.

**THE RECORDED DOCUMENTS VITIATE THE MASTER LEASES**

21.    Vineyard Commons is an adult rental community located in Highland, New York, that was constructed upon property (the "Property") encumbered by the Mortgage. The Mortgage was recorded in the Office of the Clerk of the County of Ulster on August 3, 2009 (nearly three years prior to the Purported Master Leases, at Liber Book M, Volume 9178, Page 58, Instrument No. 2009-00012292).

22.    On or about July 2, 2009, Love Funding Corp. ("LFC"), as lender, made the $46,545,000 Loan to the Borrower.  The Note and Mortgage (attached hereto as Exhibits

7

"B" and "C", respectively) were assigned to HUD (Ex. "D"), and thereafter assigned to Plaintiff (Exhibit "E").

23.     Paragraph 5 of the Mortgage provides, in pertinent part, as follows: "upon default hereunder Mortgagee [Plaintiff] shall be entitled to the appointment of a receiver by any court having jurisdiction, without notice, to take possession and protect the property described herein and operate same and **collect the rents, profits and income therefrom**." (emphasis added).

24.     As noted above, the Borrower has been in default of the Mortgage since June of 2011. There is no dispute as to that fact.

25.     Paragraph 4 of the Mortgage prohibits the Purported Master Leases and the Restaurant Master Lease by providing that all rent, profits and income from the Property belong to Plaintiff, as follows:

> That all rents, profits and income from the Property are hereby assigned to the Mortgagee for the purpose of discharging the debt secured hereby. Permission is hereby given to Mortgagor, <u>so long as no default exists hereunder</u>, to collect such rents, profits and income [therefrom].

26.     By this provision, it is clear that "all rents, profits and income from the property," including, of course, the Sublease rents (which the Borrower has attempted to alienate from Plaintiff and which the Moving Defendants claim they should be able to keep for themselves), are pledged to Plaintiff "for the purpose of discharging the debt secured by the Mortgage." Long before the Purported Master Leases and the Restaurant Master Lease, the Borrower was in default of the Mortgage, from which point (June, 2011), the Borrower relinquished its temporary right (so long as no default existed) to collect the "rents, profits and income" from the Property.

C&F: 2009914.4

27.     In addition to the Mortgage, the Borrower entered into a security agreement

(the "Security Agreement") on July 2, 2009, which provides, at paragraph 1 as follows:

> The debtor [the Borrower] hereby grants a security interest ... to
> the secured party [Plaintiff] in all property (referred to in this
> Agreement as the "Collateral"), which includes "all income, rents,
> profits, receipts and charges from the Project; (2) "ground rents",
> (3) the interest of the borrower "in and to all of the rents, royalties
> issues, profits, revenues, income and other benefits of the Property,
> or arising from the use or enjoyment of all or any portion thereof,
> or from any lease or agreement pertaining thereto, and all right title
> and interest of the debtor in and to, and remedies under, all
> contract rights, accounts receivable and general intangibles arising
> out of or in connection with any and all leases and subleases of the
> Property, or any part thereof, and of the other property described
> herein, or any part thereof, both now in existence or hereafter
> entered into, together with all proceeds (cash and non-cash) thereof
> …..

28.     The aforesaid pledge of income, leases, rents of the Project to Plaintiff was

perfected by UCC's filed in Ulster County in 2009, which UCC's were assigned to HUD and

then Plaintiff. A copy of the Security Agreement, the UCC's and the assignments thereof are

annexed hereto as Exhibit "F".

29.     Thus, by the plain terms of the Security Agreement, the Borrower granted a

security interest to Plaintiff (perfected in 2009) in "all income, rents, profits, receipts and

charges from the Project," obviously including the Sublease rents upon which the Moving

Defendants base their motion. The fraudulent and invalid Restaurant Master Lease signed

long after the Borrower's default under the Mortgage, and aimed at frustrating Plaintiff's

right to recover its pledged security, clearly violates the Security Agreement as well.

30.     In addition, Section 3 of the Mortgage incorporates a "Regulatory Agreement"

that was entered into by the Borrower, which Regulatory Agreement (a copy of which is

annexed hereto as Exhibit "G") includes the following terms:

C&F: 2009914.4

6. Owners [the Borrower] shall not without the prior written approval of the Secretary [of Housing and Urban Development]:

(a) convey, transfer or <u>encumber</u> any of the mortgaged property or permit the conveyance, transfer of encumbrance of such property,

(b) assign, transfer, dispose of or <u>encumber</u> any personal property of the project including rents, or pay out any fund except from surplus cash, except for reasonable operating expenses and necessary repairs.

(c) convey, assign or transfer ... any right to manage or receive the rents and profits from the mortgaged property. (emphasis added).[4]

31. The Purported Master Leases and the Restaurant Master Lease certainly violate the Regulatory Agreement's prohibitions quoted above.

32. In the face of the aforesaid governing documents, which were recorded nearly three years prior to the Purported Master Lease Agreements, the Moving Defendants nonetheless ask this Court to limit the Receiver's ability to collect all rents, profits and income from the Project, all of which was expressly pledged as security for the payment of the Mortgage debt. If, instead of the Purported Master Leases, the Borrower had granted a second mortgage to an institutional lender, its rights would be subordinate to the rights of the Plaintiff and the Receiver. To suggest that the Borrower after being in default for 15 months, can enter into grossly below market "Master Leases" with affiliates of its Managing Agent, and have the right to collect millions of dollars of the income from the Property ahead of the holder of the $46 Million first Mortgage, is preposterous.

33. The Moving Defendants now seek to restrict the Receiver's authority in such a way as to allow Moving Defendants and the Borrower to flagrantly violate the terms of the aforesaid recorded documents, and in doing so, steal hundreds of thousands of dollars each

---

[4] Plus, in Section 15 of the Regulatory Agreement, the Borrower agreed that it would not execute any other agreement with provisions contradictory to, or in opposition to, the provisions hereof. The Master Lease would clearly violate this provision.

C&F: 2009914.4

month in rents and income from the Project that are due and owing to Plaintiff and that have been specifically pledged to Plaintiff as security for the Mortgage debt (which is not being paid, and which has not been paid since June 2011). The unlawful Restaurant Master Lease similarly violates the aforesaid documents, and reflects an obvious attempt to circumvent Plaintiff's rights.

34.   What the Borrower and the Moving Defendants, as well as Highland, have done, aside from being directly refuted by the recorded Mortgage, Security Agreement and Regulatory Agreement, reflects an unmistakable attempt to defraud Plaintiff and defeat its right to recover all of the pledged rents from the Project.

35.   According to the Moving Defendants' logic, and to Highland, they should be entitled to disregard the recorded instruments, blatantly violate them, prevent Plaintiff from receiving the rents and profits of the Project that have been pledged to Plaintiff, and prevent the Receiver from exercising his duty to collect all rents and profits of the Project to which Plaintiff is entitled.

36.   Quite frankly, it is shocking enough that this blatant scheme was hatched by the Moving Defendants and the Borrower (and, apparently, Highland), but even more astonishing that the Moving Defendants would actually ask this Court to restrict the Receiver's authority to collect the Sublease rents which, if allowed, would permit a blatant diversion of hundreds of thousands of dollars in monthly rents and profits of the Project that are owed to Plaintiff. So too with respect to the Restaurant Master Lease and Highland's continued interference with the Receiver's authority to take control over the Property.

37.   Based on the above, it is clear that the relief sought by the Moving Defendants should be rejected, as it reflects nothing more than an attempt to continue their fraudulent

efforts in concert with the Borrower to alienate security (rents and profits of the Project) pledged to Plaintiff. The Moving Defendants must also be directed to <u>not</u> interfere with the Receiver's right to collect all Sublease rents.

38.     Moreover, an appropriate directive is necessary from this Court with respect to the Restaurant Master Lease, because Highland is similarly acting in violation of the Receiver Order and under the false premise that its fraudulent and invalid Restaurant Master Lease gives it the authority to disregard the Receiver, lock doors at the Premises, send notices to residents undermining the Receiver's authority, and prevent the residents from using the common areas at the Project.

39.     As explained below, the law clearly entitles the Receiver to collect from the Subtenants (many of whom, upon information and belief, <u>were already existing tenants when they signed the purported Subleases</u>)[5] all Sublease rents from their occupancy of the Units, none of which should be paid to the Moving Defendants. Neither the Borrower nor the Moving Defendants, are entitled to one penny of rent, profits, or income from the Property, all of which is owed to and has been pledged to Plaintiff.

## THE LAW REPUDIATES THE MOVING DEFENDANTS' MOTION

40.     While the Moving Defendants' Memorandum of Law, at page 1, notes that the "issue before the court is not a novel one", they cite to inapplicable cases and ignore the governing caselaw which, in fact, specifically addresses the pertinent issue herein.

---

[5] Not only would the purported "Master Lease Agreements" be invalid and void for the reasons set forth above, but in addition, upon information and belief, many of the tenants who signed the documents were <u>already</u> existing tenants at the time with existing leases that they had entered into with the Borrower. Upon information and belief, the Moving Defendants presented those existing tenants with the subleases, and told them to sign the subleases, thereby attempting to convert the tenants into subtenants. This is evidenced by the fact that in June, 2012, a notice was given to the residents (i.e. the <u>existing</u> residents) that rent payments were to be made "effective July 2012" to VCA, rather than Borrower. (<u>See</u> Exhibit "H"). It is unclear how many existing tenants were "converted" into subtenants, but these actions reinforce the unabashed fraudulent nature of the scheme that the Moving Defendants are now seeking to rely upon to limit the Receiver's authority.

C&F: 2009914.4

41.     The central case, <u>Bank of Manhattan Trust Co. v. 571 Park Ave Corp.</u>, 263 N.Y. 57 (1933), addressed the following question:  Is a tenant, like the Moving Defendants, who obtains a 'lease' from the borrower for certain mortgaged property, who in turn subleases that property to subtenants, entitled to retain the sublease rent and prevent the mortgagee and/or a duly appointed receiver in a foreclosure action from collecting the sublease rents prior to a sale of the mortgaged premises?

42.     The Court conclusively held that a receiver was entitled to all such sublease payments, and that the tenant/sublessor (i.e., the Moving Defendants herein), was not entitled to receive a penny.

43.     In <u>Bank of Manhattan Trust</u>, the mortgagor, just like the Borrower herein, entered into an agreement with an individual "reciting that it was indebted to [him] in the sum of $44,221.78, and was in financial difficulty." <u>Id</u>. at 61.  The agreement also provided that the indebtedness was to be repaid via the individual having "the right to use one of the apartments" "rent free, or to sublet it." <u>Id</u>.

44.     The individual thereafter sublet the apartment at a rental of $4,000 per year. Following a default under the mortgage, a receiver was appointed, and the question addressed by the Court was whether the receiver was entitled to collect the amounts payable under the sublease.

45.     The Court of Appeals, in recognizing the broad authority of the receiver, as well as the rights of the mortgagee, like Plaintiff herein, held that all rents, including the sublease rents, were entitled to be recovered by the receiver to pay off the debt owed to the mortgagee.

C&F: 2009914.4

46.    In summarizing the nature of the case, which is indistinguishable from the issues raised by the Moving Defendants, the Court held as follows:

> Reduced to its simplest terms, what we have here may be described as an agreement <u>subordinate to the mortgage</u> made by the mortgagor with a general creditor, whereby the mortgagor in consideration of the creditor's promise to forego payment of the debt . . . , gives the creditor the right to occupy apartment 1508 himself, or to sublet it and retain the proceeds.  Thus stated, it seems clear that the agreement was in substance a lease, and that the benefits accruing to the mortgagor thereunder were in the nature of rents and profits, and the value of which may readily be determined.  The rent, instead of being paid in cash, was paid by being offset against the interest otherwise payable on the debt, and against the other benefits received by the mortgagor under the agreement.  But the right thus to offset <u>ceased when the appointment of a receiver required the application of rents to the mortgage debt</u>.  They were covered by the assignment clause in the mortgage, and were part of the security to which the mortgagee by means of a receivership was entitled to resort.  <u>No valid grant of rents could be made by the mortgagor beyond default and the appointment of a receiver, for they were no longer its to grant.</u>  (emphasis added).

47.    In the case at bar, the facts are indistinguishable.  Here, the Moving Defendants allege in the Fonte Affidavit (paragraphs 4 and 5) that the Borrower "remained financially unable to keep up with my Company's bills," and as a result, the Purported Master Leases were "negotiated" because "I was owed a great deal of money."

48.    However, as the Court of Appeals held, "no valid grant of rents could be made by the mortgagor [the Borrower herein] beyond default [here, June 2011] and the appointment of a receiver, for they were no longer its to grant."

49.    In <u>Bank of Manhattan Trust</u>, the mortgage, like the Mortgage herein, provided that after a default "the rents, issues and profits of the said mortgage premises are, from the date of any such default, hereby assigned to said Trustee as further security for the performance of each and every other the covenants and obligations of [borrower] under this

14

mortgage..." Here, and even more broadly, the Mortgage, at paragraph 4, provides that "all rents, profits and income from the property covered by this Mortgage, are hereby assigned to the mortgagee for the purpose of discharging the debt hereby secured," and that permission was given to the Borrower to collect such rents, profits and income only so long as a default did not exist. Similarly, the Mortgage herein provides that upon such a default, a receiver shall be entitled "without notice" to take possession and protect the property described herein and operate same and collect the rents, profits and income therefrom." Clearly, the Borrower and the Moving Defendants cannot defeat these rights by entering into the Purported Master Leases (purporting to alienate more than 1/3 of the Units at the Project), which are subordinate to the Mortgage.

50.     As the Court of Appeals held in Bank of Manhattan Trust, once the default occurred, the mortgagee was entitled to the collection of all rents, including sublease rents, and "[n]o valid grant of rents could be made by the mortgagor beyond default and the appointment of a receiver, for they were no longer its to grant." Here, the Borrower was in default since June, 2011, and the purported "Master Lease Agreements" were entered into a year later, while the default continued.

51.     Other case law fully supports the Receiver's right to collect the sublease rents. See New York City Cmty. Pres. Corp. v. Michelin Associates, 115 A.D.2d 715, 496 N.Y.S.2d 530 (2d Dep't 1985); Resolution Trust Corp. v. 53 W. 72nd St. Realty Associates, 91 CIV. 3299 (LMM), 1991 WL 156260 (S.D.N.Y. Aug. 6, 1991). In Michelin, the receiver in a mortgage foreclosure action sought to collect rent payments from the respondent-subtenant, Walker. Walker had entered into a 20-year lease with the mortgagor-landlord, Michelin, for a stipulated monthly rent of one dollar. Michelin, 115 A.D.2d at 717. The

Appellate Division held that the receiver was fully authorized to collect the rent from

subtenant-Walker, and further stated that it was irrelevant whether Walker's lease was

fraudulent and collusively entered into. Rather, the Court stated,

> ...the agreement by Michelin to lease an apartment to Walker
> for 20 years at a stipulated rent of only one dollar per month
> was in clear contravention of the mortgage, regardless of
> whether that agreement had been made with a fraudulent intent.
> Simply put, Michelin lacked the power to defeat its pledge of
> the rents as security by granting use of the premises at a
> nominal rent.

Id. at 718.

52.     So too herein, the Borrower "lacked the power to defeat its pledge of the rents

as security" by entering into the Purported Master Leases.

53.     Similarly, in Resolution Trust Corp, KBM Apartments ("KBM") had entered

into an agreement with the mortgagor-landlord to lease a series of floors in an apartment

building. After a mortgage foreclosure action was commenced against the mortgagor, the

receiver sought to collect the rents from KBM's subtenants.  Thereafter, KBM moved, like

the Moving Defendants herein, for injunctive relief seeking a stay of the receiver's collection

of the subtenants' rents.  The Court rejected the motion and found that KBM's reliance on

the holding of Central Savings Bank (relied upon by the Moving Defendants herein)[6] was

misplaced and denied their request for an injunction. The Court stated that irrespective of

whether a lease was fraudulent, a receiver is fully empowered to collect rents from

---

[6] In Central Savings Bank v. Chatham Assocs., Inc., 54 A.D.2d 873 (1st Dept. 1976), the court pointed out that
its holding was predicated upon the fact that the subleases at issue were clearly not the product of "fraud or
collusive action in anticipation of foreclosure or receivership," inasmuch as the leases/subleases were signed in
1947, whereas the default and foreclosure action appear to have occurred nearly three decades later in the mid-
1970's. In contrast, here, the under-market, 49- year term Purported Master Leases were entered into long after
the Borrower was in default, and knowing that the foreclosure action and receivership were imminent.
Moreover, Central Savings did not involve the provisions that are contained in the Mortgage, Security
Agreement and Regulatory Agreement that pledge all rents and income and expressly bar that which the
Borrower and Moving Defendants sought to do pursuant to the Purported Master Leases.

subtenants where a mortgage specifically provides for an assignment of rents, and where the mortgagor fails to obtain the mortgagee's permission to further lease the mortgaged premises. Id. at *3. That is precisely the case herein.

54.      While the Moving Defendants rely extensively upon Prudence Co. v. 160 W 73rd St. Corp., 260 N.Y.205 (1932), the Court of Appeals in Bank of Manhattan, decided after Prudence Co., distinguished the case and held, as relevant herein, that it "did not hold that the mortgagor's agreements with respect to mortgaged premises were conclusive upon the mortgagee where they are in contravention of expressed covenants or the necessary implications of a prior recorded mortgage." Id. at 62. In describing the exact type of agreement as the Purported Master Leases, the Court held that such contracts by a mortgagor "surrendering the right to receive rent from the mortgaged premises, or assigning, in whatever manner, the rents collectible from those premises, is unquestionably an impairment of the lien of the mortgage upon the rents." Id. at 62-63.

55.      In such instances, even in the absence of any finding of an intentional conspiracy or "collusion in making such an agreement" (which appears to be the case herein), the Court of Appeals held that

> "it was simply beyond the power of the parties to either appropriate the pledged rents to a different indebtedness, or to defeat the pledge by granting the use of premises rent free. This was not only expressly forbidden by the mortgage, but it seems a necessary consequence of the assignment of rents contained in it. These rents were expressly made security for the mortgage indebtedness in the event of default, and the scope of the contract the mortgagors or its successors might make was necessarily limited to that extent. **The pledge of these rents could not subsequently be rendered worthless either by another assignment of rents to be received, or by contracting away the right collect any rent.**"

> Id. at 63. (emphasis added).

C&F: 2009914.4

56.     Here, by the same reasoning, the Purported Master Leases were "forbidden by the mortgage," the "rents were expressly made security for the mortgage indebtedness in the event of default," and the "pledge of these rents could not be subsequently rendered worthless" by the Purported Master Leases.

57.     As such, it is respectfully submitted that not only should the Moving Defendants' Motion be denied, but this Court should unambiguously provide that the Subtenants shall pay all Sublease rents to the Receiver, and only to the Receiver, and not to the Moving Defendants or anyone else.  The Moving Defendants must be directed to not interfere with the Receiver's collection of the Sublease rents and, in fact, to turn over any such rents that they have received since September 1, 2012, and that they may receive in the future during the Receivership.

58.     The Moving Defendants also rely upon Bank of Tokyo Trust Co. v. Urban Food Malls Ltd., 229 A.D.2d 14, 650 N.Y.S.2d 654 (1st Dept. 1996), notwithstanding the fact that the holding in that case refutes the Moving Defendants' argument that the Receiver is not entitled to collect the purported Sublease rents from the Subtenants during his Receivership.  Indeed, in Bank of Tokyo Trust, the Appellate Division conclusively held that "it was error to deny the receiver the right to collect rents directly from the subtenants."  In so holding, the Court relied upon a provision of the mortgage providing that each mortgage "'assigns to [plaintiff] all Leases and all Rent payable under each Lease now or at any time hereafter existing,'" and the fact that under the mortgage, each mortgagor consented to the appointment of a receiver of the mortgaged properties and of the rents and income thereof." Id. at 32.

59.     In rejecting the exact same argument as being advanced by the Moving Defendants, the Court held that "it is well settled that a receiver in a foreclosure proceeding may collect the rent generated by the mortgage property," including sub-rents, all of which was assigned as collateral under the Mortgage and Security Agreement herein.  There is no doubt that the prior recorded Mortgage, Security Agreement and Regulatory Agreement are superior to the subordinate Purported Master Leases (even assuming they were not the product of fraud and collusion and are not otherwise void) and therefore, the Master Leases "cannot defeat [the Mortgagor's] pledge of rents to the mortgagee."

60.     Moreover, the Court in Bank of Tokyo, rejected reliance upon Prudence Co., the case relied upon by the Moving Defendants herein, in noting that Prudence "stands for the unremarkable position that a receiver may not **require** the subtenant to pay more in rent to the receiver than the rent required of the subtenant under the sublease or the rent the master tenant is required to pay to the owner." Id. at 33.  However, here, the Receiver has not "required" anything from the subtenants, but instead only sought to receive the sub-rents that they agreed to.  As the Court held in Bank of Tokyo, "the receiver seeks only the agreed-to sub-rents and no more," which he was entitled to do. Id.

61.     Based on the above, it is respectfully submitted  that the motion by the Moving Defendants should be denied in all respects.  Simply put, the Purported Master Leases -- fraudulent and otherwise invalid documents -- do not entitle the Moving Defendants to collect rent that belongs to Plaintiff and that should be collected by the Receiver without interference from the Moving Defendants.   Similarly, the Restaurant Master Lease does not entitle Highland, or anyone else for that matter, to interfere with the Receiver's authority to take control over the entire Property.

62.     Lastly, it appears that some sublease rents are still being paid to VCA, rather than the Receiver.  Thus, it is respectfully submitted that VCA should be directed to immediately turn over to the Receiver all such rent received after September 2012, and any additional sublease rents that may be received hereafter during the Receivership.  The Moving Defendants should also provide a complete accounting of all payments received from occupants/subtenants at the Property since September 1, 2012, and any and all payments that they made to the Borrower under the Purported Master Leases.

## THE FAILURE TO COMPLY WITH THE RECEIVER ORDER

63.     Despite being served with the Receiver Order (see Exhibit "I"), neither the Borrower nor its managing agent, Fonte, have complied with any of its terms.  Nor have the Moving Defendants, who are controlled by Mr. Fonte.

64.     In particular, and without limitation, the following has not been turned over to the Receiver, despite the Receiver Order being served weeks ago:

    a.   Security deposits of the residents (which failure constitutes a misdemeanor under Section 7-105 of the General Obligations Law);

    b.   Copies of leases;

    c.   Copies of any maintenances contracts for the Property;

    d.   Tenant lists; and

    e.   Utility bills and account statements.[7]

65.     It is vital that these records and the security deposits be turned over to the Receiver so that he can properly manage the Project in accordance with his duties.  Yet, said parties continue to flout this Court's Receiver Order, by ignoring the obligations to turn over

---

[7] The Receiver has recently learned that Central Hudson is threatening to turn off the utilities because of unpaid arrears.  The phones in the office were turned off last week.  It is critical that the Receiver be provided with all documentation regarding these matters to properly take control over and manage the Property.

these items to the Receiver. This should have been done already, and warrants an Order from this Court directing them to do so immediately.

66.   No prior application for the relief sought herein has been made to this or any other Court.

67.   A copy of the undersigned's letter to counsel, and parties that have yet to appear, advising them of this application is annexed hereto as Exhibit "J".

WHEREFORE, Plaintiff respectfully requests that:

a.   The Moving Defendants' Motion be denied in its entirety;[8]

b.   The Court issue an Order barring and enjoining the Borrower, the Moving Defendants and/or Highland, or anyone acting on their behalf, from (i) interfering with the Receiver's right to collect all rents, profits and income from the Property, from whatever source, including but not limited to any and all Sublease rents;  (ii) interfering with the Receiver's right to take charge and enter into possession of the Property, including but not limited to, by posting any notices at the Property without the prior written approval of the Receiver, changing any locks at the Property, and excluding the residents at the Property from any space at the Premises;

c.   The Court issue an Order directing the Borrower, its managing agent, Fonte, and/or the Moving Defendants, to immediately turn over to the Receiver the security deposits and the documentation set forth above;

---

[8] The Moving Defendants' frivolous request for permission to sue the Receiver hardly merits any response, other than it should be summarily rejected in its entirety. The premise of this request – that the Moving Defendants have "valid" leases – is palpably false. While the Moving Defendants refer to a few cases for the proposition that their 'tenancy' should not be interfered with, those cases were predicated upon "tenants in lawful possession" (Burtaine v. Barr, 194 A.D. 906 (1st Dept. 1920), whereas the Purported Master Leases are illegal, invalid and do not give any "lawful" rights to the Moving Defendants. None of the cases relied upon by the Moving Defendants involved the circumstances involved herein.

C&F: 2009914.4

    d.  The Court issue an Order directing the Moving Defendants to immediately turn over to the Receiver all rental payments received from any occupant, tenant or Subtenant of the Property and provide a complete accounting to the Receiver of any rental payments received since September 1, 2012 and any payments made by them to the Borrower under the Purported Master Leases; and

    e.  Plaintiff be awarded such other and further relief as to the Court may seem just and proper, including but not limited to legal fees, costs and expenses.

Dated:  October 16, 2012
          White Plains, NY

                                  Joshua E. Kimerling

C&F: 2009914.4

**EXHIBIT A**

# MASTER LEASE AGREEMENT

THIS MASTER LEASE AGREEMENT (this "Lease") dated this  ⁻/  day of May, 2012

BETWEEN:

> VINEYARD COMMONS HOLDING, LLC
> Telephone: 845-834-2911   Fax: 845-834-2914
> (the "Landlord")
> OF THE FIRST PART
> - AND -
>
> HIGHLAND One, INC.
> Telephone:  845-834-2913 Fax:
> (the "Tenant")
> OF THE SECOND PART

IN CONSIDERATION OF the Landlord leasing certain premises to the Tenant, the Tenant leasing those premises from the Landlord and the mutual benefits and obligations set forth in this Lease, the receipt and sufficiency of which consideration is hereby acknowledged, the parties to this Lease agree as follows:

## Leased Premises

1) The Landlord agrees to rent to the Tenant the "Restaurant Area - Building 6" ("See Exhibit A") located in the Vineyard Commons residential complex Building 6, Highland, New York. This includes unfretted use of the lounge area, outside patio area, gazebo, community bathrooms, lobby, theatre, private entrance and vestibule, and 30 parking spaces directly in front of Building 6.

The Premises may be used for any lawful purpose.

## Term

2) The term of the Lease is for 49 years to commence at on June 1, 2012.

## Rent

3) Subject to the provisions of this Lease, the Tenant will pay rent of 250.00 per month for Exhibit A included in this lease payable on the first day of each month. No Increases for lease term.

## Advance Rent and Security Deposit

4) The Tenant will not be required to pay the Landlord advance rent.

5) The Tenant will note be required to pay the Landlord a security deposit equal to one month's rent.

## Quiet Enjoyment

6) The Landlord covenants that on paying the Rent and performing the covenants contained in this Lease, the Tenant will peacefully and quietly have, hold, and enjoy the Premises for the agreed term.

## Holding Over

7) If the Tenant continues to occupy the Premises with the written consent of the Landlord after the expiration or other termination of the term, then, without any further written agreement, the Tenant will be a month-to-month tenant at a minimum monthly rental equal to twice the Base Rent and subject always to all of the other provisions of this Lease insofar as the same are applicable to a month-to-month tenancy and a tenancy from year to year will not be created by implication of law.

## Utilities, Subsidies and Other Charges

8)    The Landlord is responsible for the payment of the following utilities and other charges in relation to Restaurant Area (Exhibit A) : Gas, Electric, Telephone, Cable Television and fire alarm monitoring. Landlord is responsible for any repairs to the facility and equipment.  Any termination of service that interferes with restaurant operations will result in a $500 a day penalty to be paid to the tenant, Highland One Inc.

9) The Landlord will pay Highland One Inc a monthly subsidy of $3,000 until the complex is 95% Occupied at which point this monthly subsidy will be reduced to $1,500 per month.  This subsidy payment is due on the 1st of each month.  A $250 penalty will be charged for each payments received after the 5th of the month, and a 5 % monthly interest charge on any outstanding balance owed.

## Governing Law

9)    It is the intention of the parties to this Lease that the tenancy created by this Lease and the performance under this Lease, and all suits and special proceedings under this Lease, be construed in accordance with and governed, to the exclusion of the law of any other forum, by the laws of the State of New York, without regard to the jurisdiction in which any action or special proceeding may be instituted.

## Severability

10)    If there is a conflict between any provision of this Lease and the applicable legislation of the State of New York (the "Act"), the Act will prevail and such provisions of the Lease will be

amended or deleted as necessary in order to comply with the Act. Further, any provisions that are required by the Act are incorporated into this Lease.

## Assignment and Subletting

11)    The Tenant may freely assign or sublease individual units without the prior consent of the Landlord.

## Maintenance

12)    The Tenant will, at its sole expense, keep and maintain the Premises. The Landlords maintenance responsibilities include, but are not limited to maintenance and repair of all plumbing, heating, Air Conditioning systems, structural elements, the roof, siding, windows, walls, fixtures, ~~appurtenances~~ and all of its appurtenant parts and all other elements of the demised premises without limitation.

## Non-disturbance and Indemnification

13)    In the event of a foreclosure of the subject property, the Landlord will protect, defend, indemnify and hold the Tenant harmless form and against the disturbance of the Tenant's possession, use and quiet enjoyment of each unit provided the Tenant pays all rent when due and otherwise honor's it's obligation under this lease.

14)    All of the fixtures in the space are owned and property of Highland One, Inc. Attached Or not all fixtures belong to the tenant.

15)    Please see additional rider to lease

**Signatures, effective date** Landlord and Tenant have signed this Lease as of the above date. It is effective when Landlord delivers to Tenant a copy signed by all parties.

VINEYARD COMMONS HOLDINGS, LLC,
LANDLORD:

By: _____

DEBORAH L. XENAKIS
NOTARY PUBLIC STATE OF NEW YORK
NO. 01XE6102628
QUALIFIED IN DUTCHESS COUNTY
COMMISSION EXPIRES DECEMBER 8, 2015

HIGHLAND ONE , INC.
TENANT:

By: Mark ~~Poirier~~ Poirier, Owner
Poirier



Exhibit A: Areas shaded part of Highland One, Inc Lease

VINEYARD COMMONS - BUILDING #6

**RIDER attached to and forming a part of lease dated 05/31/2012
Between Vineyard Commons Holdings LLC as Landlord**

**and**

**Highland One Inc. dba Marco Polo Restaurant as Tenant**

Premises located at:
6 Merlot Drive, #648, Highland, NY 12528

1.    If and to the extent that any of the provisions of this Rider conflict or are
otherwise inconsistent with any of the preceding printed provisions of this lease,
whether or not such inconsistency is expressly noted in this Rider, the provisions of
this Rider shall prevail.

2.    The Landlord agrees to give Highland One Inc. dba Marco Polo Restaurant
unfettered and complete access, control, and primary use of the common areas:
Patio, Theatre, Men's and Women's Bathrooms, Entrance and Lobby, Lounge area
including the billiard and sitting areas to conduct it business.  Highland One Inc can
utilize and close down with proper posting these areas as needed.  It is expressly
understood that these common areas : patio, theatre, lounge including billiard and
sitting areas are for the primary use of the Highland One Inc..

3) The Landlord agrees to provide Highland One Inc at least 30 dedicated parking
spaces directly outside it main entrance.  The Landlord agrees to post signage on
each parking spot indicating this parking space is for restaurant patrons only.

4) Landlord acknowledges that all the equipment, furniture, fixtures, lighting,
furnishing, HVAC, and fit out in the : restaurant, patio, theatre, Men's and Women's
bathrooms, entrance and lobby, entrance and lobby area, lounge area including
billiard and seating areas is the property of Highland One Inc. and cannot be used to
collateralize any financing on behalf of the Landlord.

3.    Landlord agrees to forever indemnify and save and hold the tenant harmless
against any claim, cost charge, liability or damage to any person or improperly
arising out of or by reason of such work or by reason of any claim for materials and
labor furnished in connection with said alteration.

4. Landlord hereby assumes liability for, and agrees to indemnify, save and hold
harmless the tenant from and against any and all suits, actions, demands and claims
for damages, and any and all liability, loss and expenses arising from injury
(including death) to person or demands to property caused in whole or in part by the
acts or omissions of the landlord, its agents, servants, employees;, sub-contractors,
licenses or invitees , or occurring by reason of, in connection therewith by anyone
including the public, the landlord, the landlords agents, servants employees; sub-
contractors, licensees invites whether or not due to any act or omission of the

landlord, its agents, servants, employees, sub-contractors, licenses or invites or resulting from any defect, or from any condition, or the presence of any article, or from any condition, or the presence of any article, or sustained by any employment, landlord shall assume all the rest of liability for, and indemnify the tenant against, all such claims or liabilities arising out of or in any manner, directly or indirectly, connected with the conduct of the landlord business and/or the use and/or occupancy of the demised premises.

5.   Tenant does have the right to sublet, assign or reassign the whole or any part of the lease premises.

6. Landlord agrees to give Highland One Inc use of apartment 601 and the adjoining office/storage space for office and storage use at no additional cost to the tenant. Highland One Inc will have exclusive use of this space and has the right to sublet, assign or reassign the whole or any part of is space.


_Denise A. Barnett_
Denise Barnett
Landlord's Signature
Vineyard Commons Holdings LLC


THIS IS A LEGAL
DOCUMENT BE SURE
YOU UNDERSTAND IT
BEFORE SIGNING.

_Mark Poirier_
Tenant's Signature
Mark Poierier
Highland One Inc, LLC


Dated: June 1, 2012

# EXHIBIT B

FHA FORM 4159-A
(CORPORATE)
Rev. March 1972

## MORTGAGE NOTE

$46,545,000.00

New York, New York
July 2 , 2009

FOR VALUE RECEIVED, the undersigned, **VINEYARD COMMONS HOLDINGS, LLC**, a limited liability company organized and existing under the laws of the state of New York promises to pay to **LOVE FUNDING CORPORATION**, a corporation organized and existing under the laws of Virginia, or order, the principal sum of **FORTY-SIX MILLION FIVE HUNDRED FORTY-FIVE THOUSAND** and 00/100* Dollars (**$46,545,000.00**) with interest from date at the rate of Six and Six-Tenths per centum* (**6.6%**) per annum on the unpaid balance until paid. The said principal and interest shall be payable in monthly installments as follows:

Interest alone on such amount of principal as may be advanced from time to time, computed from the date of each such advance, shall be due and payable monthly commencing on August 1, 2009 through May 1, 2011. Thereafter, commencing on June 1, 2011, monthly installments of interest and principal shall be due and payable in the sum of Two Hundred Seventy-Five Thousand Eight Hundred Twenty-Three and 51/100ths Dollars ($275,823.51) each, such payments to continue monthly thereafter on the first day of each succeeding month until the entire indebtedness has been paid in full. In any event, the balance of principal (if any) remaining unpaid, plus accrued interest, shall be due and payable May 1, 2051. The installments of principal and interest shall be applied first to interest at the applicable rate aforesaid upon the principal sum or so much thereof as shall from time to time remain unpaid, and the balance thereof shall be applied on account of principal.

Both principal and interest under this Note, as well as the additional payments set forth in the mortgage shall be payable at the office of Love Funding Corporation, 1250 Connecticut Avenue, NW, Suite 550, Washington, D.C. 20036 or such other place as the holder may designate in writing.

~~Privilege is reserved to pay the debt in whole or in an amount equal to one or more monthly pay-ments on principal next due, on the first day of any month prior to maturity upon at least thirty (30) days' prior written notice to the holder.~~ If this debt is paid in full prior to maturity and while insured under the National Housing Act, all parties liable for payment of this debt hereby agree to be jointly and severally bound to pay to the holder hereof any adjusted premium charge required by the applicable Regulations.

~~Notwithstanding any provision herein for a prepayment charge, such charge shall be applicable only to the amount of prepayment in any one calendar year which is in excess of fifteen per centum (15%) of the original principal sum of this Note.~~

In the event any installment or part of any installment due hereunder becomes delinquent for more than fifteen (15) days, there shall be due, at the option of the holder, in addition to other sums due hereunder, a sum equal to two percent (2%) of the amount of such installment (including principal and interest) so delinquent. Whenever under the law of the jurisdiction where the property is located, the amount of any such late charge is considered to be additional interest, this provision shall not be effective if the rate of interest specified in this Note, together with the amount of the late charge, would aggregate an amount in excess of the maximum rate of interest permitted and would constitute usury.

The whole of the principal sum or any part thereof, and of any other sums of money secured by the Mortgage given to secure this Note, shall, forthwith, or thereafter, at the option of the Mortgagee, become due and payable if default be made in the payment of any installment under this Note and if such default is not made good prior to the due date of the next such installment or upon the happening of any default which, by the terms of the Mortgage given to secure this Note, shall entitle the Mortgagee to declare the same, or any part thereof, to be due and payable; all the covenants, agreements, terms, and conditions of said Mortgage and of the Building Loan Agreement incorporated in the Mortgage (to the extent said Building Loan Agreement is not inconsistent with the terms of this Note and the said Mortgage) are hereby incorporated herein by reference to the same extent and effect as if fully set forth and made a part of this Note; and the undersigned hereby covenants to perform all such covenants and agreements. Failure to exercise this option shall not constitute a waiver of the right to exercise the same in the event of any subsequent default. In the event of default in the payment of this Note, and if the same is collected by an attorney at law, the undersigned hereby agree(s) to pay all costs of collection, including a reasonable attorney's fee.

*NOTE: Words in italics or stricken indicate additions or modifications to FHA Form 4159-A*

ND: 4819-5560-6786, v. 1

~~No default shall exist by reason of nonpayment of any required installment of principal so long as the amount of optional additional prepayments of principal already made pursuant to the privilege of prepayment set forth in this Note equals or exceeds the amount of such required installment of principal.~~

All parties to this Note, whether principal, surety, guarantor, or endorser, hereby waive presentment for payment, demand, protest, notice of protest, and notice of dishonor.

Notwithstanding any other provision contained in this Note, it is agreed that the execution of this Note shall impose no personal liability on the maker hereof for payment of the indebtedness evidenced hereby and in the event of a default, the holder of this Note shall look solely to the property described in the Mortgage and to the rents, issues and profits therefore in satisfaction of the indebtedness evidenced hereby and will not seek or obtain any deficiency or personal judgment against the maker hereof except such judgment or decree as may be necessary to foreclose and bar its interest in the property and all other property mortgaged, pledged, conveyed or assigned to secure payment of this Note except as set out in the Mortgage of even date given to secure this indebtedness.

Signed and sealed the day and year first above written.

> Vineyard Commons Holdings, LLC
> a New York limited liability company
>
> BY: DDFM, LLC, Managing Member
>
> By: _Denise Barnett_
> Denise Barnett, Manager

THIS IS TO CERTIFY that this is the Note described in, and secured by, Mortgage of even date herewith, and in the same principal amount as herein stated, on property located at Vineyard Avenue, in the City of Lloyd, County of Ulster, State of New York.

Dated this _1st_ day of July, 2009

_Ivette E. Santiago_
Notary Public

IVETTE E. SANTIAGO
Notary Public, State of New York
No. 31-4802301
Qualified in New York County
Commission Expires Nov. 30, 20/0



ALLONGE #1
TO
MORTGAGE NOTE
OF
VINEYARD COMMONS HOLDINGS, LLC
TO
LOVE FUNDING CORPORATION

Dated: July __, 2009

---

1.     This Allonge #1 to Mortgage Note (this "Allonge") is attached to and made a part of the Mortgage Note from Vineyard Commons Holdings, LLC dated as of the date hereof (the "Note").

1.   2.   **Prepayment:**

(a)     Maker shall not have the right to prepay the indebtedness evidenced hereby in whole or in part at any time prior to June 1, 2014. Maker shall have the right, on or after June 1, 2014, to prepay the indebtedness evidenced hereby in whole or in part on the last day of any calendar month after such date during the term hereof, upon at least thirty (30) days prior written notice to the holder of this Note, which notice shall specify the date on which the prepayment is to be made, the principal amount of such prepayment and the total amount to be paid. In the event of any prepayment of principal at any time on or after June 1, 2014, the Maker shall concurrently pay to the holder of this Note a prepayment premium equal to the following designated percentages of the amount of principal of this Note to be so prepaid with respect to any prepayment which occurs during the following indicated time periods:

| Time of Prepayment | Prepayment Premium |
|---|---|
| June 1, 2014 through May 31, 2015 | 7% |
| June 1, 2015 through May 31, 2016 | 6% |
| June 1, 2016 through May 31, 2017 | 5% |
| June 1, 2017 through May 31, 2018 | 4% |
| June 1, 2018 through May 31, 2019 | 3% |
| June 1, 2019 through May 31, 2020 | 2% |
| June 1, 2020 through May 31, 2021 | 1% |
| June 1, 2021 and thereafter | 0% |

Notwithstanding any partial prepayment of principal made pursuant to the privilege of prepayment set forth in this Note, the Maker shall not be relieved of its obligations to make scheduled monthly installments of principal and interest as and when such payments are due and payable under this Note.

(b)     Notwithstanding any prepayment prohibition imposed and/or premium required by this Note with respect to prepayments made prior to June 1, 2020, the indebtedness evidenced by this Note may be prepaid in whole or in part without the consent of the holder of this Note and without prepayment premium if the Federal Housing Commissioner (the "Commissioner") determines that prepayment will avoid a mortgage insurance claim and is therefore in the best interests of the Federal Government.

(c)     Notwithstanding the provisions of Paragraph 1(a) above, the provisions of Paragraph 1(a) shall not apply, and no prepayment premium shall be collected by the holder of this Note, with respect to any prepayment which is made by or on behalf of the Maker from insurance proceeds as a result of damage to the mortgaged premises or condemnation awards which, at the option of the holder of this Note, may be applied to reduce the indebtedness of Maker evidenced hereby pursuant to the terms of the Mortgage of even date given by Maker to the holder of this Note to secure said indebtedness.

Any prepayment made pursuant to this Paragraph 1(c) shall be deemed to have been made on the last day of the month in which such payment is received by holder.

(d)    Notwithstanding the provisions of Paragraph 1(a) above, the provisions of Paragraph 1(a) shall not apply, and no prepayment premium shall be collected by the holder of this Note, with respect to a reduction in the principal amount of this Note (or a partial prepayment) required by the Commissioner at the time of Final Endorsement as a result of the Commissioner's cost certification requirements. Any prepayment made pursuant to this Paragraph 1(d) shall be deemed to have been made on the last day of the month in which such prepayment is received by holder. If a reduction (or partial prepayment) is required by the Commissioner, the remaining payments due on this Note may be recast, with the approval of the Holder and the Commissioner, into equal monthly payments of principal and interest sufficient to amortize this Note over its then remaining term.

# EXHIBIT C

Nina Postupack
County Clerk
Kingston, NY 12401

Instrument Number: 2009- 00012292
As
M01 - Mortgage

Recorded On: August 03, 2009

Parties: VINEYARD COMMONS HOLDINGS LLC
To
LOVE FUNDING CORP

Recorded By: STEWART TITLE INS CO
Comment:

Billable Pages: 11

Num Of Pages: 11

** Examined and Charged as Follows: **

| M01 - Mortgage | 95.00 | | | | | | |
|---|---|---|---|---|---|---|---|
| Recording Charge: | 95.00 | | | | | | |
| | Amount | Consideration Amount | RS#/CS# | | | | |
| Tax-Mortgage LLOYD | 349,087.50 | 46,545,000.00 | DA 2145 | Basic | 232,725.00 | | |
| | | | | Additional | 0.00 | Special Additional | 116,362.50 |
| | | | | | | Transfer | 0.00 |
| Tax Charge: | 349,087.50 | | | | | | |

** THIS PAGE IS PART OF THE INSTRUMENT **

I hereby certify that the within and foregoing was recorded in the Clerk's Office For: Ulster County.

File Information:
Document Number: 2009- 00012292
Receipt Number: 820820
Recorded Date/Time: August 03, 2009 04:47:03P
Book-Vol/Pg: Bk-M VI-9175 Pg-55
Cashier / Station: m mpol / Cashier Workstation 7

Record and Return To:
LOVE FUNDING CORP
1250 CONNECTICUT AVE NW
SUITE 550
WASHINGTON DC   20036



Nina Postupack Ulster County Clerk

# MORTGAGE

THIS MORTGAGE, made the **2nd** day of   July , 2009 between

Vineyard Commons Holdings, LLC, a limited liability company organized and existing under the laws of the State of New York  and having its principal place of business at 10 Wintergreen Place, Hopewell Jct., New York 12533 the MORTGAGOR, and Love Funding Corporation a corporation organized and existing under the laws of          Virginia          and having its principal place of business at 1250 Connecticut Avenue, NW, Suite 550, Washington, D.C. 20036 the MORTGAGEE,

WITNESSETH, that to secure the payment of an indebtedness in the principal sum of FORTY-SIX MILLION FIVE HUNDRED FORTY-FIVE THOUSAND and 00/100ths  Dollars (\$46,545,000.00 ), lawful money of the United States, consisting of the sum THREE MILLION THREE HUNDRED EIGHTY-NINE THOUSAND TWO HUNDRED THIRTY-THREE and 00/100ths  Dollars (\$3,389,233.00) for land acquisition, legal fees, organization and audit costs, permanent financing fee and supplemental management fee, and the balance of the principal sum secured hereby, namely FORTY-THREE MILLION ONE HUNDRED FIFTY-FIVE THOUSAND SEVEN HUNDRED SIXTY-SEVEN and 00/100ths     Dollars (\$43,155,767.00) is being loaned pursuant to the provisions of the Building Loan Agreement referred to in paragraph 16 hereof which sum, or so much thereof as may be advanced, with interest from date on outstanding balance at Six and Six-Tenths percent (6.6 %) per annum, is payable in monthly installments in accordance with the terms of a certain Note or obligation bearing even date herewith and having a final maturity of   May 1, 2051 , which Note is identified as being secured hereby by a certificate thereon. Said Note and all of its terms are incorporated herein by reference and this Mortgage shall secure any and all extensions thereof, however evidenced.

AND ALSO to secure payment by the Mortgagor to the Mortgagee of all sums expended or advanced by the Mortgagee pursuant to any term or provision of this Mortgage; AND ALSO to secure performance of each covenant, term, condition and agreement of the Mortgagor herein contained and in the Regulatory Agreement and Building Loan Agreement hereinafter referred to, the Mortgagor hereby mortgages to the Mortgagee:

ALL that certain lot, piece or parcel of land with the buildings and improvements thereon erected, situate, lying and being in the  City   of   Lloyd   , County of   Ulster   , and State of New York, bounded and described as follows:  As more particularly described in Schedule "A" attached hereto and made a part hereof.

Together with all right, title and interest of the Mortgagor in and to the land lying in the streets and roads in front of and adjoining said premises; and

Replaces Form FHA-4159K, which is Obsolete          (A facsimile prepared by Byrne, Costello & Pickard, P.C.)          HUD-94159K (2-81)
(MULTIFAMILY)

CHECKED
ENTERED
MARK/OFF

TOGETHER with all fixtures and articles of personal property now or hereafter attached to or used in and about the building or buildings now erected or hereafter to be erected on the lands herein described which are necessary to the complete and comfortable use and occupancy of such building or buildings for the purposes for which they were or are to be erected including, but not limited to, all awnings, screens, shades, venetian blinds, cabinets, fixtures; and all plumbing, heating, lighting, cooking, laundry, ventilating, refrigerating, incinerating, and air conditioning equipment and fixtures and appurtenances thereto; and such other goods and chattels and personal property as are ever used or furnished in operating a building or the activities conducted therein similar to the one herein described and referred to, and all renewals or replacements thereof or articles in substitution therefor, whether or not the same are, or shall be, attached to said building or buildings in any manner, Mortgagor hereby covenanting for itself and its successors that all the aforesaid property mentioned in this paragraph, all of which is intended to be included in the mortgaged property, when acquired and placed upon the premises, is and shall be owned by it in fee simple, free and clear of all liens and encumbrances; it being hereby mutually agreed that all the aforesaid property shall, so far as permitted by law, be deemed to be affixed to the realty; and together with all building materials and equipment now or hereafter delivered to said premises and intended to be installed therein.

The Mortgagor further covenants and agrees as follows:

1. That Mortgagor will pay the Note at the times and in the manner provided therein;

2. That Mortgagor will not permit or suffer the use of any of the property for any purpose other than the use for which the same was intended at the time this Mortgage was executed; nor will it permit or suffer any alteration of or addition to the building or improvements hereafter constructed in or upon said property without the consent of the Mortgagee;

3. That the Regulatory Agreement, if any, executed by the Mortgagor and the Secretary of Housing and Urban Development, acting by and through the Federal Housing Commissioner, which is being recorded simultaneously herewith, is incorporated in and made a part of this Mortgage. Upon default under the Regulatory Agreement and upon the request of the Secretary of Housing and Urban Development, acting by and through the Federal Housing Commissioner, the Mortgagee, at its option, may declare the whole of the indebtedness secured hereby to be due and payable;

4. That all rents, profits and income from the property covered by this Mortgage are hereby assigned to the Mortgagee for the purpose of discharging the debt hereby secured. Permission is hereby given to Mortgagor so long as no default exists hereunder, to collect such rents, profits and income for use in accordance with the provisions of the Regulatory Agreement;

5. That upon default hereunder Mortgagee shall be entitled to the appointment of a receiver by any court having jurisdiction, without notice, to take possession and protect the property described herein and operate same and collect the rents, profits and income therefrom;

6. That at the option of the Mortgagor the principal balance secured hereby may be reamortized on terms acceptable to the Secretary of Housing and Urban Development, acting by and through the Federal Housing Commissioner if a partial pre-payment results from an award in condemnation in accordance with provisions of Paragraph 8 herein, or from an insurance payment made in accordance with provisions of Paragraph 7 herein, where there is a resulting loss of project income;

7. That the Mortgagor will keep the improvements now existing or hereafter erected on the mortgaged property insured against loss by fire and such other hazards, casualties, and contingencies, as may be stipulated by the Secretary of Housing and Urban Development, acting by and through the Federal Housing Commissioner upon the insurance of the Mortgage and other hazards as may be required from time to time by the Mortgagee, and all such insurance shall be evidenced by standard Fire and Extended Coverage Insurance Policy or policies, in amounts not less than necessary to comply with the applicable Coinsurance Clause percentage, but in no event shall the amounts of coverage be less than 80% of the Insurable Values or not less than the unpaid balance of the insured Mortgage, whichever is the lesser, and in default thereof the Mortgagee shall have the right to effect insurance. Such policies shall be endorsed with standard Mortgagee clause with loss payable to the Mortgagee and the Secretary of Housing and Urban Development as interest may appear, and shall be deposited with the Mortgagee;

That if the premises covered hereby, or any part thereof, shall be damaged by fire or other hazard against which insurance is held as hereinabove provided, the amounts paid by any insurance company in pursuance of the contract of insurance to the extent of the indebtedness then remaining unpaid, shall be paid to the Mortgagee and, at its option, may be applied to the debt or released for the repairing or rebuilding of the premises;

8. That all awards of damages in connection with any condemnation for public use of or injury to any of said property, shall be paid to the Mortgagee to be applied to the amount due under the Note secured hereby in (1) amounts equal to the next maturing installment or installments of principal and (2) with any balance to be credited to the next payment due under the Note. That all awards of damages in connection with any condemnation for public use of or injury to any residue of that property, shall be paid to the Mortgagee to be applied to a fund held for and on behalf of the Mortgagor which fund shall, at the option of the Mortgagee, and with the prior approval of the Secretary of Housing and Urban Development, either be applied to the amount due under the Note specified in the preceding sentence, or be disbursed for the restoration or repair of the damage to the residue. No amount applied to the reduction of the principal amount due in accordance with (1) shall be considered an optional prepayment as the term is used in this Mortgage and the Note secured hereby, nor relieve the Mortgagor from making regular monthly payments commencing on the first month following the date of receipt of the award. The holder of the Note is hereby authorized in the name of the Mortgagor to execute and deliver valid acquittances for such awards and to appeal from such awards;

9. That in order more fully to protect the security of this Mortgage, together with, and in addition to, the monthly payments of principal and interest payable under the terms of the Note secured hereby, the Mortgagor agrees to deposit with the Mortgagee concurrently with payments of interest or of interest and principal, on the first day of each month after the date hereof until the said Note is fully paid, the following sums:

(a)   An amount sufficient to provide the Mortgagee with funds to pay the next mortgage insurance premium if this instrument and the Note secured hereby are insured, or a monthly service charge, if they are held by the Secretary of Housing and Urban Development, as follows:

(I)   If and so long as said Note of even date and this instrument are insured or are reinsured under the provisions of the National Housing Act, an amount sufficient to accumulate in the hands of the Mortgagee one month prior to its due date the annual mortgage insurance premium in order to provide such Mortgagee with funds to pay such premium to the Secretary of Housing and Urban Development pursuant to the National Housing Act, as amended, and applicable Regulations thereunder, or

(II)   If and so long as said Note of even date and this instrument are held by the Secretary of Housing and Urban Development, a monthly service charge in an amount equal to 1/12 of .45% of the average outstanding principal balance due on the Note computed for each successive year beginning with the first day of the month following the date of this instrument, if the Secretary of Housing and Urban Development is the mortgagee named herein, or the first day of the month following assignment, if the Note and this instrument are assigned to the Secretary of Housing and Urban Development, without taking into account delinquencies or prepayment;

ND: 4816-0282-6498, v. 1

(b)   A sum equal to the ground rents, if any, next due, plus the premiums that will next become due and payable on policies of fire and other property insurance covering the premises covered hereby, plus water rates, taxes and assessments next due on the premises covered hereby (all as estimated by the Mortgagee) less all sums already paid therefor divided by the number of months to elapse before one month prior to the date when such ground rents, premiums, water rates, taxes and assessments will become delinquent, such sums to be held by Mortgagee in trust to pay said ground rents, premiums, water rates, taxes and special assessments;

(c)   All payments mentioned in the two preceding subsections of this paragraph and all payments to be made under the Note secured hereby shall be added together and the aggregate amount thereof shall be paid each month in a single payment to be applied by Mortgagee to the following items in the order set forth:
(I)   premium charges under the Contract of Insurance with the Secretary of Housing and Urban Development, acting by and through the Federal Housing Commissioner or service charge;
(II)   ground rents, taxes, special assessments, water rates, fire and other property insurance premiums;
(III)   interest on the Note secured hereby;
(IV)   amortization of the principal of said Note;

10. Any excess funds accumulated under (b) of the preceding paragraph remaining after payment of the items therein mentioned shall be credited to subsequent monthly payments of the same nature required thereunder; but if any such item shall exceed the estimate therefor the Mortgagor shall without demand forthwith make good the deficiency. Failure to do so before the same become delinquent or subject to interest or penalties shall be a default hereunder. In case of termination of the Contract of Mortgage Insurance by prepayment of the mortgage in full, or otherwise (except as hereinafter provided), accumulations under (a) of the preceding paragraph not required to meet payments due under the Contract of Mortgage Insurance, shall be credited to the Mortgagor. If the property is sold under foreclosure or is otherwise acquired by the Mortgagee after default, any remaining balance of the accumulations under (b) of the preceding paragraph shall be credited to the principal of the Mortgage as of the date of commencement of foreclosure proceedings or as of the date the property is otherwise acquired; and accumulations under (a) of the preceding paragraph shall be likewise credited unless required to pay sums due the Secretary of Housing and Urban Development, acting by and through the Federal Housing Commissioner under the Contract of Mortgage Insurance;

11. That no building on the premises shall be altered, removed, or demolished without the consent of the Mortgagee;

12. That the Mortgagor will pay all taxes, assessments, or water rates, and in default thereof, the Mortgagee may pay the same;

13. That the Mortgagor within five days upon request in person or within ten days upon request by mail will furnish a written statement duly acknowledged of the amount due on this Mortgage and whether any offsets or defenses exist against the Mortgage debt;

14. That the Mortgagor warrants the title to the premises and that this Mortgage is, and will be maintained as, a valid first lien on the premises;

15. That in case of sale under foreclosure the premises may be sold in one parcel;

16. This Mortgage and the Note secured hereby were executed and delivered to secure moneys advanced or to be advanced and to be used in the construction of certain improvements on the lands herein described, in accordance with a building loan agreement between the parties hereto dated concurrently, and intended to be filed simultaneously herewith, which building loan agreement (except such part or parts thereof as may be inconsistent herewith) is incorporated herein by reference to the same extent and effect as if fully set forth and made a part of this Mortgage, which said building loan agreement Mortgagor hereby covenants to perform; and if the construction of the improvements to be made pursuant to said building loan agreement shall not be carried on with reasonable diligence, or shall be discontinued at any time for any reason other than strikes or lock-outs, the Mortgagee, after due notice to the Mortgagor, or any subsequent owner, is hereby invested with full and complete authority to enter upon the same premises, employ watchmen to protect such improvements from depredation or injury, and to preserve and protect the personal property therein, and to continue any and all outstanding contracts for the erection and completion of said building or buildings, to make and enter into contracts and obligations wherever necessary, either in its own name or in the name of the Mortgagor, or other owner, and to pay and discharge all debts, obligations, and liabilities incurred thereby. All such sums so advanced by the Mortgagee (exclusive of advances of the principal of the indebtedness secured hereby) shall be added to the principal of the indebtedness secured hereby and shall be secured by this Mortgage and shall be due and payable on demand with interest at the rate specified in said Note, but no such advances shall be insured unless the same are specifically approved by the Secretary of Housing and Urban Development, acting by and through the Federal Housing Commissioner prior to the making thereof. The principal sum with interest and other charges provided for herein shall, at the option of the Mortgagee or holder of this Mortgage and the Note secured thereby, become due and payable on the failure of the Mortgagor, or owner, to keep and perform any of the covenants, conditions, and agreements of said building loan agreement. This covenant shall be terminated upon the completion of the improvements to the satisfaction of the Mortgagee and the making of the final advance as provided in said building loan agreement;

17. The Mortgagor covenants that it will not voluntarily create or permit to be created against the property subject to this Mortgage any lien or liens inferior or superior to the lien of this Mortgage;

18. That the Mortgagor will give immediate notice by mail to the Mortgagee of any fire, damage, or other casualty to the premises or of any conveyance, transfer, or change of ownership of the premises. The holder of this Mortgage, its agents or servants, shall have the right to inspect the mortgaged premises from time to time at any reasonable hour of the day;

19. That Mortgagor will not permit or commit any waste on said premises and will keep the buildings thereon and all equipment therein mortgaged in good repair, and promptly comply with all laws, ordinances, regulations, and requirements of any governmental body affecting the said mortgaged premises, and should said premises or any part thereof require inspection, repair, care, or attention of any kind or nature not provided for by the Mortgagor, the Mortgagee, being hereby made sole judge of the necessity therefor, may enter or cause entry to be made upon said property, and inspect, repair, protect, care for or maintain said property as the Mortgagee may deem necessary, and may pay such sum of money therefor; and shall be the sole judge of the amount necessary to be paid;

20. That upon any default by the Mortgagor in the compliance with, or performance of, any of the terms, covenants, or conditions of this Mortgage or of the Note secured hereby, the Mortgagee may at its option remedy such default; and that all payments made by the Mortgagee to remedy a default by the Mortgagor as aforesaid (including reasonable attorney's fees) and the total of any payment or payments due from the Mortgagor to the Mortgagee and in default, together with interest thereon at the rate specified in said Note per annum shall be added to the debt secured by this Mortgage and shall be repaid to the Mortgagee upon demand. Any such sum and the interest thereon shall be a lien on the premises, prior to any other lien attaching or accruing subsequent to the lien of this Mortgage;

21. That after any default herein or in the Note secured hereby, the Mortgagor or any subsequent owner shall, upon demand, surrender possession of the premises to the holder of this Mortgage, and the holder of this Mortgage may enter upon the premises and let the same and collect all the rents therefrom, which are due, or to become due, and apply the same, after payment of all charges and expenses on account of the indebtedness hereby secured; and all the leases existing at the time of such default, are hereby assigned to the holder of this Mortgage as further security for the payment of said indebtedness. The holder of this Mortgage may also dispossess, by the usual summary proceedings, any tenant defaulting in the payment to the holder of this Mortgage of any rent. In the event that the Mortgagor or any subsequent owner of said premises occupies the same, the Mortgagor agrees for himself and for each owner to surrender possession of the premises to the holder of this Mortgage immediately upon any default hereunder and if such Mortgagor or subsequent owner remain in possession after any default, the possession shall be as tenant of the holder of this Mortgage and Mortgagor or such subsequent owner agrees to pay in advance upon demand to the holder of this Mortgage as a reasonable monthly rental for the premises an amount at least equivalent to one-twelfth (1/12) of the aggregate of the twelve monthly installments payable in the then current year, plus the actual amount of the annual taxes, assessments, water rates, and insurance premiums for such year not covered by the aforesaid monthly payments, and in default of so doing such Mortgagor or subsequent owner may also be dispossessed by the usual summary proceedings. This covenant shall

become effective immediately after the happening of any such default, solely on the determination of the then holder of this Mortgage. In case of foreclosure and the appointment of a receiver of the rents, this covenant shall inure to the benefit of such receiver;

22. The Mortgagor covenants and warrants that the improvements about to be made upon the premises above described and all plans and specifications comply with all municipal ordinances and regulations made or promulgated by lawful authority, and that the same will upon completion comply with all such municipal ordinances and regulations and with the rules of the fire rating or inspection organization, bureau, association or office having jurisdiction, which are now or may hereafter become applicable;

23. That the Mortgagor will receive the advances secured by this Mortgage and will hold the right to receive such advances as a trust fund to be applied first for the purpose of paying the cost of the improvements, and that it will apply said advancement before using any part of the total of the same for any other purpose;

24. That so long as this Mortgage and the Note secured hereby are insured or held by the Secretary of Housing and Urban Development, under the provisions of the National Housing Act, the Mortgagor will not execute or file for record any instrument which imposes a restriction upon the sale or occupancy of the mortgaged property on the basis of race, color, creed, or national origin;

25. That the whole of the said principal sum and of any other sums of money secured by this Mortgage shall, forthwith or thereafter, at the option of the Mortgagee, become due and payable upon the happening of either of the following events, irrespective of whether or not the same be remedied by the Mortgagee:

(a)  Failure to make any monthly payment provided for herein or in the Note secured hereby prior to the due date of the next such installment.

(b)  Failure of the Mortgagor to perform or comply with any other covenant, agreement, term, or condition of this mortgage or of the Note secured hereby in accordance with the terms hereof and thereof;

26. In the event the Mortgagee shall declare the whole of the said principal sum and of any other sums of money secured by this Mortgage, due and payable as aforesaid, the Mortgagor does hereby authorize and fully empower the Mortgagee to sell the mortgaged premises at public auction, and convey the same to the purchaser according to the statute in such case made and provided;

27. That no waiver of any covenant herein or of the Note secured hereby shall at anytime thereafter be held to be a waiver of the terms hereof or of the Note secured hereby;

28. That if the Mortgagee is made or becomes a party to any suit or action, by reason of this Mortgage or the indebtedness hereby secured, the Mortgagee will pay all expenses incurred by the Mortgagee therein, including a reasonable attorney's fee;

PROVIDED ALWAYS, NEVERTHELESS, that if the Mortgagor shall well and truly pay the said Note and other indebtedness secured hereby, and shall fully keep and perform all the covenants, agreements, terms and conditions in this Mortgage and in the Note secured hereby, then this Mortgage shall be released and discharged at the cost of the Mortgagor.

29. Notwithstanding any other provision contained herein or in the note secured hereby, it is agreed that the execution of this Mortgage shall impose no personal liability upon the Mortgagor for payment of the indebtedness evidenced by said note and in the event of a default, the holder of said note shall look solely to the property subject to this Mortgage and to the rents, revenues, issues and profits thereof in satisfaction of the indebtedness evidenced by said note and will not seek or obtain any deficiency or personal judgment against the Mortgagor except such judgment or decree as may be necessary to foreclose or bar its interest in the property subject to this Mortgage and all other property mortgaged, pledged, conveyed or assigned to secure payment of said note; provided, that nothing in this condition and no action so taken shall operate to impair any obligation of the Mortgagor under the Regulatory Agreement herein referred to and made a part hereof.

The provisions of Rider I attached hereto are incorporated herein.

[Signature on succeeding page]

This Mortgage and every covenant and agreement therein contained shall be binding upon and inure to the benefit of the Mortgagor and the Mortgagee and their respective successors and assigns and to the extent permitted by law shall bind every subsequent owner of the mortgaged premises. Whenever used, the singular number shall include the plural, the plural the singular and the use of any gender shall be applicable to all genders.

This Mortgage has been executed by authority of a Managing Member of the Mortgagor.

IN WITNESS WHEREOF, this Mortgage has been duly executed by the Mortgagor.

Vineyard Commons Holdings, LLC
a New York limited liability company

BY: DDFM, LLC, Managing Member

By: _Denise Barnett_

Denise Barnett, Manager

STATE OF NEW YORK } 
                   } SS:
COUNTY OF NEW YORK }

On the 1st day of July in the year 2009, before me, the undersigned, personally appeared Denise Barnett personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person on behalf of which the individual(s) acted, executed the instrument.

_Lenore Y. Reeves_

Notary Public

LENORE Y. REEVES
Notary Public, State of New York
No. 01RE6084255
Qualified in Nassau County
Certificate Filed in New York County
Commission Expires Oct. 11, ~~1999~~ 20IC

STATE OF NEW YORK

Loan No. 012-35693

Mortgage

Vineyard Commons Holdings, LLC

TO

Love Funding Corporation

## RIDER I

### ATTACHED TO AND MADE A PART OF
### MORTGAGE (the "MORTGAGE")

### FROM

### VINYARD COMMONS HOLDINGS, LLC
### TO

### LOVE FUNDING CORPORATION

### THE FOLLOWING PARAGRAPHS ARE ADDED AS ADDITIONAL
### PARAGRAPHS TO THE MORTGAGE

29. **SECTION 13 OF THE LIEN LAW OF NEW YORK.** The Mortgagor, in compliance with Section 13 of the Lien Law, will receive the advances secured by this Mortgage and will hold the right to receive the advances as a trust fund. The advances will be applied first for the purposes of paying the cost of improvement before using any part of the total of the advances for any other purpose.

30. **ARTICLE 14 OF THE REAL PROPERTY ACTIONS AND PROCEEDINGS LAW OF NEW YORK.** A power of sale has been granted in this Mortgage pursuant to Article 14 of the Real Property Actions and Proceedings Law ("Article 14"). Upon default of the Mortgage, the Mortgagee shall have the right to sell the Mortgaged Property, foreclosed in the manner prescribed by Article 14 for a non-judicial proceeding for foreclosure.

31. **Maximum Principal Indebtedness.** Notwithstanding anything to the contrary contained herein, the maximum amount of principal indebtedness secured by this Mortgage at the time of execution thereof or which under any contingency may be secured by this Mortgage is FORTY-SIX MILLION FIVE HUNDRED FORTY-FIVE THOUSAND and 00/100ths Dollars ($46,545,000.00) plus (a) taxes, charges or assessments which may be imposed by law upon the Property; (b) premiums on insurance policies covering the Property; and (c) expenses incurred in upholding the lien of this Mortgage, including, but not limited to (I) the expense of any litigation to prosecute or defend the rights and lien created by this Mortgage, (II) any amount, cost or charges to which the Mortgage becomes subrogated, upon payment, whether under recognized principles of law or equity, or under express statutory authority, and (III) interest at the default rate (or regular interest rate).

32. In the event of a conflict between the terms and provisions of the Mortgage and this Rider I, the terms and provisions of this Rider I shall control.

Vineyard Commons Holdings, LLC
a New York limited liability company

BY: DDFM, LLC, Managing Member

By: _Denise Barnett_

Denise Barnett, Manager

---

STATE OF NEW YORK    }
                     } SS:
COUNTY OF NEW YORK   }

On the 1st day of July in the year 2009, before me, the undersigned, personally appeared _Denise Barnett_, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person on behalf of which the individual(s) acted, executed the instrument.

_Jean M. Reeves_
Notary Public

END OF RIDER I

LENORE M. REEVES
Notary Public, State of New York
No. 01RE5084366
Qualified in Nassau County
Certificate Filed in New York County
Commission Expires Oct. 17, 2010

ND: 4820-2355-6098, v. 1

ALTA LOAN POLICY (6/17/06)

**SCHEDULE A DESCRIPTION**

File No.:   ST08-02276

Policy No.:   M-8912-793630

## PARCEL A

ALL that certain plot, piece or parcel of land situate in the Town of Lloyd, County of Ulster and State of New York, bounded and more particularly described as follows:

BEGINNING at a point on the Southeasterly line of Vineyard Avenue, AKA Route 44/55, said point being the intersection of the Southeasterly line of Vineyard Avenue with the Southwesterly line of the lands now or formerly of Highland Real Estate Ventures, LLC, as recorded in Liber 3099, Page 187 generally along the remains of a stonewall the following:

S 44°37'43" E - 156.89 feet to a point, thence;
S 45°49'00" E - 316.73 feet to a point, thence;
S 47°21'16" E - 290.54 feet to an iron rod found in the centerline of a stonewall, thence; leaving said line and running along the Northwesterly line of the lands now or formerly of Vineyard Avenue Development, LLC, as recorded in Instrument Number 2006-00028968, the following:
S 38°38'28" W - 166.50 feet to a point, thence;
leaving said line and running along the Northeasterly line of the lands of Vineyard Avenue Development, LLC, the following:
N 46°06'32" W - 764.04 feet along the centerline of an 8 foot wide easement and right-of-way to a point, thence;
leaving said line and running along the Southeasterly line of Vineyard Avenue the following:
N 38°37'19" E - 165.86 feet to the point of beginning.
Containing an area of 2.838 acres, more or less. The above herein described parcel also being known as Tax Lot 95.2-6-36 as shown on the current tax maps of the Town of Lloyd.

Being the same premises conveyed to Vineyard Avenue Development, LLC by deed from Henriques/Irvine dated June 27, 2008 and recorded in the Ulster County Clerks Office on July 1, 2008 in Instrument No. 2008-00012290.

WITH THE EXCEPTION therefrom a parcel containing 3463.73 square feet, lying within the right of way lines of Vineyard Avenue, (aka State Route 44/55) about to be acquired by the State of New York. Said 3463.73 square feet parcel being known as Parcel No. 90, Map No. 71, situate in the Town of Lloyd, County of Ulster, State of New York, as shown on a map entitled, "New York State, Department of Transportation, Acquisition Map, Highland-Gardiner, Part 1, S.H. NO. 350, about to be filed in the Regional Office of the NYSDOT. The intention of this exception is to convey any and all of the land lying within said right of way, including all the rights, title, and interest to any portion thereof, to the State of New York.

## PARCEL B

ALL that certain plot, piece or parcel of land situate in the Town of Lloyd, County of Ulster and State of New York, bounded and more particularly described as follows:

BEGINNING at a point on the Southeasterly line of Vineyard Avenue, AKA Route 44/55, said point being the intersection of the Southeasterly line of Vineyard Avenue with the Northeasterly line of lands now or formerly of

Stillwell, as recorded in Liber 1480 Page 318 and running thence along the Southerly line of Vineyard Avenue, the following:

ALTA LOAN POLICY (6/17/06)

N22°41'10" E - 92.50 feet to a point, thence;
N27°08'50" E - 67.10 feet to a point, thence;
N31°43.15" E - 64.87 feet to a point, thence;
N36°03'10" E - 75.00 feet to a point, thence;
N38°33'55" E - 77.40 feet to a point, thence;
N39°32'00".E - 104.34 feet to a point, thence;

leaving said line and running along the Southwesterly line of lands now or formerly of Vineyard Avenue Development, LLC, as recorded in Instrument No. 2008-00012290 the following:

S 46°06'32" E - 764.04 feet, along the centerline of an 8 foot wide easement and right-of-way to a point, thence;

leaving said line and running along the Southeasterly line of lands now or formerly of Vineyard Avenue Development, LLC the following:

N 38°38'28" E - 166.50 feet to an iron rod found in the centerline of a stonewall on the Southwesterly line of the lands now or formerly of Highland Real Estate. Ventures, LLC, as recorded in Liber 3099, Page 187, thence;

leaving said line and running along the Southwesterly line of the lands now or formerly of Highland Real Estate Ventures, LLC, generally along the remains of a stonewall the following:

S47°21'16" E - 242.23 feet to a point, thence;
S56°30'10" E - 58.30 feet to a point, thence;
S41°09'49" E - 50.87 feet to a point in the Twaalfskill Creek, thence;

leaving said line and running along the Northwesterly line of lands now or formerly of Roberto, as recorded in Liber 821 Page 52, generally through the Twaalfskill Creek the following:

S31°46'40" W - 236.86 feet to a point, thence;
S34°42'48" W - 277.50 feet to a point, thence;
S29°10'30" W - 29.30 feet to a point, thence;
S33°4'72'5" W - 47.40 feet to a point, thence;

continuing along said line in part through the Twaalfskill Creek, then in part passing over the Northwesterly bank of said creek and continuing generally along the remains of a stonewall the following:

S33°57'07" W - 568.40 feet to a point on the Northerly bank of the Twaalfskill Creek at the intersection of a stonewall if projected, thence;

leaving said line and running along the Northeasterly line of the lands now or formerly of Bozydaj, as recorded in Liber 1310 Page 368, generally along the remains of a stonewall the following:

N46°24'16" W - 325.00 feet to a point at the intersection of a stonewall, thence;

continuing along said line the following:

N45°52'16" W - 536.62 feet to a point thence;

leaving said line and running along the Southeasterly line of lands now or formerly of Reina, as recorded in Liber 1574 Page 166, the following:

N34°08'07" E - 138.00 feet to a point, thence;

leaving said line and running along the Northeasterly line of the lands now or formerly of Reina the following:

N55°51'53" W - 15.20 feet to an iron pipe found, thence;

leaving said line and running along the Southeasterly line of lands now or formerly of Coppola, as recorded in Liber 3937 Page 59, the following:

N36°56'32" E - 249.33 feet to a point, thence;

leaving said line and running along the Southeasterly line of lands now or formerly of Stillwell the following:

N32°32'14" E - 140.00 feet to a point, thence;

leaving said line and running along the Northeasterly line of the lands now or formerly of Stillwell the following:

N51°37'23" W - 258.52 feet to a point on the southeasterly side of Vineyard Avenue and the point of beginning.

The above herein described parcel also being known as Tax Lot 95.2-6-2 as shown on the current tax maps of the Town of Lloyd.

Being the same premises conveyed to Vineyard Avenue Development, LLC by deed from Ultra Craft Homes, Inc. dated November 7, 2006, and recorded in the Ulster County Clerk's Office on November 27, 2006 in Instrument No. 2006-00028968.

ALTA LOAN POLICY (6/17/06)

**PARCEL "B" IS SUBJECT TO A 20 FOOT WIDE EASEMENT OR RIGHT-OF-WAY** to rear of barn to enable owner of barn to have access to the basement of said barn, as set forth and recorded in Liber 1515 Page 21 and in Liber 1480 Page 318, being bounded and more particularly described as follows:

BEGINNING at a point on the Southeasterly line of Vineyard Avenue, aka Route 44/55, said point being the intersection of the Southeasterly line of Vineyard Avenue with the Northeasterly line of the lands now or formerly of Stillwell, as recorded in Liber 1480 Page 318 and running thence along the Southeasterly line of Vineyard Avenue the following:
N22°41'10" E - 20.77 feet to a point, thence;
leaving said line and running over and through the lands of the above herein described parcel "B" the following:
S51°37'23" E - 282.20 feet to a point, thence;
S32°32'14" W - 160.46 feet to a point, thence;
N50°36'23" W - 20.14 feet to a point, thence;
leaving said line and running along the Southeasterly line of lands now or formerly of Stillwell, the following:
N32°32'14" E - 140.00 feet to a point, thence;
leaving said line and running along the Northeasterly lines of lands now or formerly of Stillwell, the following:
N51°37'23" W - 258.52 feet to a point on the southeasterly side of Vineyard Avenue and the point of beginning.

**PARCEL "A" AND PARCEL "B" ARE SUBJECT TO A 30 FOOT WIDE PUBLIC UTILITY EASEMENT** being bounded and more particularly described as follows:

BEGINNING at a point on the Southeasterly line of Vineyard Avenue, aka Route 44/55, said point being the intersection of the Southeasterly line of Vineyard Avenue and the Southwesterly line of lands now or formerly of Highland Real Estate Ventures, LLC, as recorded in Liber 3099, Page 187 the following:
S44°37'43" E - 30.21 feet to a point, thence;
leaving said line and running Southwesterly, 30 feet Southeasterly and parallel with the Southeasterly line of Vineyard Avenue and along the Northwesterly line of parcel "A" the following:
S38°37'19" W - 162.54 feet to a point, thence;
leaving said line and running Southwesterly, 30 feet Southeasterly and parallel with the Southeasterly line of Vineyard Avenue, over and through the lands of parcel "B" the following:
S39°32'00" W - 104.33 feet to a point, thence;
S38°33'35" W - 25.47 feet to a point, thence;
leaving said parallel line and continuing through the lands of parcel "B" the following:

S02°33'00" W - 127.59 feet to a point, thence;
S11°27'00" E - 61.10 feet to a point, thence;
S52°27'00" E - 238.83 feet to a point, thence;
S05°27'00" E - 85.47 feet to a point, thence;
S39°33'00" W - 191.14 feet to a point, thence;
S14°27'00" E - 313.00 feet to a point, thence;
N84°38'00" E - 80.48 feet to a point, thence;
S50°27'00" E - 38.00 feet to a point, thence;
S31°33'00" W - 40.00 feet to a point, thence;

N83°57'00" W - 110.00 feet to a point, thence;
N14°27'00" W - 361.00 feet to a point, thence;
N39°33'00" E - 194.00 feet to a point, thence;
N05°27'00" W - 60.00 feet to a point, thence;
N52°27'00" W - 237.00 feet to a point, thence;
N11°27'00" W - 76.00 feet to a point, thence;
N02°33'00" E - 90.00 feet to a point being 30 feet Southeasterly from the Southeasterly line of Vineyard Avenue, thence;
S36°03'10" W - 73.21 feet to a point being 30 feet Southeasterly from and parallel with the southeasterly line of Vineyard Avenue to a point, thence;
S31°43'15" W - 62.54 feet to a point, thence;

ALTA LOAN POLICY (6/17/06)

S27°08'50" W - 64.73 feet to a point, thence;

S22°41'10" W - 99.76 feet to a point on the Northeasterly line of the lands now or formerly of Stillwell, as recorded in Liber 1480, Page 318, thence;

leaving said parallel line and running along the Northeasterly line of the lands now or formerly of Stillwell the following:

N51°37'23" W - 31.16 feet to a point on the Southeasterly line of the Vineyard Avenue, thence;

leaving said line and running along the Southeasterly line of Vineyard Avenue the following;

N22°41'10" E - 92.50 feet to a point, thence;

N27°08'50" E - 67.10 feet to a point, thence;

N31°43'15" E - 64.87 feet to a point, thence;

N36°03'10" E - 75.00 feet to a point, thence;

N38°33'55" E - 77.40 feet to a point, thence;

N39°32'00" E - 104.34 feet to a point, thence;

N38°37'19" E - 165.86 feet to the point of beginning.

## SUBJECT TO THE RIGHTS OF PUBLIC UTILITIES OF RECORD

PARCEL"A" AND PARCEL "B" ARE SUBJECT TO AN 8' WIDE COMMON EASEMENT OR RIGHT-OF-WAY being bounded and more particularly described as follows:
the centerline of said easement being along EITHER the 5th course of parcel "A" or the 7th course of parcel "B", whereas both are reciprocals of the same course.

# EXHIBIT D

Nina Postupack
County Clerk
Kingston, NY 12401

50 2012 00002554

Volm-9904 Pg-174

Instrument Number: 2012- 00002554
As
M02 - Assignment of Mortgage

Recorded On: February 23, 2012

Parties: LOVE FUNDING CORP
To
SECRETARY OF HOUSING&URBAN DEV

Billable Pages: 7

Recorded By: KENSINGTON VANGUARD

Num Of Pages: 7

Comment:

## ** Examined and Charged as Follows: **

2 - Assignment of Mortgage     75.50

    Recording Charge:     75.50

## ** THIS PAGE IS PART OF THE INSTRUMENT **

I hereby certify that the within and foregoing was recorded in the Clerk's Office For: Ulster County,

e Information:

    Document Number: 2012- 00002554
    Receipt Number: 1122053
    Recorded Date/Time: February 23, 2012 12:12:37P
    Book-Vol/Pg: Bk-M Vl-9904 Pg-174
    Cashier / Station: s smar / Cashier Workstation 6

Record and Return To:

    LORI HOFFER
    EMMET MARVIN&MARTIN LLP
    120 BROADWAY
    NEW YORK NY 10271



Nina Postupack

Nina Postupack Ulster County Clerk

This Assignment is an Assignment within the secondary market, and, therefore, is not subject to the requirements of the Real Property Law Section 275.

- 95. 2
6
36 and 2

## ASSIGNMENT OF MORTGAGE

~~KNOW ALL MEN BY THESE PRESENTS:~~

LOVE FUNDING CORPORATION, a Virginia corporation, having an office at 1250 Connecticut Avenue-NW, Suite 310 Washington, DC, 20036, hereinafter referred to as the Assignor, for value received does by these presents, without recourse, representation or warranty, except as hereinafter set forth, grant, bargain, sell, assign, transfer and set over unto the SECRETARY OF HOUSING AND URBAN DEVELOPMENT, OF WASHINGTON, D.C., HIS SUCCESSORS AND ASSIGNS, having an office at 451 Seventh Street, SW, Washington, D.C., 20410, hereinafter referred to as the Assignee, all right, title and interest in and to that certain:

Mortgage Note and Mortgage each dated July 2, 2009, executed by Vineyard Commons Holdings, LLC, a New York limited liability company, in the original principal amount of Forty Six Million Five Hundred Forty Five Thousand and no/100 Dollars ($46,545,000.00), which Mortgage Note, was made payable to Love Funding Corporation, a Virginia corporation, and which Mortgage Note, is secured by said Mortgage, which was filed for record on August 3, 2009, under Document No. 2009-00012292, in the Ulster County Clerk's Office, New York and covering the following described property:

### SEE EXHIBIT "A" ATTACHED HERETO

TO HAVE AND TO HOLD the same unto the said SECRETARY OF HOUSING AND URBAN DEVELOPMENT OF WASHINGTON, D.C., HIS SUCCESSORS AND ASSIGNS.

This Assignment is without recourse or warranty, except that the undersigned hereby warrants that no act or omission of the undersigned has impaired the validity or priority of said Mortgage. The undersigned also warrants that said Mortgage is prior to all mechanics' and materialmen's liens filed of record subsequent to the recording of such Mortgage regardless of whether such liens attached prior to such recording date, and prior to all liens and encumbrances which may have attached or defects which may have arisen subsequent to the recording of such Mortgage (except such liens or other matters as have been approved by the Assignee hereunder). The undersigned also warrants that, as of the execution of this Assignment, the sum of Forty Five Million Nine Hundred Forty Two Thousand Five Hundred Sixty Four and 00/100 Dollars ($45,942,564.00), together with the interest accruing at the rate of 6.6% per annum, as provided in the said Mortgage Note and Mortgage, is actually due and owing under said Mortgage Note and Mortgage, that there are no offsets or counterclaims thereto, and that the undersigned has a good right to assign the said Mortgage Note and Mortgage.

✓ Kensington Vanguard
39 West 37th St. 7th Floor
New York, NY 10018

CHECKED   CC
ENTERED   SM
MARKIOFF _____

IN WITNESS WHEREOF, the Assignor has executed this Assignment this _17th_ day of February, 2012.

LOVE FUNDING CORPORATION

Witness:

By: _Vicki Sammons_

Name: Vicki Sammons

Title:   Vice President

DISTRICT OF COLUMBIA

On the   _17th_   day of February, 2012, before me, the undersigned, personally appeared Vicki Sammons, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted executed the instrument.

_Wendy Cromartie_

Notary Public

My Commission Expires  _2/14/17_

Prepared by and return after recording to Lori Hoffer, Emmet, Marvin & Martin, LLP, 120 Broadway, New York, NY 10271

Project: Vineyard Commons
Location: Lloyd, New York
FHA No.: 012-35693



EXHIBIT A

## PARCEL A

ALL that certain plot, piece or parcel of land situate in the Town of Lloyd, County of Ulster and State of New York, bounded and more particularly described as follows:

BEGINNING at a point on the Southeasterly line of Vineyard Avenue, AKA Route 44/55, said point being the intersection of the Southeasterly line of Vineyard Avenue with the Southwesterly line of the lands now or formerly of Highland Real Estate Ventures, LLC, as recorded in Liber 3099, Page 187 generally along the remains of a stonewall the following:

S 44°37'43" E - 156.89 feet to a point, thence;
S 45°49'00" E - 316.73 feet to a point, thence;
S 47°21'16" E - 290.54 feet to an iron rod found in the centerline of a stonewall, thence; leaving said line and running along the Northwesterly line of the lands now or formerly of Vineyard Avenue Development, LLC, as recorded in Instrument Number 2006-00028968, the following:
S 38°38'28" W - 166.50 feet to a point, thence;
leaving said line and running along the Northeasterly line of the lands of Vineyard Avenue Development, LLC, the following:
N 46°06'32" W - 764.04 feet along the centerline of an 8 foot wide easement and right-of-way to a point, thence; leaving said line and running along the Southeasterly line of Vineyard Avenue the following:
N 38°37'19" E - 165.86 feet to the point of beginning.
Containing an area of 2.838 acres, more or less. The above herein described parcel also being known as Tax Lot 95.2-6-36 as shown on the current tax maps of the Town of Lloyd.

Being the same premises conveyed to Vineyard Avenue Development, LLC by deed from Henriques/Irvine dated June 27, 2008 and recorded in the Ulster County Clerks Office on July 1, 2008 in Instrument No. 2008-00012290.

WITH THE EXCEPTION therefrom a parcel containing 3463.73 square feet, lying within the right of way lines of Vineyard Avenue, (aka State Route 44/55) about to be acquired by the State of New York. Said 3463.73 square feet parcel being known as Parcel No. 90, Map No. 71, situate in the Town of Lloyd, County of Ulster, State of New York, as shown on a map entitled, "New York State, Department of Transportation, Acquisition Map, Highland-Gardiner, Part 1, S.H. NO. 350, about to be filed in the Regional Office of the NYSDOT. The intention of this exception is to convey any and all of the land lying within said right of way, including all the rights, title, and interest to any portion thereof, to the State of New York.

## PARCEL B

ALL that certain plot, piece or parcel of land situate in the Town of Lloyd, County of Ulster and State of New York, bounded and more particularly described as follows:

BEGINNING at a point on the Southeasterly line of Vineyard Avenue, AKA Route 44/55, said point being the intersection of the Southeasterly line of Vineyard Avenue with the Northeasterly line of lands now or formerly of

Stillwell, as recorded in Liber 1480 Page 318 and running thence along the Southerly line of Vineyard Avenue, the following:

N22°41'10" E - 92.50 feet to a point, thence;
N27°08'50" E - 67.10 feet to a point, thence;
N31°43.15" E - 64.87 feet to a point, thence;
N36°03'10" E - 75.00 feet to a point, thence;
N38°33'55" E - 77.40 feet to a point, thence;
N39°32'00" E - 104.34 feet to a point, thence;

leaving said line and running along the Southwesterly line of lands now or formerly of Vineyard Avenue
Development, LLC, as recorded in Instrument No. 2008-00012290 the following:

S 46°06'32" E - 764.04 feet, along the centerline of an 8 foot wide easement and right-of-way to a point, thence;
leaving said line and running along the Southeasterly line of lands now or formerly of Vineyard Avenue Development,
LLC the following:

N 38°38'28" E - 166.50 feet to an iron rod found in the centerline of a stonewall on the Southwesterly line of the lands
now or formerly of Highland Real Estate. Ventures, LLC, as recorded in Liber 3099, Page 187, thence;
leaving said line and running along the Southwesterly line of the lands now or formerly of Highland Real Estate
Ventures, LLC, generally along the remains of a stonewall the following:

S47°21'16" E - 242.23 feet to a point, thence;
S56°30'10" E - 58.30 feet to a point, thence;
S41°09'49" E - 50.87 feet to a point in the Twaalfskill Creek, thence;

leaving said line and running along the Northwesterly line of lands now or formerly of Roberto, as recorded in Liber 821
Page 52, generally through the Twaalfskill Creek the following:

S31°46'40" W - 236.86 feet to a point, thence;
S34°42'48" W - 277.50 feet to a point, thence;
S29°10'30" W - 29.30 feet to a point, thence;
S33°47'25" W - 47.40 feet to a point, thence;

continuing along said line in part through the Twaalfskill Creek, then in part passing over the Northwesterly bank of said
creek and continuing generally along the remains of a stonewall the following:

S33°57'07" W - 568.40 feet to a point on the Northerly bank of the Twaalfskill Creek at the intersection of a stonewall if
projected, thence;

leaving said line and running along the Northeasterly line of the lands now or formerly of Bozydaj, as recorded in Liber
1310 Page 368, generally along the remains of a stonewall the following:

N46°24'16" W - 325.00 feet to a point at the intersection of a stonewall, thence;

continuing along said line the following:

N45°52'16" W - 536.62 feet to a point thence;

leaving said line and running along the Southeasterly line of lands now or formerly of Reina, as recorded in Liber 1574
Page 166, the following:

N34°08'07" E - 138.00 feet to a point, thence;

leaving said line and running along the Northeasterly line of the lands now or formerly of Reina the following:

N55°51'53" W - 15.20 feet to an iron pipe found, thence;

leaving said line and running along the Southeasterly line of lands now or formerly of Coppola, as recorded in Liber 3937
Page 59, the following:

N36°56'32" E - 249.33 feet to a point, thence;

leaving said line and running along the Southeasterly line of lands now or formerly of Stillwell the following:
N32°32'14" E - 140.00 feet to a point, thence;

leaving said line and running along the Northeasterly line of the lands now or formerly of Stillwell the following:
N51°37'23" W - 258.52 feet to a point on the southeasterly side of Vineyard Avenue and the point of beginning.

The above herein described parcel also being known as Tax Lot 95.2-6-2 as shown on the current tax maps of the Town
of Lloyd.

Being the same premises conveyed to Vineyard Avenue Development, LLC by deed from Ultra Craft Homes, Inc. dated
November 7, 2006, and recorded in the Ulster County Clerk's Office on November 27, 2006 in Instrument No. 2006-
00028968.

PARCEL "B" IS SUBJECT TO A 20 FOOT WIDE EASEMENT OR RIGHT-OF-WAY to rear of barn to enable owner of barn to have access to the basement of said barn, as set forth and recorded in Liber 1515 Page 21 and in Liber 1480 Page 318, being bounded and more particularly described as follows:

BEGINNING at a point on the Southeasterly line of Vineyard Avenue, aka Route 44/55, said point being the intersection of the Southeasterly line of Vineyard Avenue with the Northeasterly line of the lands now or formerly of Stillwell, as recorded in Liber 1480 Page 318 and running thence along the Southeasterly line of Vineyard Avenue the following:
N22°41'10" E - 20.77 feet to a point, thence;

leaving said line and running over and through the lands of the above herein described parcel "B" the following:
S51°37'23" E - 282.20 feet to a point, thence;
S32°32'14" W - 160.46 feet to a point, thence;
N50°36'23" W - 20.14 feet to a point, thence;

leaving said line and running along the Southeasterly line of lands now or formerly of Stillwell, the following:
N32°32'14" E - 140.00 feet to a point, thence;

leaving said line and running along the Northeasterly lines of lands now or formerly of Stillwell, the following:
N51°37'23" W - 258.52 feet to a point on the southeasterly side of Vineyard Avenue and the point of beginning.

PARCEL "A" AND PARCEL "B" ARE SUBJECT TO A 30 FOOT WIDE PUBLIC UTILITY EASEMENT being bounded and more particularly described as follows:

BEGINNING at a point on the Southeasterly line of Vineyard Avenue, aka Route 44/55, said point being the intersection of the Southeasterly line of Vineyard Avenue and the Southwesterly line of lands now or formerly of Highland Real Estate Ventures, LLC, as recorded in Liber 3099, Page 187 the following:
S44°37'43" E - 30.21 feet to a point, thence;
leaving said line and running Southwesterly, 30 feet Southeasterly and parallel with the Southeasterly line of Vineyard Avenue and along the Northwesterly line of parcel "A" the following:
S38°37'19" W - 162.54 feet to a point, thence;
leaving said line and running Southwesterly, 30 feet Southeasterly and parallel with the Southeasterly line of Vineyard Avenue, over and through the lands of parcel "B" the following:
S39°32'00" W - 104.33 feet to a point, thence;
S38°33'35" W - 25.47 feet to a point, thence;
leaving said parallel line and continuing through the lands of parcel "B" the following:

S02°33'00" W - 127.59 feet to a point, thence;
S11°27'00" E - 61.10 feet to a point, thence;
S52°27'00" E - 238.83 feet to a point, thence;
S05°27'00" E - 85.47 feet to a point, thence;
S39°33'00" W - 191.14 feet to a point, thence;
S14°27'00" E - 313.00 feet to a point, thence;
N84°38'00" E - 80.48 feet to a point, thence;
S50°27'00" E - 38.00 feet to a point, thence;
S31°33'00" W - 40.00 feet to a point, thence;

N83°57'00" W - 110.00 feet to a point, thence;
N14°27'00" W - 361.00 feet to a point, thence;
N39°33'00" E - 194.00 feet to a point, thence;
N05°27'00" W - 60.00 feet to a point, thence;
N52°27'00" W - 237.00 feet to a point, thence;
N11°27'00" W - 76.00 feet to a point, thence;
N02°33'00" E - 90.00 feet to a point being 30 feet Southeasterly from the Southeasterly line of Vineyard Avenue, thence;
S36°03'10" W - 73.21 feet to a point being 30 feet Southeasterly from and parallel with the southeasterly line of Vineyard Avenue to a point, thence;
S31°43'15" W - 62.54 feet to a point, thence;

S27°08'50" W - 64.73 feet to a point, thence;

S22°41'10" W - 99.76 feet to a point on the Northeasterly line of the lands now or formerly of Stillwell, as recorded in Liber 1480, Page 318, thence;

leaving said parallel line and running along the Northeasterly line of the lands now or formerly of Stillwell the following:
N51°37'23" W - 31.16 feet to a point on the Southeasterly line of the Vineyard Avenue, thence;

leaving said line and running along the Southeasterly line of Vineyard Avenue the following:
N22°41'10" E - 92.50 feet to a point, thence;
N27°08'50" E - 67.10 feet to a point, thence;
N31°43'15" E - 64.87 feet to a point, thence;
N36°03'10" E - 75.00 feet to a point, thence;
N38°33'55" E - 77.40 feet to a point, thence;
N39°32'00" E - 104.34 feet to a point, thence;
N38°37'19" E - 165.86 feet to the point of beginning.

## SUBJECT TO THE RIGHTS OF PUBLIC UTILITIES OF RECORD

PARCEL "A" AND PARCEL "B" ARE SUBJECT TO AN 8' WIDE COMMON EASEMENT OR RIGHT-OF-WAY being bounded and more particularly described as follows:
the centerline of said easement being along EITHER the 5th course of parcel "A" or the 7th course of parcel "B", whereas both are reciprocals of the same course.

Case 1:12-cv-01692-LEK-CFH   Document 3-2   Filed 12/03/12   Page 61 of 118

Project:    Vineyard Commons
Location:   Lloyd, New York
FHA No.:    012-35693

## ALLONGE TO MORTGAGE NOTE

THIS IS AN ALLONGE to the Mortgage Note dated July 2, 2009, made by Vineyard Commons Holdings, LLC, a New York limited liability company to Love Funding Corporation, a Virginia corporation, in the original principal amount of Forty Six Million Five Hundred Forty Five Thousand and no/100 Dollars ($46,545,000.00).

For value received, all right, title and interest of the undersigned to the within Mortgage Note, the unpaid balance of which is Forty Five Million Nine Hundred Forty Two Thousand Five Hundred Sixty Four and 00/100 Dollars ($45,942,564.00), together with the interest thereon, are hereby assigned to the Secretary of Housing and Urban Development of Washington, D.C., his successors and assigns, without recourse or warranty except as shown in that certain assignment of even date assigning to said Secretary the Mortgage securing this Note.

Dated this _17th_ day of February, 2012.

[INTENTIONALLY LEFT BLANK]

LOVE FUNDING CORPORATION

Witness:

By: _Vicki Sammons_

Name: Vicki Sammons

Title: Vice President

# EXHIBIT E



Ulster County
Nina Postupack
County Clerk
Kingston, NY 12401

09-12292

60 2012 00014175

Volm-10086 Pg-239

Instrument Number: 2012- 00014175
As
**Recorded On:** September 11, 2012    **M02 - Assignment of Mortgage**

**Parties:** SECRETARY OF HOUSING&URBAN DEV
To
TNHYIF INC

**Billable Pages:** 3

**Recorded By:** NEW YORK TITLE

**Num Of Pages:** 3

**Comment:**

## ** Examined and Charged as Follows: **

| | |
|---|---|
| M02 - Assignment of Mortgage | 55.50 |
| Recording Charge: | 55.50 |

## ** THIS PAGE IS PART OF THE INSTRUMENT **

I hereby certify that the within and foregoing was recorded in the Clerk's Office For: Ulster County,

**File Information:**

Document Number: 2012- 00014175
Receipt Number: 1187171
Recorded Date/Time: September 11, 2012 12:13:33P
Book-Vol/Pg: Bk-M Vl-10086 Pg-239
Cashier / Station: s smar / Cashier Workstation 6

**Record and Return To:**

KENNETH F JURIST ESQ
CUDDY&FEDER LLP
445 HAMILTON AVENUE 14TH FLOOR
WHITE PLAINS NY 10601



Nina Postupack

Nina Postupack Ulster County Clerk

3
\

After recording, please
return to:

Kenneth F. Jurist, Esq.
Cuddy & Feder LLP
445 Hamilton Avenue, 14th Floor
White Plains, New York 10601

This instrument
prepared by:

Gregory J. Bolton, Esq.
U.S. Department of Housing and
Urban Development
Office of General Counsel
451 Seventh Street S.W.
Washington, D.C. 20410

## ASSIGNMENT OF MORTGAGE

FHA Project No.: 012-35693
Project Name: Vineyard Apartments
City, State: Lloyd, New York

    THE SECRETARY OF HOUSING AND URBAN DEVELOPMENT OF
WASHINGTON, D.C. ("HUD"), 451 Seventh Street S.W., Washington, DC 20410, in
consideration of Ten Dollars ($10.00) and other good and valuable consideration, hereby assigns,
transfers, sets over and conveys to TNHYIF, Inc., c/o True North Management Group, 44 So.
Broadway, 10th Floor, White Plains, New York 10601 ("Assignee"), without recourse, the
following:

1. that certain Mortgage made by Vineyard Commons Holdings, LLC, mortgagor, to Love
Funding Corporation, mortgagee, dated July 2, 2009, in the principal amount of
$46,545,000.00, and recorded August 3, 2009, as Instrument No. 2009-00012292, in the
Ulster County Clerk's Office, and assigned by Assignment of Mortgage, dated February
17, 2012, from Love Funding Corporation to the Secretary of Housing and Urban
Development of Washington D.C., and his successors and assigns, duly recorded in the
Ulster County Clerk's Office on February 23, 2012 as Instrument No. 2012-00002554
(the "Mortgage"), together with the note secured by the Mortgage (the "Note"); and

2. such other documents, agreements, instruments and other collateral (excluding the
Regulatory Agreement referenced in the Mortgage) which evidence, secure or otherwise
relate to HUD's right, title or interest in and to the Mortgage and/or the Note, including
without limitation the security agreement, if any, and the title insurance policies and
hazard insurance policies that may presently be in effect.

*This assignment is not subject to the requirements of Section 275
of the Real Property Law because it is an assignment
within the secondary mortgage market.*

CHECKED
ENTERED
MARKOFF

*New York/Title (Marvin)*

C&F: 1987686.1

**IN WITNESS WHEREOF**, HUD has caused this Assignment to be executed and delivered under seal by its duly authorized agent as of the _30th_ day of _August_ , 2012.

WITNESS:

SECRETARY OF HOUSING AND
URBAN DEVELOPMENT OF WASHINGTON, D.C.

_ERIC CRIBBS_

By: _____

Authorized Agent, _Marlene L. Robinson_

## UNIFORM FORM CERTIFICATE OF ACKNOWLEDGMENT
(Outside of New York State)

State, District of Columbia, Territory, Possession, or Foreign Country

District of Columbia ) ss.:

On the 30th day of August in the year 2012 before me, the undersigned, personally appeared Marlene L. Robinson, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their/ capacity (ies), that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument. in the District of Columbia.

Notary Public

[SEAL]

My commission expires _June 30, 2016_

District of Columbia : SS
Subscribed and Sworn to before me
this _30th_ day of _August_ , _2012_
Nikeisha Joyner-Wiggins, Notary Public, D.C.
My commission expires June 30, 2016

NIKEISHA JOYNER WIGGINS
NOTARY PUBLIC
MY COMMISSION EXPIRES
6/30/2016
DISTRICT OF COLUMBIA

# EXHIBIT F

12293 Page 1 of 13



**Ulster County**
**Nina Postupack**
**County Clerk**
**Kingston, NY 12401**

50 2009 00012293

Instrument Number: 2009- 00012293
As
D03 - Agreement

Recorded On: **August 03, 2009**

Parties: **VINEYARD COMMONS HOLDINGS LLC**
To
**SECRETARY OF HOUSING&URBAN DEV**

Recorded By: **STEWART TITLE INS CO**
Comment: **LLOYD TOWN**

Billable Pages: **13**

Num Of Pages: **13**

** Examined and Charged as Follows: **

D03 - Agreement          105.50

Recording Charge:       105.50

** THIS PAGE IS PART OF THE INSTRUMENT **

I hereby certify that the within and foregoing was recorded in the Clerk's Office For: Ulster County,

**File Information:**
Document Number: 2009- 00012293
Receipt Number: 820820
Recorded Date/Time: August 03, 2009 04:47:03P
Book-Vol/Pg: Bk-D VI-4792 Pg-10
Cashier / Station: m mpol / Cashier Workstation 7

**Record and Return To:**
FELICIA HULIT ESQ
MILES&STOCKBRIDGE PC
10490 LITTLE PATUXENT PARKWAY
COLUMBIA MD 21044

*Nina Postupack* (signature)

Nina Postupack Ulster County Clerk

ST08.02276
5.95
B6
L2+36

**Regulatory Agreement for Multifamily Housing Projects**

U.S. Department of Housing and Urban Development
Office of Housing
Federal Housing Commissioner

| Under Sections 207, 220, 221(d)(4), 231 and 232, Except Nonprofits | | | |
|---|---|---|---|
| Project Number 012-35693 | | Mortgagee Love Funding Corporation. | |
| Amount of Mortgage Note $46,545,000.00 | | Date 7/2/09 | |
| Mortgage Recorded   State: NY   Book | County: Ulster   Page | Date signed TEN EDILEN 7/__/09 | Originally endorsed for insurance under Section 221(d)(4) |

This Agreement effective as of this ___2nd___ day of ___July___ , 2009 , between

Vineyard Commons Holdings, LLC

whose address is ___10 Wintergreen Place, Hopewell Jct., NY 12533___

their successors, heirs, and assigns (jointly and severally, hereinafter referred to as Owners) and the undersigned Secretary of Housing and Urban Development and his successors (hereinafter referred to as Secretary).

In consideration of the endorsement for insurance by the Secretary of the above described note or in consideration of the consent of the Secretary to the transfer of the mortgaged property or the sale and conveyance of the mortgaged property by the Secretary, and in order to comply with the requirements of the National Housing Act, as amended, and the Regulations adopted by the Secretary pursuant thereto, Owners agree for themselves, their successors, heirs and assigns, that in connection with the mortgaged property and the project operated thereon and so long as the contract of mortgage insurance continues in effect, and during such further period of time as the Secretary shall be the owner, holder or reinsurer of the mortgage, or during any time the Secretary is obligated to insure a mortgage on the mortgage property:

1. Owners, except as limited by paragraph 17 hereof, assume and agree to make promptly all payments due under the note and mortgage.

2. (a) Owners shall establish or continue to maintain a reserve fund for replacements by the allocation to such reserve fund in a separate account with the mortgagee or in a safe and responsible depository designated by the mortgagee, concurrently with the beginning of payments towards amortization of the principal of the mortgage insured or held by the Secretary of an amount equal to $14,234.00 per month (after a different date or amount is approved in writing by the Secretary.

Such fund, whether in the form of a cash deposit or invested in obligations of, or fully guaranteed as to principal by, the United States of America shall at all times be under the control of the mortgagee. Disbursements from such fund, whether for the purpose of effecting replacement of structural elements and mechanical equipment of the project or for any other purpose, may be made only after receiving the consent in writing of the Secretary. In the event that the owner is unable to make a mortgage note payment on the due date and that payment cannot be made prior to the due day of the next such installment or when the mortgagee has agreed to forgo making an election to assign the mortgage to the Secretary based on a monetary default, or to withdraw an election already made, the Secretary is authorized to instruct the mortgagee to withdraw funds from the reserve fund for replacements to be applied to the mortgage payment in order to prevent or cure the default. In addition, in the event of a default in the terms of the mortgage, pursuant to which the loan has been accelerated, the Secretary may apply or authorize the

application of the balance in such fund to the amount due on the mortgage debt as accelerated.

(b) Where Owners are acquiring a project already subject to an insured mortgage, the reserve fund for replacements to be established shall be equal to the amount due to be in such fund under existing agreements or charter provisions at the time Owners acquire such project, and payments hereunder shall begin with the first payment due on the mortgage after acquisition, unless some other method of establishing and maintaining the fund is approved in writing by the Secretary.

3. Real property covered by the mortgage and this agreement is described in Schedule A attached hereto.

(This paragraph 4 is not applicable to cases insured under Section 232.)

4. (a) Owners shall make dwelling accommodation and services of the project available to occupants at charges not exceeding those established in accordance with a rental schedule approved in writing by the Secretary, for any project subject to regulation of rent by the Secretary. Accommodations shall not be rented for a period of less than thirty (3) days, or, unless the mortgage is insured under Section 231, for more than three years. Commercial facilities shall be rented for such use and upon such terms as approved by the Secretary. Subleasing of dwelling accommodations, except for subleases of single dwelling accommodations by the tenant thereof, shall be prohibited without prior written approval of Owners and the Secretary and any lease shall so provide. Upon discovery of any unapproved sublease, Owners shall immediately demand cancellation and notify the Secretary thereof.

(b) Upon prior written approval by the Secretary, Owners may charge to and receive from any tenant such amounts as from time to time may be mutually agreed upon between the tenant and the Owners for any facilities and/or services which may be furnished by the Owners or others to such tenant upon his request, in addition to the facilities and services included in the approved rental schedule. Approval of charges for facilities and services is not required for any project not subject to regulation of rent by the Secretary.

(c) For any project subject to regulation of rent by the Secretary, the Secretary will at any time entertain a written

CHECKED

ENTERED

MARK/OFF

12293 Page 3 of 13

request for a rent increase properly supported by substantiating evidence and within a reasonable time shall:

(1)    Approve a rental schedule that is necessary to compensate for any net increase, occurring since the last approved rental schedule, in taxes (other than income taxes) and operating and maintenance cost over which Owners have no effective control or;

(2)    Deny the increase stating the reasons therefor.

5.   (a)  If the mortgage is originally a Secretary-held purchase money mortgage, or is originally endorsed for insurance under any Section other than Sections 231 or 232 and is not designed primarily for occupancy by elderly persons, Owners shall not in selecting tenants discriminate against any person or persons by reason of the fact that there are children in the family.

(b)  If the mortgage is originally endorsed for insurance under Section 221, Owners shall in selecting tenants give to displaced persons or families an absolute preference or priority of occupancy which shall be accomplished as follows:

(1)    For a period of sixty (60) days from the date of original offering, unless a shorter period of time is approved in writing by the Secretary, all units shall be held for such preferred applicants, after which time any remaining unrented units may be rented to non-preferred applicants;

(2)    Thereafter, and on a continuing basis, such preferred applicants shall be given preference over nonpreferred applicants in their placement on a waiting list to be maintained by the Owners; and

(3)    Through such further provisions agreed to in writing by the parties.

(c)  Without the prior written approval of the Secretary not more than 25% of the number of units in a project insured under Section 231 shall be occupied by persons other than elderly persons.

(d)  All advertising or efforts to rent a project insured under Section 231 shall reflect a bona fide effort of the Owners to obtain occupancy by elderly persons.

6.   Owners shall not without the prior written approval of the Secretary:

(a)  Convey, transfer, or encumber any of the mortgaged property, or permit the conveyance, transfer or encumbrance of such property.

(b)  Assign, transfer, dispose of, or encumber any personal property of the project, including rents, or pay out any funds except from surplus cash, except for reasonable operating expenses and necessary repairs.

(c)  Convey, assign, or transfer any beneficial interest in any trust holding title to the property, or the interest of any general partner in a partnership owning the property, or any right to manage or receive the rents and profits from the mortgaged property.

(d)  Remodel, add to, reconstruct, or demolish any part of the mortgaged property or subtract from any real or personal property of the project.

ND: 4819-3327-4883, v. 1

(e)  Make, or receive and retain, any distribution of assets or any income of any kind of the project except surplus cash and except on the following conditions:

(1)    All distributions shall be made only as of and after the end of a semiannual or annual fiscal period, and only as permitted by the law of the applicable jurisdiction;

(2)    No distribution shall be made from borrowed funds, prior to the completion of the project or when there is any default under this Agreement or under the note or mortgage;

(3)    Any distribution of any funds of the project, which the party receiving such funds is not entitled to retain hereunder, shall be held in trust separate and apart from any other funds; and

(4)    There shall have been compliance with all outstanding notices of requirements for proper maintenance of the project.

(f)  Engage, except for natural persons, in any other business or activity, including the operation of any other rental project, or incur any liability or obligation not in connection with the project.

(g)  Require, as a condition of the occupancy or leasing of any unit in the project, any consideration or deposit other than the prepayment of the first month's rent plus a security deposit in an amount not in excess of one month's rent to guarantee the performance of the covenants of the lease. Any funds collected as security deposits shall be kept separate and apart from all other funds of the project in a trust account the amount of which shall at all times equal or exceed the aggregate of all outstanding obligations under said account.

(h)  Permit the use of the dwelling accommodations or nursing facilities of the project for any purpose except the use which was originally intended, or permit commercial use greater than that originally approved by the Secretary.

7.   Owners shall maintain the mortgaged premises, accommodations and the grounds and equipment appurtenant thereto, in good repair and condition. In the event all or any of the buildings covered by the mortgage shall be destroyed or damaged by fire or other casualty, the money derived from any insurance on the property shall be applied in accordance with the terms of the mortgage.

8.   Owners shall not file any petition in bankruptcy or for a receiver or in insolvency or for reorganization or composition, or make any assignment for the benefit of creditors or to a trustee for creditors, or permit an adjudication in bankruptcy or the taking possession of the mortgaged property or any part thereof by a receiver or the seizure and sale of the mortgaged property or any part thereof under judicial process or pursuant to any power of sale, and fail to have such adverse actions set aside within forty-five (45) days.

9.   (a)  Any management contract entered into by Owners or any of them involving the project shall contain a provision that, in the event of default hereunder, it shall be subject to termination without penalty upon written request by the Secretary. Upon such request Owners shall immediately arrange to terminate the contract within a period of not more than thirty (30) days and shall make arrangements

satisfactory to the Secretary for continuing proper management of the project.

(b)  Payment for services, supplies, or materials shall not exceed the amount ordinarily paid for such services, supplies, or materials in the area where the services are rendered or the supplies or materials furnished.

(c)  The mortgaged property, equipment, buildings, plans, offices, apparatus, devices, books, contracts, records, documents, and other papers relating thereto shall at all times be maintained in reasonable condition for proper audit and subject to examination and inspection at any reasonable time by the Secretary or his duly authorized agents. Owners shall keep copies of all written contracts or other instruments which affect the mortgaged property, all or any of which may be subject to inspection and examination by the Secretary or his duly authorized agents.

(d)  The books and accounts of the operations of the mortgaged property and of the project shall be kept in accordance with the requirements of the Secretary.

(e)  Within sixty (60) days following the end of each fiscal year the Secretary shall be furnished with a complete annual financial report based upon an examination of the books and records of mortgagor prepared in accordance with the requirements of the Secretary, prepared and certified to by an officer or responsible Owner and, when required by the Secretary or is duly authorized, prepared and certified by a Certified Public Accountant, or other person acceptable to the Secretary.

(f)  At request of the Secretary, his agents, employees, or attorneys, the Owners shall furnish monthly occupancy reports and shall give specific answers to questions upon which information is desired from time to time relative to income, assets, liabilities, contracts, operation, and condition of the property ad the status of the insured mortgage.

(g)  All rents and other receipts of the project shall be deposited in the name of the project in a financial institution, whose deposits are insured by an agency of the Federal Government. Such funds shall be withdrawn only in accordance with the provisions of this Agreement for expenses of the project or for distributions of surplus cash as permitted by paragraph 6(e) above. Any Owner receiving funds of the project other than by such distribution of surplus cash shall immediately deposit such funds i the project bank account and failing so to do in violation of this Agreement shall hold such funds in trust. Any Owner receiving property of the project in violation of this Agreement shall hold such funds in trust. At such time as the Owners shall have lost control and/ or possession of the project, all funds held in trust shall be delivered to the mortgagee to the extent that the mortgage indebtedness has not been satisfied.

(h)  If the mortgage is insured under Section 232:

(1)  The Owners or lessees shall at all times maintain in full force and effect from the state or other licensing authority such license as may be required to operate the project as a nursing home and shall not lease all or part of the project except on terms approved by the Secretary.

(2)  The Owners shall suitably equip the project for nursing home operations.

(3)  The Owners shall execute a Security Agreement and Financing Statement (or other form of chattel lien) upon all items of equipment, except as the Secretary may exempt, which are not incorporated as security for the insured mortgage. The Security Agreement and Financing Statement shall constitute a first lien upon such equipment and shall run in favor of the mortgagee as additional security for the insured mortgage.

(i)  If the mortgage is insured under Section 231, Owners or lessees shall at all times maintain in full force and effect from the state or other licensing authority such license as may be required to operate the project as housing for the elderly.

10.  Owners will comply with the provisions of any Federal, State, or local law prohibiting discrimination in housing on the grounds of race, color, religion or creed, sex, or national origin, including Title VIII of the Civil Rights Act of 1968 (Public Law 90-284; 82 Stat. 73), as amended, Executive Order 11063, and all requirements imposed by or pursuant to the regulations of the Department of Housing and Urban Development implementing these authorities (including 24 CFR Parts 100, 107 and 110, and Subparts I and M of Part 200).

11.  Upon a violation of any of the above provisions of this Agreement by Owners, the Secretary may give written notice thereof, to Owners, by registered or certified mail, addressed to the addresses stated in this Agreement, or such other addresses as may subsequently, upon appropriate written notice thereof to the Secretary, be designated by the Owners as their legal business address. If such violation is not corrected to the satisfaction of the Secretary within thirty (30) days after the date such notice is mailed or within such further time as the Secretary determines is necessary to correct the violation, without further notice the Secretary may declare a default under this Agreement effective on the date of such declaration of default and upon such default the Secretary may:

(a)  (i)  If the Secretary holds the note - declare the whole of said indebtedness immediately due and payable and then proceed with the foreclosure of the mortgage;

(ii)  If said note is not held by the Secretary - notify the holder of the note of such default and request holder to declare a default under the not and mortgage, and holder after receiving such notice and request, but not otherwise, at its option, may declare the whole indebtedness due, and thereupon proceed with foreclosure of the mortgage, or assign the note and mortgage to the Secretary as provided in the Regulations;

(b)  Collect all rents and charges in connection with the operation of the project and use such collections to pay the Owners' obligations under this Agreement and under the note and mortgage and the necessary expenses of preserving the property and operating the project.

(c)  Take possession of the project, bring any action necessary to enforce any rights of the Owners growing out of the project operation, and operate the project in

accordance with the terms of this Agreement until such time as the Secretary in his discretion determines that the Owners are again in a position to operate the project in accordance with the terms of this Agreement and in compliance with the requirements of the note and mortgage.

(d)    Apply to any court, State or Federal, for specific performance of this Agreement, for an injunction against any violation of the Agreement, for the appointment of a receiver to take over and operate the project in accordance with the terms of the Agreement, or for such other relief as may be appropriate, since the injury to the Secretary arising from a default under any of the terms of this Agreement would be irreparable and the amount of damage would be difficult to ascertain.

12.    As security for the payment due under this Agreement to the reserve fund for replacements, and to secure the Secretary because of his liability under the endorsement of the note for insurance, and as security for the other obligations under this Agreement, the Owners respectively assign, pledge and mortgage to the Secretary their rights to the rents, profits, income and charges of whatsoever sort which they may receive or be entitled to receive from the operation of the mortgaged property, subject, however, to any assignment of rents in the insured mortgage referred to herein. Until a default is declared under this Agreement, however, permission is granted to Owners to collect and retain under the provisions of this Agreement such rents, profits, income, and charges, but upon default this permission is terminated as to all rents due or collected thereafter.

13.    As used in this Agreement the term:

(a)    "Mortgage" includes "Deed of Trust", "Chattel Mortgage", "Security Instrument", and any other security for the note identified herein, and endorsed for insurance or held by the Secretary;

(b)    "Mortgagee" refers to the holder of the mortgage identified herein, its successors and assigns;

(c)    "Owners" refers to the persons named in the first paragraph hereof and designated as Owners, their successors, heirs and assigns;

(d)    "Mortgaged Property" includes all property, real, personal or mixed, covered by the mortgage or mortgages securing the note endorsed for insurance or held by the Secretary;

(e)    "Project" includes the mortgaged property and all its other assets of whatsoever nature or wheresoever situate, used in or owned by the business conducted on said mortgaged property, which business is providing housing and other activities as are incidental thereto;

(f)    "Surplus Cash" means any cash remaining after:

(1)    the payment of:

(i)    All sums due or currently required to be paid under the terms of any mortgage or note insured or held by the Secretary;

(ii)    All amounts required to be deposited in the reserve fund for replacements;

(iii)    All obligations of the project other than the insured mortgage unless funds for payment are set aside or deferment of payment has been approved by the Secretary; and

(2)    the segregation of:

(i)    An amount equal to the aggregate of all special funds required to be maintained by the project; and

(ii)    All tenant security deposits held.

(g)    "Distribution" means any withdrawal or taking of cash or any assets of the project, including the segregation of cash or assets for subsequent withdrawal within the limitations of Paragraph 6(e) hereof, and excluding payment for reasonable expenses incident to the operation and maintenance of the project.

(h)    "Default" means a default declared by the Secretary when a violation of this Agreement is not corrected to his satisfaction within the time allowed by this Agreement or such further time as may be allowed by the Secretary after written notice;

(i)    "Section" refers to a Section of the National Housing Act, as amended.

(j)    "Displaced persons or families" shall mean a family or families, or a person, displaced from an urban renewal area, or as the result of government action, or as a result of a major disaster as determined by the President pursuant to the Disaster Relief Act of 1970.

(k)    "Elderly person" means any person, married or single, who is sixty-two years of age or over.

14.    This instrument shall bind, and the benefits shall inure to, the respective Owners, their heirs, legal representatives, executors, administrators, successors in office or interest, and assigns, and to the Secretary and his successors so long as the contract of mortgage insurance continues in effect, and during such further time as the Secretary shall be the owner, holder, or reinsurer of the mortgage, or obligated to reinsure the mortgage.

15.    Owners warrant that they have not, and will not, execute any other agreement with provisions contradictory of, or in opposition to, the provisions hereof, and that, in any event, the requirements of this Agreement are paramount and controlling as to the rights and obligations set forth and supersede any other requirements in conflict therewith.

16.    The invalidity of any clause, part or provisions of this Agreement shall not affect the validity or the remaining portions thereof.

17.    The following Owners: **Vineyard Commons Holdings, LLC and all members and managing members thereof**

Do not assume personal liability for payments due under the note and mortgage, or for the payments to the reserve for replacements, or for matters not under their control, provided that said Owners shall remain liable as this Agreement only with respect to the matters hereinafter stated; namely:

(a)    for funds or property of the project coming into their hands which, by the provisions hereof, they are not entitled to retain; and

12293 Page 6 of 13

(b)   for their own acts and deeds or acts and deeds of others which they have authorized in violation of the provisions hereof.

(To be executed with formalities for recording a deed to real estate.)

18.   The provisions of Rider I attached hereto are incorporated herein.

**IN WITNESS WHEREOF**, the parties have executed this Regulatory Agreement as of the date first above written.

**VINEYARD COMMONS HOLDINGS, LLC**
a New York limited liability company

By: DDFM, LLC, a New York limited liability company
Managing Member

By: _____
Denise Barnett, Manager

STATE OF NEW YORK   }
                                        } SS:
COUNTY OF NEW YORK }

On the 1st day of ____July____ in the year 2009, before me, the undersigned, personally appeared ____Denise Barnett____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person on behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

This instrument prepared by and
after recording return to:

LENORE Y. REEVES
Notary Public, State of New York
No. 01RE6034266
Qualified in Nassau County
Certificate Filed in New York County
Commission Expires Oct. 11, 1998 2010

Felicia Hulit, Esquire
Miles & Stockbridge, P.C.
10490 Little Patuxent Parkway
Columbia, MD 21044

ND: 4819-3327-4883, v. 1

12293 Page 7 of 13

Vineyard Commons at Highland
012-35693

SECRETARY OF HOUSING AND URBAN
DEVELOPMENT, ACTING BY AND THROUGH
THE FEDERAL HOUSING COMMISSIONER

By: _____  TERESA M. BAINTON
Director, New York State Office

STATE OF NEW YORK   }
                    } SS:
COUNTY OF _____   }

On the ___ day of ____ July ____ in the year 2009, before me, the undersigned,
personally appeared _____, personally known to me or proved to me on
the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the
within instrument and acknowledged to me that he/she/they executed the same in his/her/their
capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person
on behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

HENRY SILLCOCKS
Notary Public, State Of New York
No. 4787736
Qualified In Westchester County
Commission Expires December 31, 20__

12293 Page 8 of 13

Vineyard Commons at Highland
012-35693

**EXHIBIT A**

ALTA LOAN POLICY (6/17/06)

## SCHEDULE A DESCRIPTION

File No.:  ST08-02276                              Policy No.:  M-8912-793630

### PARCEL A

ALL that certain plot, piece or parcel of land situate in the Town of Lloyd, County of Ulster and State of New York, bounded and more particularly described as follows:

BEGINNING at a point on the Southeasterly line of Vineyard Avenue, AKA Route 44/55, said point being the intersection of the Southeasterly line of Vineyard Avenue with the Southwesterly line of the lands now or formerly of Highland Real Estate Ventures, LLC, as recorded in Liber 3099, Page 187 generally along the remains of a stonewall the following:

S 44°37'43" E - 156.89 feet to a point, thence;
S 45°49'00" E - 316.73 feet to a point, thence;
S 47°21'16" E - 290.54 feet to an iron rod found in the centerline of a stonewall, thence; leaving said line and running along the Northwesterly line of the lands now or formerly of Vineyard Avenue Development, LLC, as recorded in Instrument Number 2006-00028968, the following:
S 38°38'28" W - 166.50 feet to a point, thence;
leaving said line and running along the Northeasterly line of the lands of Vineyard Avenue Development, LLC, the following:
N 46°09'32" W - 764.04 feet along the centerline of an 8 foot wide easement and right-of-way to a point, thence;
leaving said line and running along the Southeasterly line of Vineyard Avenue the following:
N 38°37'19" E - 165.86 feet to the point of beginning.
Containing an area of 2.838 acres, more or less. The above herein described parcel also being known as Tax Lot 95.2-6-36 as shown on the current tax maps of the Town of Lloyd.

Being the same premises conveyed to Vineyard Avenue Development, LLC by deed from Henriques/Irvine dated June 27, 2008 and recorded in the Ulster County Clerks Office on July 1, 2008 in Instrument No. 2008-00012290.

WITH THE EXCEPTION therefrom a parcel containing 3463.73 square feet, lying within the right of way lines of Vineyard Avenue, (aka State Route 44/55) about to be acquired by the State of New York. Said 3463.73 square feet parcel being known as Parcel No. 90, Map No. 71, situate in the Town of Lloyd, County of Ulster, State of New York, as shown on a map entitled, "New York State, Department of Transportation, Acquisition Map, Highland-Gardiner, Part 1, S.H. NO. 350, about to be filed in the Regional Office of the NYSDOT. The intention of this exception is to convey any and all of the land lying within said right of way, including all the rights, title, and interest to any portion thereof, to the State of New York.

### PARCEL B

ALL that certain plot, piece or parcel of land situate in the Town of Lloyd, County of Ulster and State of New York, bounded and more particularly described as follows:

BEGINNING at a point on the Southeasterly line of Vineyard Avenue, AKA Route 44/55, said point being the intersection of the Southeasterly line of Vineyard Avenue with the Northeasterly line of lands now or formerly of

Stillwell, as recorded in Liber 1480 Page 318 and running thence along the Southerly line of Vineyard Avenue, the following:

ALTA LOAN POLICY (6/17/06)

N22°41'10" E - 92.50 feet to a point, thence;
N27°08'50" E - 67.10 feet to a point, thence;
N31°43.15" E - 64.87 feet to a point, thence;
N36°03'10" E - 75.00 feet to a point, thence;
N38°33'55" E - 77.40 feet to a point, thence;
N39°32'00" E - 104.34 feet to a point, thence;

leaving said line and running along the Southwesterly line of lands now or formerly of Vineyard Avenue Development, LLC, as recorded in Instrument No. 2008-00012290 the following:

S 46°06'32" E - 764.04 feet, along the centerline of an 8 foot wide easement and right-of-way to a point, thence;

leaving said line and running along the Southeasterly line of lands now or formerly of Vineyard Avenue Development, LLC the following:

N 38°38'28" E - 166.50 feet to an iron rod found in the centerline of a stonewall on the Southwesterly line of the lands now or formerly of Highland Real Estate. Ventures, LLC, as recorded in Liber 3099, Page 187, thence;

leaving said line and running along the Southwesterly line of the lands now or formerly of Highland Real Estate Ventures, LLC, generally along the remains of a stonewall the following:

S47°21'16" E - 242.23 feet to a point, thence;
S56°30'10" E - 58.30 feet to a point, thence;
S41°09'49" E - 50.87 feet to a point in the Twaalfskill Creek, thence;

leaving said line and running along the Northwesterly line of lands now or formerly of Roberto, as recorded in Liber 821 Page 52, generally through the Twaalfskill Creek the following:

S31°46'40" W - 236.86 feet to a point, thence;
S34°42'48" W - 277.50 feet to a point, thence;
S29°10'30" W - 29.30 feet to a point, thence;
S33°47'25" W - 47.40 feet to a point, thence;

continuing along said line in part through the Twaalfskill Creek, then in part passing over the Northwesterly bank of said creek and continuing generally along the remains of a stonewall the following:

S33°57'07" W - 568.40 feet to a point on the Northerly bank of the Twaalfskill Creek at the intersection of a stonewall if projected, thence;

leaving said line and running along the Northeasterly line of the lands now or formerly of Bozydaj, as recorded in Liber 1310 Page 368, generally along the remains of a stonewall the following:

N46°24'16" W - 325.00 feet to a point at the intersection of a stonewall, thence;

continuing along said line the following:

N45°52'16" W - 536.62 feet to a point thence;

leaving said line and running along the Southeasterly line of lands now or formerly of Reina, as recorded in Liber 1574 Page 166, the following:

N34°08'07" E - 138.00 feet to a point, thence;

leaving said line and running along the Northeasterly line of the lands now or formerly of Reina the following:

N55°51'53" W - 15.20 feet to an iron pipe found, thence;

leaving said line and running along the Southeasterly line of lands now or formerly of Coppola, as recorded in Liber 3937 Page 59, the following:

N36°56'32" E - 249.33 feet to a point, thence;

leaving said line and running along the Southeasterly line of lands now or formerly of Stillwell the following:

N32°32'14" W - 140.00 feet to a point, thence;

leaving said line and running along the Northeasterly line of the lands now or formerly of Stillwell the following:

N51°37'23" W - 258.52 feet to a point on the southeasterly side of Vineyard Avenue and the point of beginning.

The above herein described parcel also being known as Tax Lot 95.2-6-2 as shown on the current tax maps of the Town of Lloyd.

Being the same premises conveyed to Vineyard Avenue Development, LLC by deed from Ultra Craft Homes, Inc. dated November 7, 2006, and recorded in the Ulster County Clerk's Office on November 27, 2006 in Instrument No. 2006-00028968.

ALTA LOAN POLICY (6/17/06)

**PARCEL "B" IS SUBJECT TO A 20 FOOT WIDE EASEMENT OR RIGHT-OF-WAY** to rear of barn to enable owner of barn to have access to the basement of said barn, as set forth and recorded in Liber 1515 Page 21 and in Liber 1480 Page 318, being bounded and more particularly described as follows:

BEGINNING at a point on the Southeasterly line of Vineyard Avenue, aka Route 44/55, said point being the intersection of the Southeasterly line of Vineyard Avenue with the Northeasterly line of the lands now or formerly of Stillwell, as recorded in Liber 1480 Page 318 and running thence along the Southeasterly line of Vineyard Avenue the following:
N22°41'10" E - 20.77 feet to a point, thence;
leaving said line and running over and through the lands of the above herein described parcel "B" the following:
S51°37'23" E - 282.20 feet to a point, thence;
S32°32'14" W - 160.46 feet to a point, thence;
N50°36'23" W - 20.14 feet to a point, thence;
leaving said line and running along the Southeasterly line of lands now or formerly of Stillwell, the following:
N32°32'14" E - 140.00 feet to a point, thence;
leaving said line and running along the Northeasterly lines of lands now or formerly of Stillwell, the following:
N51°37'23" W - 258.52 feet to a point on the southeasterly side of Vineyard Avenue and
the point of beginning.

**PARCEL "A" AND PARCEL "B" ARE SUBJECT TO A 30 FOOT WIDE PUBLIC UTILITY EASEMENT** being bounded and more particularly described as follows:

BEGINNING at a point on the Southeasterly line of Vineyard Avenue, aka Route 44/55, said point being the intersection of the Southeasterly line of Vineyard Avenue and the Southwesterly line of lands now or formerly of Highland Real Estate Ventures, LLC, as recorded in Liber 3099, Page 187 the following:
S44°37'43" E - 30.21 feet to a point, thence;
leaving said line and running Southwesterly, 30 feet Southeasterly and parallel with the Southeasterly line of Vineyard Avenue and along the Northwesterly line of parcel "A" the following:
S38°37'19" W - 162.54 feet to a point, thence;
leaving said line and running Southwesterly, 30 feet Southeasterly and parallel with the Southeasterly line of Vineyard Avenue, over and through the lands of parcel "B" the following:
S39°32'00" W - 104.33 feet to a point, thence;
S38°33'35" W - 25.47 feet to a point, thence;
leaving said parallel line and continuing through the lands of parcel "B" the following:

S02°33'00" W - 127.59 feet to a point, thence;
S11°27'00" E - 61.10 feet to a point, thence;
S52°27'00" E - 238.83 feet to a point, thence;
S05°27'00" E - 85.47 feet to a point, thence;
S39°33'00" W - 191.14 feet to a point, thence;
S14°27'00" E - 313.00 feet to a point, thence;
N84°38'00" E - 80.48 feet to a point, thence;
S50°27'00" E - 38.00 feet to a point, thence;
S31°33'00" W - 40.00 feet to a point, thence;

N83°57'00" W - 110.00 feet to a point, thence;
N14°27'00" W - 361.00 feet to a point, thence;
N39°33'00" E - 194.00 feet to a point, thence;
N05°27'00" W - 60.00 feet to a point, thence;
N52°27'00" W - 237.00 feet to a point, thence;
N11°27'00" W - 76.00 feet to a point, thence;
N02°33'00" E - 90.00 feet to a point being 30 feet Southeasterly from the Southeasterly line of Vineyard Avenue, thence;
S36°03'10" W - 73.21 feet to a point being 30 feet Southeasterly from and parallel with the southeasterly line of Vineyard Avenue to a point, thence;
S31°43'15" W - 62.54 feet to a point, thence;

ALTA LOAN POLICY (6/17/06)

S27°08'50" W - 64.73 feet to a point, thence;

S22°41'10" W - 99.76 feet to a point on the Northeasterly line of the lands now or formerly of Stillwell, as recorded in Liber 1480, Page 318, thence;

leaving said parallel line and running along the Northeasterly line of the lands now or formerly of Stillwell the following:

N51°37'23" W - 31.16 feet to a point on the Southeasterly line of the Vineyard Avenue, thence;

leaving said line and running along the Southeasterly line of Vineyard Avenue the following:

N22°41'10" E - 92.50 feet to a point, thence;

N27°08'50" E - 67.10 feet to a point, thence;

N31°43'15" E - 64.87 feet to a point, thence;

N36°03'10" E - 75.00 feet to a point, thence;

N38°33'55" E - 77.40 feet to a point, thence;

N39°32'00" E - 104.34 feet to a point, thence;

N38°37'19" E - 165.86 feet to the point of beginning.

## SUBJECT TO THE RIGHTS OF PUBLIC UTILITIES OF RECORD

## PARCEL"A" AND PARCEL "B" ARE SUBJECT TO AN 8' WIDE COMMON EASEMENT OR RIGHT-OF-WAY being bounded and more particularly described as follows:

the centerline of said easement being along EITHER the 5th course of parcel "A" or the 7th course of parcel "B", whereas both are reciprocals of the same course.

12293 Page 13 of 13

Vineyard Commons at Highland
012-35693

## RIDER I

1.   Elevator Addendum to Section 2(a):

So long as the mortgage of the Owner or Owners is insured or held by the Secretary of Housing and Urban Development, the said Owner or Owners shall keep in full force and effect, from the date of initial/final endorsement, an elevator contract for maintenance, together with any necessary and proper renewals thereof, providing for the replacement of all items of elevator mechanical equipment. Such contract and renewals, if any, shall be with an elevator maintenance company and in such form as shall be satisfactory to the Secretary and/or his agents, employees or attorneys. Should such contract, or any renewal thereof, not be obtained by the said Owner, or Owners, or should same be allowed or permitted to lapse, an additional allocation of the monthly reserve fund for replacements from the Breakdown of Reserve for Replacements (FHA Form #2419) shall be made as directed by the Secretary, and/or his agents, employees or attorneys and same shall be paid by the said Owner or Owners, in monthly installments, together with the amount first mentioned in the paragraph, and commencing at a date thereafter as may be specified by the Secretary of Housing and Urban Development.

# EXHIBIT G

## SECURITY AGREEMENT

**THIS SECURITY AGREEMENT** (the "Agreement") made as of the 2nd day of July, 2009 by and between **Vineyard Commons Holdings, LLC,** a New York limited liability company with an office at 10 Wintergreen Place, Hopewell Jct., New York 12533 (the "Debtor") and **Love Funding Corporation,** a corporation organized and existing under the laws of Virginia having an office and place of business at 1250 Connecticut Avenue, NW, Suite 550, Washington, D.C. 20036 (the "Secured Party").

The Debtor is indebted to the Secured Party in the amount of **$46,545,000.00** in connection with the construction of an apartment complex known as **"Vineyard Commons at Highland",** FHA Project No. **012-35693** located in Lloyd, Ulster County, New York (collectively referred to in this Agreement as the "Project"). The indebtedness (which is referred to in this Agreement as the "Indebtedness") is evidenced by a Mortgage Note dated of even date herewith, payable to the order of the Secured Party (referred to in this Agreement as the "Note"), and is secured by a Mortgage (the "Mortgage") dated of even date herewith, and recorded or to be recorded among the land records for Ulster County in New York. The Mortgage securing the Indebtedness is insured by the Secretary of Housing and Urban Development (referred to in this agreement as the "Secretary") under Section 221(d)(4) of the National Housing Act, as amended.

To further secure the repayment of the Indebtedness and at the request of the Secured Party and the Secretary, the Debtor wishes to grant to the Secured Party, pursuant to the Uniform Commercial Code as in effect in the State of New York (referred to in this agreement as the "State") a security interest in certain property related to the Project. The parties also intend to set forth in this instrument their agreement with respect to that security interest.

**NOW, THEREFORE,** in consideration of the foregoing and of the mutual promises set forth below, and in further consideration of the sum of One Dollar ($1.00) and other good and valuable consideration in hand paid by each party to the other, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.     <u>Creation of Security Interest.</u>

        (a)    <u>Granting Clause.</u> The Debtor hereby grants a security interest (referred to in this Agreement as the "Security Interest") to the Secured Party in all property (referred to in this Agreement as the "Collateral") which (i) is owned by the Debtor or becomes the property of the Debtor hereafter and is used in the operation of the Project, and/or (ii) is described in **Exhibit "B"** attached to this Agreement; and/or (iii) is part of, attached to, or located on the land and premises legally described in **Exhibit "A"** attached to this Agreement. Exhibits "A" and "B" are hereby incorporated into this Agreement by reference. The Security Interest is granted for the purpose of securing the Indebtedness.

        (b)    <u>Warranty.</u> The Debtor warrants and represents to the Secured Party that it owns the Collateral free and clear of any lien, security interest, encumbrance, and other claim of any kind, other than the Security Interest created by this Agreement, and has the full power to

grant the Security Interest; provided, however that this warranty is subject to: (i) the rights of the lessor with respect to any personal property or equipment leased by the Debtor; (ii) any security deposits, accounts or monies in the custody of the Debtor or under its control which are subject to the rights of third parties; and (iii) any account or deposit which is subject to terms and conditions contained in special purpose escrow agreements and other documents relating to the indebtedness.

      (c)    **Perfection.**  The Debtor agrees, to the best of its knowledge, to comply with all applicable laws and requirements in order to grant to Secured Party a valid, perfected first lien in the Collateral, and upon the request of the Secured Party, from time to time execute and deliver to the Secured Party one or more financing statements pursuant to the Uniform Commercial Code then in effect in the State, and any other instruments required by the Secured Party in connection herewith the filing of which is advisable, in the sole judgment of the Secured Party, to perfect the Secured Party's Security Interest in the Collateral under the laws of the United States, the State, or any other jurisdiction in which the Secured Party shall determine such filings to be advisable.  The Debtor hereby authorizes the Secured Party to execute and file, at any time and from time to time, on behalf of the Debtor one or more financing statements with respect to the Collateral, the filing of which is advisable, in the sole judgment of the Secured Party including, especially, but without limitation, continuation statements and statements reperfecting a security interest in any of the Collateral where the financing statements with respect thereto had lapsed.  The Debtor hereby irrevocably appoints the Secured Party as the Debtor's attorney-in-fact to execute and file, from time to time, on its behalf, one or more financing statements with respect to the Collateral and to execute such other documents and instruments on behalf of the Debtor as the Secured Party, in its sole judgment, shall deem necessary or desirable for the purposes of effectuating this Agreement, such power being coupled with an interest and irrevocable.  The Debtor agrees to notify the Secured Party prior to any change in its mailing address or principal place of business, in order that a prompt filing or refiling of any outstanding financing statements or other public notices may be made, if necessary.  The Debtor further agrees to advise the Secured Party promptly of any new facts which would adversely affect the priority of the security interest granted to the Secured Party by this Agreement.

      (d)    **Proceeds, etc.**  The Security Interest shall extend to and include the proceeds of any Collateral and any property which the Debtor may receive on account of any Collateral.

      (e)    **Costs and Expenses of Secured Party.**  The Debtor will pay any and all fees, costs and expenses, of whatever kind and nature, which the Secured Party may incur in filing any financing statements or other public notices, and the charges of any attorneys whom the Secured Party may engage in preparing and filing such documents, making title examinations and rendering opinion letters, as well as all costs and expenses incurred by the Secured Party, including reasonable attorneys' fees and court costs in protecting, maintaining, preserving, enforcing or foreclosing the Security Interest granted to the Secured Party hereunder, whether through judicial proceedings or otherwise, or in defending or prosecuting any actions or proceedings arising out of or relating to this transaction, promptly after the Debtor shall have been notified by the Secured Party of the amount of such fees, costs or expenses.

2.    **Care of Collateral.** Unless specifically otherwise agreed by the Secured Party in writing, the Debtor shall at its sole cost and expense:

(a)    Maintain possession of the Collateral on the Project premises (which are described in Exhibit "A") and not remove the Collateral from that location.

(b)    Keep the Collateral separate and identifiable.

(c)    Maintain the Collateral in good repair and condition as the same is as of the date hereof, as the same is when acquired, reasonable wear and tear excepted, making replacements when and where necessary, and otherwise deal with the Collateral in all such ways as are considered good practice by Debtors of such property.

(d)    Use the Collateral lawfully and only as permitted by insurance policies.

(e)    Permit the Secured Party to inspect the Collateral and any records relating to the Collateral upon reasonable request and notice during normal business hours.

(f)    Insure the Collateral for its full replacement value, subject to a reasonable deductible, in the name of and with loss or damage payable to the Secured Party, the Federal Housing Administration and the Debtor as their interests may appear.  All such policies shall provide for not less than thirty (30) days minimum written notice to the Secured Party of cancellation or material change.

(g)    Keep the Collateral free and clear of all liens and security interests of others.

(h)    Promptly advise the Secured Party of any change in the location of the principal place of business of the Debtor, or other office locations where Debtor is doing business.

3.    **Defense of Collateral.** The Debtor will promptly defend any proceeding which may affect the Security Interest or the title to the Collateral, and will reimburse the Secured Party for all costs and expenses incurred by the Secured Party in connection with such defense.

4.    **Charges, Liens and Encumbrances Affecting Collateral.** The Debtor will pay when due all existing or future charges, liens, or encumbrances on and all taxes and assessments now or hereafter imposed on or affecting the Collateral.

5.    **Remedies on Default.** In the event of a default, as defined in Section 6:

(a)    The Secured Party may, at its option, declare the full principal amount of the Indebtedness, and any interest accrued on that amount, to be immediately due and payable; and

(b)    The Secured Party shall have all of the rights and remedies of a Secured Party against the Collateral under the Uniform Commercial Code as in effect in the State.

ND: 4830-4022-6306, v. 1

Without limitation of those rights and remedies, the Secured Party may, upon written notice to the Debtor, take, and publicly or privately sell or convey full right, title, and interest in and to, the Collateral, or any part of it, in the name of the Secured Party and/or its designees. The Debtor hereby constitutes and appoints the Secured Party as its true and lawful attorney-in-fact, such power being coupled with an interest and irrevocable, to assign and transfer its interest in any or all of the Collateral in the event of a default. The Secured Party may require the Debtor to assemble the Collateral and make it available to the Secured Party in a location, which is reasonably convenient to both parties.

6. **Defaults.** For purposes of this Agreement, the Debtor shall be deemed to be in default if:

(a) The Debtor (or Operator with respect to (iii) and (iv) below) violates any provision of (i) the Note (which evidences the Indebtedness); (ii) the Mortgage (which also secures the Indebtedness); (iii) this Security Agreement; or (iv) any other instrument related to the Indebtedness (which Note, Mortgage, Security Agreement and other instruments related to the Indebtedness are hereinafter sometimes collectively referred to as the "Security Documents"); provided, however, that an event of default shall not occur unless such violations are not cured within applicable cure periods, if any, as may be provided in said Security Documents;

(b) There occurs any actual or threatened demolition of or injury or waste to the Project premises, not covered by insurance, or not replaced or restored by the Debtor, which may impair the value of the Collateral; or

(c) A receiver is appointed for or a petition in bankruptcy is filed by or against the Debtor, its successors or its assigns, which receiver or involuntary bankruptcy petition is not removed, vacated or stayed within forty-five (45) days from the first date of appointment or filing thereof; or

(d) The Debtor is dissolved and liquidation of the Debtor is commenced in accordance with the Debtor's organizational documents and/or the law of the State.

7. **No Waiver.** No failure on the part of the Secured Party to exercise, and no delay on the part of the Secured Party in exercising, any right or remedy under this Agreement shall operate as a waiver of that right or remedy. A single or partial exercise by the Secured Party of any right or remedy under this Agreement shall not constitute an election of remedies by the Secured Party or preclude any other or further exercise of that right or remedy or the exercise of any other right or remedy. The remedies provided in this Agreement are not exclusive of any remedies provided by law.

8. **Priority of Remedies; Renewals and Extensions.** Neither the Debtor nor any other persons interested in the Collateral or the proceeds of the Collateral shall have any right to require the Secured Party first to resort to or proceed personally against any other person or to proceed against any other collateral security, or to give priority or preference to any item of Collateral, or to proceed upon any guaranty prior to exercising its rights hereunder. No renewal or extension of the Indebtedness, no release or surrender of any Collateral given as security for

the Indebtedness, no release of any obligor with respect to the Indebtedness, and no delay by the Secured Party in enforcing the Indebtedness or exercising any right or power with respect to the Indebtedness shall affect the Secured Party's rights with respect to the Collateral. The Debtor further specifically agrees that, in any exercise of the rights of the Secured Party under this or any other instrument, any combination or all of the property rights or security given to secure the Debtor's indebtedness to the Secured Party may be offered for sale for one total price, and the proceeds of any such sale accounted for in one account without distinction between the items of security or without assigning to them any proportion of such proceeds, the Debtor hereby waiving the application of any doctrine of marshaling.

9. **Termination.** This Agreement, and each of the rights and remedies afforded to the Secured Party hereunder shall automatically terminate upon payment of the Indebtedness in full in compliance with the provisions of the Note. Upon termination hereunder, the Secured Party hereby agrees to execute a Termination Statement and any other documents reasonably necessary to terminate this Agreement and release the Collateral from the Security Interest.

10. **Non-Recourse Obligation.** Notwithstanding any other provision contained herein or in the Note, it is agreed that the execution of the Note shall impose no personal liability upon the Debtor for payment of the indebtedness evidenced thereby and in the event of a default, the holder of the Note shall look solely to the property subject to the Mortgage and this Security Agreement and to the rents, issues and profits thereof in satisfaction of the indebtedness evidenced by the Note and will not seek or obtain any deficiency or personal judgment against the Debtor except such judgment as may be necessary to foreclose or bar its interest in the property subject to the Mortgage and this Security Agreement and all other property mortgaged, pledged, conveyed or assigned to secure payment of the Note; provided, that nothing in this condition and no action so taken shall operate to impair any obligation of the Debtor under that certain Regulatory Agreement of even date herewith between the Debtor and the Secretary.

11. **Terms.** Unless otherwise defined, all words used in this Agreement shall have the meanings given them in the Uniform Commercial Code as in effect in the State.

12. **Notices.** All notices, demands and communications between the parties concerning this Agreement shall be in writing and shall be delivered, or mailed by registered or certified mail with postage prepaid, or telegraphed, addressed in each case as follows, and shall be deemed to have been given or made when so delivered, deposited in the mail, or telegraphed to the parties at the addresses first set forth above.

Either party, at any time, by written notice given to the other in accordance with this Section, may designate a different address to which such communications shall thereafter be directed.

13. **Rights of Secretary as Secured Party.**

(a) Contemporaneously herewith the Secretary and the Debtor have executed the Regulatory Agreement, which Regulatory Agreement is hereby incorporated by reference herein.

ND: 4830-4022-6306, v. 1

(b)     The Regulatory Agreement is incorporated in the Mortgage by reference. Under the terms of the Regulatory Agreement, the Secretary may exercise certain rights in and to the Collateral prior to the assignment of the Note, Mortgage, this Security Agreement and any other collateral documents which have been executed and delivered to the Secretary as a condition precedent to the Secretary's endorsement of the Note for mortgage insurance.

(c)     The Debtor and the Secured Party hereby agree that the Secretary shall be an additional secured party under this Security Agreement together with the Secured Party, as their interests may appear, and that the Secretary shall be listed on the Uniform Commercial Code Financing Statements to be filed contemporaneously herewith; provided, however, that nothing herein or in the Uniform Commercial Code Financing Statements shall require the execution, now or at any future time, of any amendment, extension, or other document by the Secretary.

(d)     To the extent any party herein is required or desires to give notice to the Secretary hereunder, such notice shall be delivered in accordance with the provisions of Paragraph 12 hereof, as follows:

> U.S. Department of Housing and Urban
> Development
> New York State Office
> 26 Federal Plaza
> New York, New York  10278
>
> Attention:  Regional Counsel

## 14.     Miscellaneous.

(a)     This Agreement is intended to be supplemental to and not in substitution or in derogation of any security agreement contained in the Mortgage.  In the event of any conflict between this Agreement and the Mortgage, the Mortgage shall be controlling.

(b)     In any instance where the consent or approval of the Secured Party may be given or is required or any determination is to be rendered by the Secured Party hereunder, the granting, withholding or denial of such consent or approval and the rendering of such determination shall be made or exercised by the Secured Party at its sole and exclusive option and in its reasonable discretion.

(c)     It is understood and agreed that no judgment or decree which may be entered on any debt secured or intended to be secured by the Mortgage shall operate to abrogate or lessen the effect of this Agreement, but that this Agreement shall continue in full force and effect until the payment and discharge of the Indebtedness due under the Security Documents.

(d)     It is understood and agreed that the remedies granted to the Secured Party herein shall not be deemed exclusive of any other remedies possessed by the Secured Party under the Note, the Mortgage, any other of the Security Documents or at law or in equity, but shall be deemed additional and cumulative thereto.

ND: 4830-4022-6306, v. 1

(e)     This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

(f)     All captions in this Agreement are for convenience only, and shall not be considered in construing this Agreement.

(g)     Any reference in this Agreement to a "Section" shall be construed as referring to a Section of this Agreement.

(h)     This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns.

(i)     The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of the remaining provisions, which shall remain in full force and effect.

(j)     This instrument contains the entire agreement between the parties as to the rights granted and the obligations assumed in this instrument. This Agreement may be amended only by a subsequent written instrument signed by both parties.

**[Signatures on Following Page]**

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the day and year hereinabove first written.

<u>DEBTOR</u>:

**Vineyard Commons Holdings, LLC**
a New York limited liability company

BY: DDFM, LLC, Managing Member

By _____
       Denise Barnett, Manager

(Signature Page Continues)

**SECURED PARTY**:

**Love Funding Corporation,**
a Virginia corporation

By: _Vicki Sammons_
      Vicki Sammons
      Vice President

Exhibit "A"

# LEGAL DESCRIPTION

PARCEL A

ALL that certain plot, piece or parcel of land situate in the Town of Lloyd, County of Ulster and State of New York, bounded and more particularly described as follows:

BEGINNING at a point on the Southeasterly line of Vineyard Avenue, AKA Route 44/55, said point being the intersection of the Southeasterly line of Vineyard Avenue with the Southwesterly line of the lands now or formerly of Highland Real Estate Ventures, LLC, as recorded in Liber 3099, Page 187 generally along the remains of a stonewall the following:
1) S 44°53'43" E - 156.89 feet to a point, thence;
2) S 45°49'00" E - 516.73 feet to a point, thence;
3) S 47°21'16" E - 290.54 feet to an iron rod found in the centerline of a stonewall, thence;
leaving said line and running along the Northwesterly line of the lands now or formerly
of Vineyard Avenue Development, LLC, as recorded in Instrument Number 2006-00028968, the following:
4) S 38°54'28" W - 166.50 feet to a point, thence;
leaving said line and running along the Northeasterly line of the lands of Vineyard Avenue Development, LLC, the following:
5) N 46°02'52" W - 764.04 feet along the centerline of an 8 foot wide easement and right-of-way to a point, thence;
leaving said line and running along the Southeasterly line of Vineyard Avenue the following:
6) N 38°37'19" E - 163.86 feet to the point of beginning.

Containing an area of 2.838 acres, more or less. The above herein described parcel also being known as Tax Lot 95.2-6-36 as shown on the current tax maps of the Town of Lloyd.

Being the same premises conveyed to Vineyard Avenue Development, LLC by deed from Henriques/Irvine dated June 27, 2008 and recorded in the Ulster County Clerks Office on July 1, 2008 in Instrument No. 2008-00012290.

WITH THE EXCEPTION therefrom a parcel containing 3463.73 square feet, lying within the right of way lines of Vineyard Avenue, (aka State Route 44/55) about to be acquired by the State of New York. Said 3463.73 square feet parcel being known as Parcel No. 90, Map No. 71, situate in the Town of Lloyd, County of Ulster, State of New York, as shown on a map entitled, "New York State, Department of Transportation, Acquisition Map, Highland-Gardiner, Part 1, S.H. NO. 350, about to be filed in the Regional Office of the NYSDOT. The intention of this exception is to convey any and all of the land lying within said right of way, including all the rights, title, and interest to any portion thereof, to the State of New York.

PARCEL B

ALL that certain plot, piece or parcel of land situate in the Town of Lloyd, County of Ulster and State of New York, bounded and more particularly described as follows:

BEGINNING at a point on the Southeasterly line of Vineyard Avenue, AKA Route 44/55, said point being the intersection of the Southeasterly line of Vineyard Avenue with the Northeasterly line of lands now or formerly of Stillwell, as recorded in Liber 1480 Page 318 and running thence along the Southerly line of Vineyard Avenue, the following:
1) N 22°41'10" E - 92.50 feet to a point, thence;
2) N 27°08'50" E - 67.10 feet to a point, thence;
3) N 31°43'15" E - 64.87 feet to a point, thence;
4) N 36°03'10" E - 75.00 feet to a point, thence;
5) N 38°33'55" E - 77.40 feet to a point, thence;
6) N 39°32'00" E - 104.34 feet to a point, thence;
leaving said line and running along the Southeasterly line of lands now or formerly of Vineyard Avenue Development, LLC, as recorded in Instrument No. 2006-00012290 the following:
7) S 46°00'33" E - 764.04 feet, along the centerline of an 8 foot wide easement and right-of-way to a point, thence;
leaving said line and running along the Southeasterly line of lands now or formerly of Vineyard Avenue Development, LLC the following:
8) N 38°28'28" E - 166.50 feet to an iron rod found in the centerline of a stonewall on the Southwesterly line of the lands now or formerly of Highland Real Estate Ventures, LLC, as recorded in Liber 3099, Page 187, thence;
leaving said line and running along the Southwesterly line of the lands now or formerly of Highland Real Estate Ventures, LLC, generally along the remains of a stonewall the following:
9) S 47°21'16" E - 242.23 feet to a point, thence;
10) S 56°30'16" E - 58.30 feet to a point, thence;
11) S 41°09'49" E - 50.87 feet to a point in the Twaalfskill Creek, thence;
leaving said line and running along the Northwesterly line of lands now or formerly of Roberto, as recorded in Liber 821 Page 52, generally through the Twaalfskill Creek the following:
12) S 31°46'40" W - 236.86 feet to a point, thence;
13) S 54°42'48" W - 277.50 feet to a point, thence;
14) S 29°10'30" W - 29.30 feet to a point, thence;
15) S 33°47'25" W - 47.40 feet to a point, thence;
continuing along said line in part passing over the Northeasterly bank of said creek and continuing generally along the remains of a stonewall the following:
16) S 33°57'07" W - 568.40 feet to a point on the Northerly bank of the Twaalfskill Creek at the intersection of a stonewall if projected, thence;
leaving said line and running along the Northeasterly line of the lands now or formerly of Bozyda), as recorded in Liber 1310 Page 368, generally along the remains of a stonewall the following:
17) N46°24'16" W - 325.00 feet to a point at the intersection of a stonewall, thence;
continuing along said line the following:
18) N45°52'16" W - 336.62 feet to a point thence;
leaving said line and running along the Southeasterly line of lands now or formerly of Reiss, as recorded in Liber 1574 Page 166, the following:
19) N34°08'07" E - 158.00 feet to a point, thence;
leaving said line and running along the Northeasterly line of lands now or formerly of Reiss the following:
20) N55°51'53" W - 15.20 feet to an iron pipe found, thence;
leaving said line and running along the Southeasterly line of lands now or formerly of Coppola, as recorded in Liber 3937 Page 59, the following:
21) N36°56'32" E - 249.35 feet to a point, thence;
leaving said line and running along the Southeasterly line of lands now or formerly of Stillwell, the following:
22) N32°32'14" E - 140.00 feet to a point, thence;
leaving said line and running along the Northeasterly line of lands now or formerly of Stillwell, the following:
23) N51°57'23" W - 258.52 feet to a point on the southeasterly side of Vineyard Avenue and the point of beginning.

Containing an area of 23.554 acres, more or less. The above herein described parcel also being known as Tax Lot 95.2-6-2 as shown on the current tax maps of the Town of Lloyd.

Being the same premises conveyed to Vineyard Avenue Development, LLC by deed from Ultra Craft Homes, Inc. dated November 7, 2006, and recorded in the Ulster County Clerks office on November 27, 2006 in Instrument No. 2006-00028908.

PARCEL "B" IS SUBJECT TO A 20 FOOT WIDE EASEMENT OR RIGHT-OF-WAY to rear of barn to enable owner of barn to have access to the basement of said barn, as set forth and recorded in Liber 1515 Page 21 and in Liber 1480 Page 318, being bounded and more particularly described as follows:

BEGINNING at a point on the Southeasterly line of Vineyard Avenue, aka Route 44/55, said point being the intersection of the Southeasterly line of Vineyard Avenue with the Northeasterly line of the lands now or formerly of Stillwell, as recorded in Liber 1480 Page 318 and running thence along the Southeasterly line of Vineyard Avenue, the following:
1) N22°41'10" E - 20.77 feet to a point, thence;
leaving said line and running over and through the lands of the above herein described parcel "B" the following:
2) S51°57'23" E - 238.20 feet to a point, thence;
3) S32°32'14" W - 160.46 feet to a point, thence;
4) N50°36'23" W - 20.14 feet to a point, thence;
leaving said line and running along the Southeasterly line of lands now or formerly of Stillwell, the following:
5) N32°32'14" E - 140.00 feet to a point, thence;
leaving said line and running along the Northeasterly lines of lands now or formerly of Stillwell, the following:
6) N51°57'23" W - 258.52 feet to a point on the southeasterly side of Vineyard Avenue and the point of beginning.
Containing an area of 0.193 acres, more or less.

PARCEL "A" AND PARCEL "B" ARE SUBJECT TO A 16 FOOT WIDE PUBLIC UTILITY EASEMENT being bounded and more particularly described as follows:

BEGINNING at a point on the Southeasterly line of Vineyard Avenue, aka Route 44/55, said point being the intersection of the Southeasterly line of Vineyard Avenue with the Southwesterly line of lands now or formerly of Highland Real Estate Ventures, LLC, as recorded in Liber 3099, Page 187 the following:
1) S44°53'43" E - 39.21 feet to a point, thence;
leaving said line and running Southwesterly, 20 feet Southeasterly and parallel with the Southeasterly line of Vineyard Avenue and along the Northwesterly line of parcel "A" the following:
2) S38°37'19" W - 162.54 feet to a point, thence;
leaving said line and running Southeasterly, 20 feet Southeasterly and parallel with the Southeasterly line of Vineyard Avenue, over and through the lands of parcel "B" the following:
3) S39°32'00" W - 104.33 feet to a point, thence;
4) S38°33'55" W - 25.47 feet to a point, thence;
leaving said parallel line and continuing through the lands of parcel "B" the following:
5) S02°13'00" W - 127.59 feet to a point, thence;
6) S11°27'00" E - 61.10 feet to a point, thence;
7) S52°27'00" E - 238.85 feet to a point, thence;
8) S05°27'00" E - 85.47 feet to a point, thence;
9) S29°33'00" W - 191.14 feet to a point, thence;
10) S14°27'00" E - 313.00 feet to a point, thence;
11) N46°33'00" E - 80.48 feet to a point, thence;
12) S59°27'00" E - 38.00 feet to a point, thence;
13) S31°33'00" W - 40.00 feet to a point, thence;
14) N85°27'00" W - 110.00 feet to a point, thence;
15) N14°27'00" W - 361.00 feet to a point, thence;
16) S59°33'00" E - 194.00 feet to a point, thence;
17) N05°27'00" W - 60.00 feet to a point, thence;
18) N52°27'00" W - 237.00 feet to a point, thence;
19) N11°27'00" W - 76.00 feet to a point, thence;
20) N02°13'00" E - 90.00 feet to a point being 30 feet Southeasterly from the Southeasterly line of Vineyard Avenue, thence;
21) S36°03'10" W - 73.31 feet to a point being 30 feet Southeasterly from and parallel with the southeasterly line of Vineyard Avenue to a point, thence;
22) S31°43'15" W - 62.54 feet to a point, thence;
23) S27°08'50" W - 64.73 feet to a point, thence;
24) S22°41'10" W - 99.76 feet to a point on the Northeasterly line of the lands now or formerly of Stillwell, as recorded in Liber 1480, Page 318, thence;
leaving said parallel line and running along the Northeasterly line of the lands now or formerly of Stillwell the following:
25) N51°57'23" W - 51.16 feet to a point on the Southeasterly line of the Vineyard Avenue, thence;
leaving said line and running along the Southeasterly line of Vineyard Avenue the following:
26) N22°41'10" E - 92.50 feet to a point, thence;
27) N27°08'50" E - 67.10 feet to a point, thence;
28) N31°43'15" E - 64.87 feet to a point, thence;
29) N36°03'10" E - 75.00 feet to a point, thence;
30) N38°33'55" E - 77.00 feet to a point, thence;
31) N39°32'00" E - 104.34 feet to a point, thence;
32) N38°37'19" E - 163.86 feet to the point of beginning.
Containing an area of 1.269 acres, more or less.

SUBJECT TO THE RIGHTS OF PUBLIC UTILITIES OF RECORD

PARCEL "A" AND PARCEL "B" ARE SUBJECT TO AN 8' WIDE COMMON EASEMENT OR RIGHT-OF-WAY being bounded and more particularly described as follows:
I) the centerline of said easement being along EITHER the 5th course of parcel "A" or the 7th course of parcel "B", whereas both are reciprocals of the same course.

| ALTA/ACSM LAND TITLE SURVEY | Sheet 2 of 2 |
|---|---|

Prepared for Tax Map Parcels
**95.2-6-2 & 95.2-6-36**
situate in the
**Town of Lloyd**
**County of Ulster, New York**

BERNARD M. CAFFREY JR.
PROFESSIONAL LAND SURVEYOR
PROFESSIONAL LAND...
CERTIFIED TO BE CORRECT AND ACCURATE

CAFFREY AND ASSOCIATES, INC.
PROFESSIONAL · SURVEYORS · PLANNERS
28 ROUTE 33N, HAMBURG, NEW JERSEY 07419
LICENSED IN NEW YORK, NEW JERSEY AND PENNSYLVANIA    (973) 827-6600

SCALE 1"=100'   DATE: August 15, 2008    JOB No. 97-003   DRAWN BY: jbm

## EXHIBIT "B" TO SECURITY AGREEMENT
## AND FINANCING STATEMENTS

This Exhibit "B" is attached to, incorporated by reference in, and forms a part of that certain Security Agreement and Financing Statements (collectively, the "Security Documents"), executed and delivered by the Debtor in connection with the financing of the Project (as hereinafter defined) in favor of **Love Funding Corporation,** a Virginia corporation (the "Secured Party").

This Exhibit "B" refers to the following collateral, which may be now or hereafter located on the premises of, relate to, or be used in connection with, the financing, repair, ownership, management, and operation of a certain multifamily housing project known as **"Vineyard Commons at Highland"** (the "Project"), located in Lloyd, Ulster County, New York, and owned by **Vineyard Commons Holdings, LLC,** a New York limited liability company (referred to as the "Debtor"):

1.      All income, rents, profits, receipts and charges from the Project.

2.      All Accounts, Deposit Accounts, Instruments, Chattel Paper, Investment Property and Supporting Obligations, including without limitation the following: Reserve Fund for Replacement, residual receipts, and special funds; ground rents, taxes, water rents, assessments and fire and other hazard-insurance premiums; accounts receivable; operating revenue; initial operating escrow; and escrow for latent defects.

3.      All insurance and condemnation proceeds; and all inventories.

4.      All materials now owned or hereafter acquired by the Debtor and intended for the construction, reconstruction, alteration and repair of any building, structure or improvement now or hereafter erected or placed on the property described in Exhibit "A" attached hereto (the "Property"), all of which materials shall be deemed to be included within the Project immediately upon the delivery thereof to the Project.

5.      All of the walks, fences, shrubbery, driveways, fixtures, machinery, apparatus, equipment, fittings, and other goods and other personal property of every kind and description whatsoever, now owned or hereafter acquired by the Debtor and attached to or contained in and used or usable in connection with any present or future operation of the Project, including, by way of example rather than of limitation, all lighting, laundry, incinerating and power equipment; all engines, boilers, machines, motors, furnaces, compressors and transformers; all generating equipment; all pumps, tanks, ducts, conduits, wire, switches, electrical equipment and fixtures, fans and switchboards; all telephone equipment; all piping, tubing, plumbing equipment and fixtures; all heating, refrigeration, air conditioning, cooling, ventilating, sprinkling, water, power and communications equipment, systems and apparatus; all water coolers and water heaters; all fire prevention, alarm and extinguishing systems and apparatus; all cleaning equipment; all lift, elevator and escalator equipment and apparatus; all partitions, shades, blinds, awnings, screens, screen doors, storm doors, exterior and interior signs, gas fixtures, stoves, ovens, refrigerators, garbage disposals, dishwashers, cabinets, mirrors, mantles, floor coverings, carpets, rugs, draperies and other furnishings and furniture installed or to be installed or used or

usable in the operation of any part of the Project or facilities erected or to be erected in or upon the Property; and every renewal or replacement thereof or articles in substitution therefor, whether or not the same are now or hereafter attached to the Property in any manner; all except for any right, title or interest therein owned by any tenant (it being agreed that all personal property owned by the Debtor and placed by it on the Property shall, so far as permitted by law, be deemed to be affixed to the Property, appropriated to its use, and covered by each of the Security Documents to which this Exhibit is attached).

6.      All of the Debtor's right, title and interest in and to any and all judgments, awards of damages (including but not limited to severance and consequential damages), payments, proceeds, settlements or other compensation (collectively, the "Awards") heretofore or hereafter made, including interest thereon, and the right to receive the same, as a result of, in connection with, or in lieu of (i) any taking of the Property or any part thereof by the exercise of the power of condemnation or eminent domain, or the police power, (ii) any change or alteration of the grade of any street, or (iii) any other injury or decrease in the value of the Property or any part thereof (including but not limited to destruction or decrease in value by fire or other casualty), all of which Awards, rights thereto and shares therein are hereby assigned to the Secured Party, who is hereby authorized to collect and receive the proceeds thereof and to give proper receipts and acquittances therefor and to apply, at its option, the net proceeds thereof, after deducting expenses of collection, as a credit upon any portion, as selected by the Secured Party, of the indebtedness secured by the Security Documents.

7.      All of the Debtor's right, title and interest in and to any and all payments, proceeds, settlements or other compensation heretofore or hereafter made, including any interest thereon, and the right to receive the same from any and all insurance policies covering the Property or any portion thereof, or any of the other property described herein.

8.      The interest of the Debtor in and to all of the rents, royalties, issues, profits, revenues, income and other benefits of the Property, or arising from the use or enjoyment of all or any portion thereof, or from any lease or agreement pertaining thereto, and all right, title and interest of the Debtor in and to, and remedies under, all contract rights, accounts receivable and general intangibles arising out of or in connection with any and all leases and subleases of the Property, or any part thereof, and of the other property described herein, or any part thereof, both now in existence or hereafter entered into, together with all proceeds (cash and non-cash) thereof; and including, without limitation, all cash or securities deposited thereunder to secure performance by the lessees of their obligations thereunder.

9.      All of the Debtor's rights, options, powers and privileges in and to (but not the Debtor's obligations and burdens under) any construction contract, architectural and engineering agreements and management contract pertaining to the construction, development, repair, operation, ownership, equipping and management of the Property and all of the Debtor's right, title and interest in and to (but not the Debtor's obligations and burdens under) all architectural, engineering and similar plans, specifications, drawings, reports, surveys, plats, permits and the like, contracts for construction, development, repair, operation, management and maintenance of, or provision of services to, the Property or any of the other property described herein, and all sewer taps and allocations, agreements for utilities, bonds and the like, all relating to the Property.

10.     All intangible personal property, accounts, licenses, permits, instruments, contract rights, chattel paper and general intangibles of the Debtor, including but not limited to cash; accounts receivable; bank accounts; certificates of deposit; securities; promissory notes; rents;

rights (if any) to amounts held in escrow; insurance proceeds; condemnation rights; deposits; judgments, liens and causes of action; warranties and guarantees.

11.     The interest of the Debtor in any cash escrow fund and in any and all funds, securities, instruments, documents and other property which are at any time paid to, deposited with, under the control of, or in the possession of the Secured Party, or any of its agents, branches, affiliates, correspondents or others acting on its behalf, which rights shall be in addition to any right of set-off or right of lien that the Secured Party may otherwise enjoy under applicable law, regardless of whether the same arose out of or relates in any way, whether directly or indirectly, to the Project located upon the Property.

12.     The interest of the Debtor in and to any and all funds created or established and held by the Trustee pursuant to any indenture of trust or similar instrument authorizing the issuance of bonds or notes for the purpose of financing the Project located upon the Property.

13.     All inventory, including raw materials, components, work-in-process, finished merchandise and packing and shipping materials.

14.     Any and all of the above arising or acquired by the Debtor or to which the Debtor may have a legal or beneficial interest in on the date hereof and at any time in the future.

15.     Any and all of the above which may become fixtures by virtue of attachment to Property.

16.     The interest of the Debtor, as lessee, in any and all of the above which may be leased by the Debtor from others.

17.     All of the records and books of account now or hereafter maintained by or on behalf of the Debtor and/or its agents and employees in connection with the Project.

18.     All names now or hereafter used in connection with the Project and the goodwill associated therewith.

19.     Any and all other collateral of the Debtor as defined in the Uniform Commercial Code adopted in the State.

20.     Proceeds, products, returns, additions, accessions and substitutions of and to any and all of the above.

**Ulster County**
**Nina Postupack**
**County Clerk**
**Kingston, NY 12401**



69 2009 00000541

Instrument Number: 2009- 00000541
As
L09 - UCC-1

Recorded On: August 03, 2009

Parties: LOVE FUNDING CORP
To
VINEYARD COMMONS HOLDINGS LLC

Recorded By: STEWART TITLE INS CO          Num Of Pages:    10

Comment:

** Examined and Charged as Follows: **

L09 - UCC-1                40.00

   Recording Charge:       40.00

09-541

** THIS PAGE IS PART OF THE INSTRUMENT **

I hereby certify that the within and foregoing was recorded in the Clerk's Office For: Ulster County,

**File Information:**                    **Record and Return To:**

Document Number: 2009- 00000541
Receipt Number: 820820
Recorded Date/Time: August 03, 2009 04:47:03P
Book-Vol/Pg: Bk-LI VI-93 Pg-59
Cashier / Station: m mpoi / Cashier Workstation 7



Nina Postupack Ulster County Clerk

## UCC FINANCING STATEMENT
### FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**A. NAME & PHONE OF CONTACT AT FILER [optional]**

**B. SEND ACKNOWLEDGMENT TO: (Name and Address)**

LOVE FUNDING CORPORATION
1250 Connecticut Avenue, NW
Suite 550
Washington, D.C. 20036
FHA# 012-35893

**FILED**
4 H 4 7 M

AUG 03 2009

NINA POSTUPACK
ULSTER COUNTY CLERK

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME – insert only one debtor name (1a or 1b) – do not abbreviate or combine names**

| 1a. ORGANIZATION'S NAME |
|---|
| VINEYARD COMMONS HOLDINGS, LLC |

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 10 Wintergreen Place | Hopewell Jct. | NY | 12533 | USA |

| 1d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID#, if any |
|---|---|---|---|---|
| | | Limited liability company | New York | ☒ NONE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME – insert only one debtor name (2a or 2b) – do not abbreviate or combine names**

| 2a. ORGANIZATION'S NAME |
|---|
| |

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. TAX ID#: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID#, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

**3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) – insert only one secured party name (3a or 3b)**

| 3a. ORGANIZATION'S NAME |
|---|
| LOVE FUNDING CORPORATION |

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1250 Connecticut Avenue, NW, Suite 550 | Washington | DC | 20036 | USA |

**4. This FINANCING STATEMENT covers the following collateral:**

See Exhibit B attached hereto and made a part hereof.

**5. ALTERNATIVE DESIGNATION [if applicable]:** ☐ LESSEE/LESSOR  ☐ CONSIGNEE/CONSIGNOR  ☐ BAILEE/BAILOR  ☐ SELLER/BUYER  ☐ AG. LIEN  ☐ NON-UCC FILING

**6.** ☒ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.   Attach Addendum [if applicable]   **7. Check to REQUEST SEARCH REPORT(S) on Debtor(s)** [ADDITIONAL FEE]   [optional] ☐ All Debtors ☐ Debtor 1 ☐ Debtor 2

**8. OPTIONAL FILER REFERENCE DATA**
File with Ulster County, New York

*Stewart Title Ins. Co.*

# UCC FINANCING STATEMENT ADDENDUM
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**9.** NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT

|  | 9a. ORGANIZATION'S NAME |  |  |
|---|---|---|---|
| OR | VINEYARD COMMONS HOLDINGS, LLC | | |
|  | 9b INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME, SUFFIX |

**10.** MISCELLANEOUS:

Either secured party may file amendments or continuations.

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**11.** ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME – insert only one name (11a or 11b) – do not abbreviate or combine names

|  | 11a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|---|
| OR | | | | | |
|  | 11b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX | |

| 11c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|---|
| | | | | | |

| 11d. TAX ID#: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 11e. TYPE OF ORGANIZATION | 11f. JURISDICTION OF ORGANIZATION | 11g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ None |

**12.** ☐ ADDITIONAL SECURED PARTY'S or ☐ ASSIGNOR S/P'S NAME – insert only one name (12a or 12b)

|  | 12a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | Secretary of Housing and Urban Development | | | |
|  | 12b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 12c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 26 Federal Plaza | New York | NY | 10278-0068 | USA |

**13.** This FINANCING STATEMENT covers ☐ timber to be cut or ☐ as-extracted collateral, or is filed as a ☐ fixture filing.

**14.** Description of real estate:

See Exhibit A attached hereto and made a part hereof.

S.95 B6 L2 & 26

**15.** Name and address of a RECORD Owner of above-described real estate (if Debtor does not have a record interest):

**16.**      Additional collateral description.

**17.** Check only if applicable and check only one box.
Debtor is a ☐ Trust or ☐ Trustee acting with respect to property held in trust or ☐ Decedent's Estate

**18.** Check only if applicable and check only one box.

☐ Debtor is a TRANSMITTING UTILITY

☐ Filed in connection with a Manufactured-Home Transaction – effective 30 years

☐ Filed in connection with a Public-Finance Transaction – effective 30 years

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT ADDENDUM (FORM UCC1AD) (rev. 07/29/98)

ALTA LOAN POLICY (6/17/06)

## SCHEDULE A DESCRIPTION

File No.:   ST08-02276                              Policy No.:   M-8912-793630

### PARCEL A

ALL that certain plot, piece or parcel of land situate in the Town of Lloyd, County of Ulster and State of New York, bounded and more particularly described as follows:

BEGINNING at a point on the Southeasterly line of Vineyard Avenue, AKA Route 44/55, said point being the intersection of the Southeasterly line of Vineyard Avenue with the Southwesterly line of the lands now or formerly of Highland Real Estate Ventures, LLC, as recorded in Liber 3099, Page 187 generally along the remains of a stonewall the following:

S 44°37'43" E - 156.89 feet to a point, thence;
S 45°49'00" E - 316.73 feet to a point, thence;
S 47°21'16" E - 290.54 feet to an iron rod found in the centerline of a stonewall, thence; leaving said line and running along the Northwesterly line of the lands now or formerly of Vineyard Avenue Development, LLC, as recorded in Instrument Number 2006-00028968, the following:
S 38°38'28" W - 166.50 feet to a point, thence;
leaving said line and running along the Northeasterly line of the lands of Vineyard Avenue Development, LLC, the following:
N 46°06'32" W - 764.04 feet along the centerline of an 8 foot wide easement and right-of-way to a point, thence;
leaving said line and running along the Southeasterly line of Vineyard Avenue the following:
N 38°37'19" E - 165.86 feet to the point of beginning.
Containing an area of 2.838 acres, more or less. The above herein described parcel also being known as Tax Lot 95.2-6-36 as shown on the current tax maps of the Town of Lloyd.

Being the same premises conveyed to Vineyard Avenue Development, LLC by deed from Henriques/Irvine dated June 27, 2008 and recorded in the Ulster County Clerks Office on July 1, 2008 in Instrument No. 2008-00012290.

WITH THE EXCEPTION therefrom a parcel containing 3463.73 square feet, lying within the right of way lines of Vineyard Avenue, (aka State Route 44/55) about to be acquired by the State of New York. Said 3463.73 square feet parcel being known as Parcel No. 90, Map No. 71, situate in the Town of Lloyd, County of Ulster, State of New York, as shown on a map entitled, "New York State, Department of Transportation, Acquisition Map, Highland-Gardiner, Part 1, S.H. NO. 350, about to be filed in the Regional Office of the NYSDOT. The intention of this exception is to convey any and all of the land lying within said right of way, including all the rights, title, and interest to any portion thereof, to the State of New York.

### PARCEL B

ALL that certain plot, piece or parcel of land situate in the Town of Lloyd, County of Ulster and State of New York, bounded and more particularly described as follows:

BEGINNING at a point on the Southeasterly line of Vineyard Avenue, AKA Route 44/55, said point being the intersection of the Southeasterly line of Vineyard Avenue with the Northeasterly line of lands now or formerly of

Stillwell, as recorded in Liber 1430 Page 318 and running thence along the Southerly line of Vineyard Avenue, the following:

ALTA LOAN POLICY (6/17/06)
N22°41'10" E - 92.50 feet to a point, thence;
N27°08'50" E - 67.10 feet to a point, thence;
N31°43.15" E - 64.87 feet to a point, thence;
N36°03'10" E - 75.00 feet to a point, thence;
N38°33'55" E - 77.40 feet to a point, thence;
N39°32'00".E - 104.34 feet to a point, thence;
leaving said line and running along the Southwesterly line of lands now or formerly of Vineyard Avenue
Development, LLC, as recorded in Instrument No. 2008-00012290 the following:
S 46°06'32" E - 764.04 feet, along the centerline of an 8 foot wide casement and right-of-way to a point, thence;
leaving said line and running along the Southeasterly line of lands now or formerly of Vineyard Avenue Development,
LLC the following:
N 38°38'28" E - 166.50 feet to an iron rod found in the centerline of a stonewall on the Southwesterly line of the lands
now or formerly of Highland Real Estate. Ventures, LLC, as recorded in Liber 3099, Page 187, thence;
leaving said line and running along the Southwesterly line of the lands now or formerly of Highland Real Estate
Ventures, LLC, generally along the remains of a stonewall the following:
S47°21'16" E – 242.23 feet to a point, thence;
S56°30'10" E - 58.30 feet to a point, thence;
S41°09'49" E - 50.87 feet to a point in the Twaalfskill Creek, thence;
leaving said line and running along the Northwesterly line of lands now or formerly of Roberto, as recorded in Liber 821
Page 52, generally through the Twaalfakill Creek the following:
S31°46'40" W - 236.86 feet to a point, thence;
S34°42'48" W - 277.50 feet to a point, thence;
S29°10'30" W - 29.30 feet to a point, thence;
S33°47'25" W - 47.40 feet to a point, thence;
continuing along said line in part through the Twaalfakill Creek, then in part passing over the Northwesterly bank of said
creek and continuing generally along the remains of a stonewall the following:
S33°57'07" W - 568.40 feet to a point on the Northerly bank of the Twaalfakill Creek at the intersection of a stonewall if
projected, thence;
leaving said line and running along the Northeasterly line of the lands now or formerly of Bozydaj, as recorded in Liber
1310 Page 368, generally along the remains of a stonewall the following:
N46°24'16" W - 325.00 feet to a point at the intersection of a stonewall, thence;
continuing along said line the following:
N45°52'16" W - 536.62 feet to a point thence;
leaving said line and running along the Southeasterly line of lands now or formerly of Reina, as recorded in Liber 1574
Page 166, the following:
N34°08'07" E - 138.00 feet to a point, thence;
leaving said line and running along the Northeasterly line of the lands now or formerly of Reina the following:
N55°51'53" W - 15.20 feet to an iron pipe found, thence;
leaving said line and running along the Southeasterly line of lands now or formerly of Coppola, as recorded in Liber 3937
Page 59, the following:

N36°56'32" E - 249.33 feet to a point, thence;
leaving said line and running along the Southeasterly line of lands now or formerly of Stillwell the following:
N32°32'14" E - 140.00 feet to a point, thence;
leaving said line and running along the Northeasterly line of the lands now or formerly of Stillwell the following:
N51°37'23" W - 258.52 feet to a point on the southeasterly side of Vineyard Avenue and the point of beginning.

The above herein described parcel also being known as Tax Lot 95.2-6-2 as shown on the current tax maps of the Town
of Lloyd.

Being the same premises conveyed to Vineyard Avenue Development, LLC by deed from Ultra Craft Homes, Inc. dated
November 7, 2006, and recorded in the Ulster County Clerk's Office on November 27, 2006 in Instrument No. 2006-
00028968.

ALTA LOAN POLICY (6/17/06)

**PARCEL "B" IS SUBJECT TO A 20 FOOT WIDE EASEMENT OR RIGHT-OF-WAY** to rear of barn to enable owner of barn to have access to the basement of said barn, as set forth and recorded in Liber 1515 Page 21 and in Liber 1480 Page 318, being bounded and more particularly described as follows:

BEGINNING at a point on the Southeasterly line of Vineyard Avenue, aka Route 44/55, said point being the intersection of the Southeasterly line of Vineyard Avenue with the Northeasterly line of the lands now or formerly of Stillwell, as recorded in Liber 1480 Page 318 and running thence along the Southeasterly line of Vineyard Avenue the following:
N22°41'10" E - 20.77 feet to a point, thence;
leaving said line and running over and through the lands of the above herein described parcel "B" the following:
S51°37'23" E - 282.20 feet to a point, thence;
S32°32'14" W - 160.46 feet to a point, thence;
N50°36'23" W - 20.14 feet to a point, thence;
leaving said line and running along the Southeasterly line of lands now or formerly of Stillwell, the following:
N32°32'14" E - 140.00 feet to a point, thence;
leaving said line and running along the Northeasterly lines of lands now or formerly of Stillwell, the following:
N51°37'23" W - 258.52 feet to a point on the southeasterly side of Vineyard Avenue and
the point of beginning.

**PARCEL "A" AND PARCEL "B" ARE SUBJECT TO A 30 FOOT WIDE PUBLIC UTILITY EASEMENT** being bounded and more particularly described as follows:

BEGINNING at a point on the Southeasterly line of Vineyard Avenue, aka Route 44/55, said point being the intersection of the Southeasterly line of Vineyard Avenue and the Southwesterly line of lands now or formerly of Highland Real Estate Ventures, LLC, as recorded in Liber 3099, Page 187 the following:
S44°37'43" E - 30.21 feet to a point, thence;
leaving said line and running Southwesterly, 30 feet Southeasterly and parallel with the Southeasterly line of Vineyard Avenue and along the Northwesterly line of parcel "A" the following:
S38°37'19" W - 162.54 feet to a point, thence;
leaving said line and running Southwesterly, 30 feet Southeasterly and parallel with the Southeasterly line of Vineyard Avenue, over and through the lands of parcel "B" the following:
S39°32'00" W - 104.33 feet to a point, thence;
S38°33'35" W - 25.47 feet to a point, thence;
leaving said parallel line and continuing through the lands of parcel "B" the following:

S02°33'00" W - 127.59 feet to a point, thence;
S11°27'00" E - 61.10 feet to a point, thence;
S52°27'00" E - 238.83 feet to a point, thence;
S05°27'00" E - 85.47 feet to a point, thence;
S39°33'00" W - 191.14 feet to a point, thence;
S14°27'00" E - 313.00 feet to a point, thence;
N84°38'00" E - 80.48 feet to a point, thence;
S50°27'00" E - 38.00 feet to a point, thence;
S31°33'00" W - 40.00 feet to a point, thence;

N83°57'00" W - 110.00 feet to a point, thence;
N14°27'00" W - 361.00 feet to a point, thence;
N39°33'00" E - 194.00 feet to a point, thence;
N05°27'00" W - 60.00 feet to a point, thence;
N52°27'00" W - 237.00 feet to a point, thence;
N11°27'00" W - 76.00 feet to a point, thence;
N02°33'00" E - 90.00 feet to a point being 30 feet Southeasterly from the Southeasterly line of Vineyard Avenue, thence;
S36°03'10" W - 73.21 feet to a point being 30 feet Southeasterly from and parallel with the southeasterly line of Vineyard Avenue to a point, thence;
S31°43'15" W - 62.54 feet to a point, thence:

ALTA LOAN POLICY (6/17/06)

S27°08'50" W - 64.73 feet to a point, thence;

S22°41'10" W - 99.76 feet to a point on the Northeasterly line of the lands now or formerly of Stillwell, as recorded in Liber 1480, Page 318, thence;

leaving said parallel line and running along the Northeasterly line of the lands now or formerly of Stillwell the following:

N51°37'23" W - 31.16 feet to a point on the Southeasterly line of the Vineyard Avenue, thence;

leaving said line and running along the Southeasterly line of Vineyard Avenue the following:

N22°41'10" E - 92.50 feet to a point, thence;

N27°08'50" E - 67.10 feet to a point, thence;

N31°43'15" E - 64.87 feet to a point, thence;

N36°03'10" E - 75.00 feet to a point, thence;

N38°33'55" E - 77.40 feet to a point, thence;

N39°32'00" E - 104.34 feet to a point, thence;

N38°37'19" E - 165.86 feet to the point of beginning.

## SUBJECT TO THE RIGHTS OF PUBLIC UTILITIES OF RECORD

**PARCEL "A" AND PARCEL "B" ARE SUBJECT TO AN 8' WIDE COMMON EASEMENT OR RIGHT-OF-WAY** being bounded and more particularly described as follows:

the centerline of said easement being along EITHER the 5th course of parcel "A" or the 7th course of parcel "B", whereas both are reciprocals of the same course.

## EXHIBIT "B" TO SECURITY AGREEMENT
## AND FINANCING STATEMENTS

This Exhibit "B" is attached to, incorporated by reference in, and forms a part of that certain Security Agreement and Financing Statements (collectively, the "Security Documents"), executed and delivered by the Debtor in connection with the financing of the Project (as hereinafter defined) in favor of **LOVE FUNDING CORPORATION**, a Virginia corporation (the "Secured Party").

This Exhibit "B" refers to the following collateral, which may be now or hereafter located on the premises of, relate to, or be used in connection with, the construction, financing, repair, ownership, management, and operation of a certain multifamily housing project known as **"Vineyard Commons at Highland"** (the "Project"), located in Lloyd, Ulster County, New York and owned by **VINEYARD COMMONS HOLDINGS, LLC** (referred to as the "Debtor"):

1.    All income, rents, profits, receipts and charges from the Project.

2.    All Accounts, Deposit Accounts, Instruments, Chattel Paper, Investment Property and Supporting Obligations, including without limitation the following: Reserve Fund for Replacement, residual receipts, and special funds; ground rents, taxes, water rents, assessments and fire and other hazard-insurance premiums; accounts receivable; operating revenue; initial operating escrow; and escrow for latent defects.

3.    All insurance and condemnation proceeds; and all inventories.

4.    All materials now owned or hereafter acquired by the Debtor and intended for the construction, reconstruction, alteration and repair of any building, structure or improvement now or hereafter erected or placed on the property described in Exhibit "A" attached hereto (the "Property"), all of which materials shall be deemed to be included within the Project immediately upon the delivery thereof to the Project.

5.    All of the walks, fences, shrubbery, driveways, fixtures, machinery, apparatus, equipment, fittings, and other goods and other personal property of every kind and description whatsoever, now owned or hereafter acquired by the Debtor and attached to or contained in and used or usable in connection with any present or future operation of the Project, including, by way of example rather than of limitation, all lighting, laundry, incinerating and power equipment; all engines, boilers, machines, motors, furnaces, compressors and transformers; all generating equipment; all pumps, tanks, ducts, conduits, wire, switches, electrical equipment and fixtures, fans and switchboards; all telephone equipment; all piping, tubing, plumbing equipment and fixtures; all heating, refrigeration, air conditioning, cooling, ventilating, sprinkling, water, power and communications equipment, systems and apparatus; all water coolers and water heaters; all fire prevention, alarm and extinguishing systems and apparatus; all cleaning equipment; all lift, elevator and escalator equipment and apparatus; all partitions, shades, blinds, awnings, screens, screen doors, storm doors, exterior and interior signs, gas fixtures, stoves, ovens, refrigerators, garbage disposals, dishwashers, cabinets, mirrors, mantles, floor coverings, carpets, rugs, draperies and other furnishings and furniture installed or to be installed or used or usable in the operation of any part of the Project or facilities erected or to be erected in or upon the

5

Property; and every renewal or replacement thereof or articles in substitution therefor, whether or not the same are now or hereafter attached to the Property in any manner; all except for any right, title or interest therein owned by any tenant (it being agreed that all personal property owned by the Debtor and placed by it on the Property shall, so far as permitted by law, be deemed to be affixed to the Property, appropriated to its use, and covered by each of the Security Documents to which this Exhibit is attached).

6.     All of the Debtor's right, title and interest in and to any and all judgments, awards of damages (including but not limited to severance and consequential damages), payments, proceeds, settlements or other compensation (collectively, the "Awards") heretofore or hereafter made, including interest thereon, and the right to receive the same, as a result of, in connection with, or in lieu of (i) any taking of the Property or any part thereof by the exercise of the power of condemnation or eminent domain, or the police power, (ii) any change or alteration of the grade of any street, or (iii) any other injury or decrease in the value of the Property or any part thereof (including but not limited to destruction or decrease in value by fire or other casualty), all of which Awards, rights thereto and shares therein are hereby assigned to the Secured Party, who is hereby authorized to collect and receive the proceeds thereof and to give proper receipts and acquittances therefor and to apply, at its option, the net proceeds thereof, after deducting expenses of collection, as a credit upon any portion, as selected by the Secured Party, of the indebtedness secured by the Security Documents.

7.     All of the Debtor's right, title and interest in and to any and all payments, proceeds, settlements or other compensation heretofore or hereafter made, including any interest thereon, and the right to receive the same from any and all insurance policies covering the Property or any portion thereof, or any of the other property described herein.

8.     The interest of the Debtor in and to all of the rents, royalties, issues, profits, revenues, income and other benefits of the Property, or arising from the use or enjoyment of all or any portion thereof, or from any lease or agreement pertaining thereto, and all right, title and interest of the Debtor in and to, and remedies under, all contract rights, accounts receivable and general intangibles arising out of or in connection with any and all leases and subleases of the Property, or any part thereof, and of the other property described herein, or any part thereof, both now in existence or hereafter entered into, together with all proceeds (cash and non-cash) thereof; and including, without limitation, all cash or securities deposited thereunder to secure performance by the lessees of their obligations thereunder.

9.     All of the Debtor's rights, options, powers and privileges in and to (but not the Debtor's obligations and burdens under) any construction contract, architectural and engineering agreements and management contract pertaining to the construction, development, repair, operation, ownership, equipping and management of the Property and all of the Debtor's right, title and interest in and to (but not the Debtor's obligations and burdens under) all architectural, engineering and similar plans, specifications, drawings, reports, surveys, plats, permits and the like, contracts for construction, development, repair, operation, management and maintenance of, or provision of services to, the Property or any of the other property described herein, and all sewer taps and allocations, agreements for utilities, bonds and the like, all relating to the Property.

10.    All intangible personal property, accounts, licenses, permits, instruments, contract rights, chattel paper and general intangibles of the Debtor, including but not limited to cash; accounts receivable; bank accounts; certificates of deposit; securities;

6

promissory notes; rents; rights (if any) to amounts held in escrow; insurance proceeds; condemnation rights; deposits; judgments, liens and causes of action; warranties and guarantees.

11.    The interest of the Debtor in any cash escrow fund and in any and all funds, securities, instruments, documents and other property which are at any time paid to, deposited with, under the control of, or in the possession of the Secured Party, or any of its agents, branches, affiliates, correspondents or others acting on its behalf, which rights shall be in addition to any right of set-off or right of lien that the Secured Party may otherwise enjoy under applicable law, regardless of whether the same arose out of or relates in any way, whether directly or indirectly, to the Project located upon the Property.

12.    The interest of the Debtor in and to any and all funds created or established and held by the Trustee pursuant to any indenture of trust or similar instrument authorizing the issuance of bonds or notes for the purpose of financing the Project located upon the Property.

13.    All inventory, including raw materials, components, work-in-process, finished merchandise and packing and shipping materials.

14.    Any and all of the above arising or acquired by the Debtor or to which the Debtor may have a legal or beneficial interest in on the date hereof and at any time in the future.

15.    Any and all of the above which may become fixtures by virtue of attachment to Property.

16.    The interest of the Debtor, as lessee, in any and all of the above which may be leased by the Debtor from others.

17.    All of the records and books of account now or hereafter maintained by or on behalf of the Debtor and/or its agents and employees in connection with the Project.

18.    All names now or hereafter used in connection with the Project and the goodwill associated therewith.

19.    Any and all other collateral of the Debtor as defined in the Uniform Commercial Code adopted in the State.

20.    Proceeds, products, returns, additions, accessions and substitutions of and to any and all of the above.

807051

# UCC FINANCING STATEMENT AMENDMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
Lori Hoffer 212-238-3242

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

    Emmet, Marvin & Martin, LLP
    120 Broadway, 33rd Floor
    New York, NY 10271

FILED
11 H 93 M
FEB 2 3 2012
NINA POSTUPACK
ULSTER COUNTY CLERK

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|
| 2009-00000541   Filed 8/3/09 | |

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ ASSIGNMENT (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. AMENDMENT (PARTY INFORMATION): This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.
☐ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c.   ☐ DELETE name: Give record name to be deleted in item 6a or 6b.   ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Secretary of Housing and Urban Development of Washington, D.C. | | | |
| OR 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 451 Seventh Street, SW | Washington | DC | 20410 | USA |

| 7d. TAX ID #:  SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION  Gov't | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any  ☐ NONE |
|---|---|---|---|---|

8. AMENDMENT (COLLATERAL CHANGE): check only one box.
Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☒ assigned.

    All collateral as described in the initial financing statement is assigned to assignee.

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment).  If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Love Funding Corporation | | | |
| OR 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA
Debtor: Vineyard Commons Holdings, LLC  FHA No. 012-36593    Ulster County, New York

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 07/29/98)

12-75

# UCC FINANCING STATEMENT AMENDMENT ADDENDUM

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

11. INITIAL FINANCING STATEMENT FILE # (same as Item 1a on Amendment form)

**2009-00000541 Filed 8/3/09**

12. NAME OF PARTY AUTHORIZING THIS AMENDMENT (same as Item 9 on Amendment form)

OR | 12a. ORGANIZATION'S NAME
**Love Funding Corporation**

| 12b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME,SUFFIX |

13. Use this space for additional information

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY



**Ulster County**
**Nina Postupack**
**County Clerk**
**Kingston, NY 12401**

59 2012 00000431

Volm-128 Pg-45

Instrument Number: 2012-00000431
As
**Recorded On:** September 11, 2012    **L10 - UCC-3**

**Parties:** SECRETARY OF HOUSING&URBAN DEV
To
TNHYIF INC

**Recorded By:** NEW YORK TITLE    **Num Of Pages:**   **3**
**Comment:**

** Examined and Charged as Follows: **

| L10 - UCC-3 | 40.00 |
| Recording Charge: | 40.00 |

12 – 431

** THIS PAGE IS PART OF THE INSTRUMENT **

I hereby certify that the within and foregoing was recorded in the Clerk's Office For: Ulster County,

**File Information:**                    **Record and Return To:**
  Document Number: 2012-00000431
  Receipt Number: 1187171
  Recorded Date/Time: September 11, 2012 12:13:33P
  Book-Vol/Pg: Bk-LI VI-128 Pg-45
  Cashier / Station: s smar / Cashier Workstation 6



Nina Postupack Ulster County Clerk

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

Kenneth Jurist, Esq.

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

Cuddy & Feder LLP
445 Hamilton Avenue, 14th Floor
White Plains, New York 10601
Attention: Kenneth Jurist, Esq.

NYT 15762

**FILED**
12 H 13 M

SEP 1 1 2012

Nina Postupack
Ulster County Clerk

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|
| 2009-00000541  filed  8/5/09 | ☑ |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☑ **ASSIGNMENT** (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. **AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor  or ☐ Secured Party of record. Check only one of these two boxes.

Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

| ☐ CHANGE name and/or address: Please refer to the detailed instructions in regards to changing the name/address of a party. | ☐ DELETE name: Give record name to be deleted in item 6a or 6b. | ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7e-7g (if applicable). |
|---|---|---|

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| TNHYIF Inc. | | | |
| OR 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 44 South Broadway, 10th Floor | White Plains | NY | 10601 | USA |

| 7d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | Corporation | Maryland | D13573100 | ☐ NONE |

8. **AMENDMENT (COLLATERAL CHANGE):** check only one box.

Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment. If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Secretary of Housing and Urban Development of Washington, D.C. | | | |
| OR 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA

Debtor: Vineyard Commons Holdings, LLC; Ulster County, New York

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 05/22/02)

✓New York Title

# EXHIBIT H

Vineyard Commons
2 Merlot Drive
Highland, New York 12528
June 8, 2012

Dear Resident:

This letter is to inform you that effective July 2012 there are two changes to our monthly rent procedures. First, your rent payment check/money order is to be made out to <u>Vineyard Commons Apartments, Inc.</u> Secondly, starting July 2012 residents who mail their rent checks need to mail them to the new mailing address below.

Please update your records to replace our previous address:

Vineyard Commons
6 Merlot Drive, Suite 642
Highland, NY 12528

with the following new address:

**Vineyard Commons Apartments, Inc.**
**1955 Central Park Ave- Box 400**
**Yonkers, NY 10710**

Please feel free to continue to use the secured drop box located in the club house for monthly rent payments. The code to the clubhouse door is 1621.

Thank you for your prompt attention to this matter.

Sincerely,

Management

# EXHIBIT I

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF ULSTER**

---

TNHYIF, INC.,
          Plaintiff(s),

vs.                                    **Index No. 12 - 3216**

**VINEYARD COMMONS HOLDINGS, LLC, WORKERS'**
**COMPENSATION BOARD OF THE STATE OF NEW**
**YORK, NEW YORK STATE DEPARTMENT OF LABOR,**
**VINEYARD COMMONS CLUBHOUSE, INC., VINEYARD**
**COMMONS APARTMENTS INC., et al**
          Defendant(s),

---

AFFIDAVIT OF SERVICE

STATE OF NEW YORK )
COUNTY OF ALBANY  )

        KEITH J. CHRISTIANSEN, being duly sworn, deposes and says that: he is over the age of eighteen (18) years, is not a party to the action herein and resides in Voorheesville, NY. That on the 5th day of October 2012, at 3:10 p.m., he served the SUMMONS, VERIFIED COMPLAINT, AMENDED VERIFIED COMPLAINT, ORDER APPOINTING RECEIVER, AMENDED ORDER APPOINTING RECEIVER, AFFIRMATION OF KENNETH JURIST, TOGETHER WITH EXHIBITS A THROUGH D, NOTICE OF PENDENCY, REQUEST FOR JUDICIAL INTERVENTION, the above action, upon VINEYARD COMMONS APARTMENTS INC., by delivering two true copies thereof, together with the statutory fee of $40 to the New York State Department of State, pursuant to Section 306 of the Business Corporation Law of the State of New York.

Location of Service: 99 Washington Avenue, Albany, NY.
Manner of Service: By Donna Christie, Clerk authorized to accept service.
Description of Person Served: sex: female, age: 50, skin color: white, height: 5'5",
        Weight: 150, hair color: light.

                                        Keith J. Christiansen

Sworn to before me this
5th day of October 2012

JANE CHRISTIANSEN
Notary Public, State of New York
No. 01CH6196916
Qualified in Albany County
Commission Expires November 17, 20/6

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF ULSTER**

---

**TNHYIF, INC.,**
              Plaintiff(s),

              vs.                                    **Index No. 12 - 3216**

**VINEYARD COMMONS HOLDINGS, LLC, WORKERS'**
**COMPENSATION BOARD OF THE STATE OF NEW**
**YORK, NEW YORK STATE DEPARTMENT OF LABOR,**
**VINEYARD COMMONS CLUBHOUSE, INC., VINEYARD**
**COMMONS APARTMENTS INC., et al**
              Defendant(s),

---

AFFIDAVIT OF SERVICE

STATE OF NEW YORK  )
COUNTY OF ALBANY   )

        KEITH J. CHRISTIANSEN, being duly sworn, deposes and says that: he is over the age of eighteen (18) years, is not a party to the action herein and resides in Voorheesville, NY. That on the 5th day of October 2012, at 3:10 p.m., he served the SUMMONS, VERIFIED COMPLAINT, AMENDED VERIFIED COMPLAINT, ORDER APPOINTING RECEIVER, AMENDED ORDER APPOINTING RECEIVER, AFFIRMATION OF KENNETH JURIST, TOGETHER WITH EXHIBITS A THROUGH D, NOTICE OF PENDENCY, REQUEST FOR JUDICIAL INTERVENTION, the above action, upon VINEYARD COMMONS HOLDINGS, LLC, by delivering two true copies thereof, together with the statutory fee of $40 to the New York State Department of State, pursuant to Section 303 of the Limited Liability Company Law of the State of New York.

Location of Service:  99 Washington Avenue, Albany, NY.
Manner of Service: By Donna Christie, Clerk authorized to accept service.
Description of Person Served:  sex: female, age: 50, skin color: white, height: 5'5",
        Weight: 150, hair color: light.

                                                        _____
                                                        Keith J. Christiansen

Sworn to before me this
5th day of October 2012

_____
JANE CHRISTIANSEN
Notary Public, State of New York
No. 01CH6196916
Qualified in Albany County
Commission Expires November 17, 20 16

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF ULSTER**

---

TNHYIF, INC.,
        Plaintiff(s),

    vs.                           **Index No. 12 - 3216**

VINEYARD COMMONS HOLDINGS, LLC, WORKERS'
COMPENSATION BOARD OF THE STATE OF NEW
YORK, NEW YORK STATE DEPARTMENT OF LABOR,
VINEYARD COMMONS CLUBHOUSE, INC., VINEYARD
COMMONS APARTMENTS INC., et al
        Defendant(s),

---

AFFIDAVIT OF SERVICE

STATE OF NEW YORK )
COUNTY OF ALBANY  )

    KEITH J. CHRISTIANSEN, being duly sworn, deposes and says that: he is over the age of eighteen (18) years, is not a party to the action herein and resides in Voorheesville, NY. That on the 5th day of October 2012, at 3:10 p.m., he served the SUMMONS, VERIFIED COMPLAINT, AMENDED VERIFIED COMPLAINT, ORDER APPOINTING RECEIVER, AMENDED ORDER APPOINTING RECEIVER, AFFIRMATION OF KENNETH JURIST, TOGETHER WITH EXHIBITS A THROUGH D, NOTICE OF PENDENCY, REQUEST FOR JUDICIAL INTERVENTION, the above action, upon VINEYARD COMMONS CLUBHOUSE, INC., by delivering two true copies thereof, together with the statutory fee of $40 to the New York State Department of State, pursuant to Section 306 of the Business Corporation Law of the State of New York.

Location of Service: 99 Washington Avenue, Albany, NY.
Manner of Service: By Donna Christie, Clerk authorized to accept service.
Description of Person Served: sex: female, age: 50, skin color: white, height: 5'5",
        Weight: 150, hair color: light.

                                                      Keith J. Christiansen

Sworn to before me this
5th day of October 2012

JANE CHRISTIANSEN
Notary Public, State of New York
No. 01CH6196916
Qualified in Albany County
Commission Expires November 17, 20 _16_

# EXHIBIT J

# CUDDY& FEDER LLP

445 Hamilton Avenue, 14th Floor
White Plains, New York 10601
Tel 914.761.1300   Fax 914.761.5372
www.cuddyfeder.com

October 16, 2012

<u>Via Facsimile – 845-230-7918 & email – weis@sayeghlaw.com</u>
Robert A. Weis, Esq.
The Law Firm of William G. Sayegh P.C.
65 Gleneida Avenue
Carmel, NY 10512

<u>Via Facsimile - 845-635-8807 & email – damon_velardi@vastilaw.com</u>
Damon Velardi, Esq.
Vasti & Vasti PC
1733 Main Street, Route 44
Pleasant Valley, NY

Re: TNHYIF Inc. v. Vineyard Commons Holdings, LLC et al
    Index No. 12-3216

Dear Mr. Weis & Mr. Velardi:

As you know, we represent Plaintiff in connection with the above-referenced action.

Please be advised that we intend to present the Hon. Christopher E. Cahill, JSC with an Order to Show Cause containing a TRO against your clients and other parties.   The TRO will request an Order enjoining Vineyard Commons Apartments, & Vineyard Commons Clubhouse and Defendant Vineyard Commons Holdings, LLC from interfering with the Receiver's right to collect all rents, profits and income from the mortgaged property, including but not limited to rents from any and all subtenants and/or occupants of the mortgage premises, and will seek to enjoin your clients, Vineyard Commons Holdings, anyone acting on their behalf, and Highland One, Inc. from interfering in any way with the Receiver's right and authority to take complete charge over and enter into possession of the subject mortgaged property, including the restaurant, lounge areas, patio, lobby, and theatre. Lastly, the TRO will seek an Order directing Vineyard Commons Holdings, Vineyard Commons Apartments, Vineyard Commons Clubhouse, as well as Trifont Liberty Management and Mark J. Fonte to immediately turn over to the Receiver all security deposits for the subject mortgaged property and deliver to him all documentation as required by the previously issued Receiver's Order.

We intend to present the Order to Show Cause before Justice Cahill on Wednesday, October 17 at 11 a.m.

Very truly yours,

Joshua E. Kimerling
JEK/cdn

C&F: 2011935.2

**ATTORNEYS AT LAW**   White Plains   Fishkill   New York City   Stamford

# CUDDY&
# FEDER'''

Page -2-
October 16, 2012

cc:    <u>Via Federal Express</u>
       Vineyard Commons Holdings, LLC
       10 Wintergreen Place
       Hopewell Junction, New York 12553

       Trifont Liberty Management and Mark J. Fonte
       1955 Central Park Avenue
       Yonkers, New York 10710

       Andrew Zweben, Esq., Receiver (by email)

C&F: 2011935.2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ULSTER
--------------------------------------------------------------X
TNHYIF, INC.,

                                     Plaintiff,

      -against-

VINEYARD COMMONS HOLDINGS, LLC,
WORKERS' COMPENSATION BOARD OF THE
STATE OF NEW YORK, NEW YORK STATE
DEPARTMENT OF LABOR, VINEYARD COMMONS
CLUBHOUSE, INC., VINEYARD COMMONS
APARTMENTS INC., and "JOHN DOE NO. 1" through
"JANE DOE NO. 12", the last twelve names being
fictitious and unknown to Plaintiff, the persons or parties
intended being tenants, occupants, persons or
corporations, if any, having or claiming an interest in or
lien upon the Premises, described in the Complaint,
                                    Defendants.
--------------------------------------------------------------X

**AFFIDAVIT OF SERVICE**

Index No.: 12-3216

STATE OF NEW YORK      )
                            ) ss.:
COUNTY OF WESTCHESTER  )

      RITA MANZIONE, being duly sworn says:  I am not a party to this action, am over 18
years of age, and reside in New Paltz, NY.

      On October 18, 2012, I served the Order to Show Cause dated October 17, 2012 Signed
by the Hon. Christopher E. Cahill, J.S.C., Affirmation in Opposition to Motion to Modify Order
Appointing Receiver and in Support of Cross-Motion, together with Exhibits A-J by FEDERAL
EXPRESS addressed to the last known address of the addressee as indicated below:

Vineyard Commons Holdings, LLC
10 Wintergreen Place
Hopewell Junction, New York 12533

Trifont Liberty Management
1955 Central Park Avenue
Yonkers, New York 10710

Highland One, Inc.
c/o Vasti & Vasti, PC
1733 Main Street, Route 44
Pleasant Valley, NY 12569

                                        _____
                                        RITA MANZIONE

Sworn to before me this
18th day of October 2012

_____
Notary Public

PATRICIA A. CUDDIHY
Notary Public, State of New York
No. 01CU5085638
Qualified in Putnam County
Commission expires September 2, 2013

C&F: 2014733.1